UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED WHOLESALE MORTGAGE,
LLC,

       Plaintiff,

v.

MADISON ATRENA LLC d/b/a
DISTRICT LENDING,

       Defendant.

Case No. 23-13176
Honorable Laurie J. Michelson

---

## OPINION AND ORDER DENYING DISTRICT LENDING'S MOTION TO DISMISS [19]

In 2021, United Wholesale Mortgage, a wholesale mortgage lender, announced a new "initiative" to its mortgage broker partners, including District Lending: to continue working with us, you must stop working with two of our competitors, Rocket Mortgage and Fairway Mortgage. At the time of the announcement, UWM and District Lending had been working together for two years—and they continued working together without issue for another two years. But in January 2023, District Lending resumed submitting loans to Rocket and/or Fairway. So UWM sued District Lending for breach of contract. District Lending, however, takes the position that it never agreed to the amended terms—in effect, that UWM tried but failed to modify the parties' original contract to add the Rocket/Fairway prohibition. So District Lending moved to dismiss UWM's complaint under Federal Rule of Civil Procedure 12(b)(6).

District Lending's motion is fully briefed (ECF Nos. 21, 22) and does not require further argument, *see* E.D. Mich. LR 7.1(f). Because UWM plausibly alleges that District Lending agreed to the amended agreement, and later breached it by submitting loans to prohibited lenders, the Court will deny District Lending's motion to dismiss.

## I.

To survive a Rule 12(b)(6) motion to dismiss, a complaint must contain "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Heinrich v. Waiting Angels Adoption Servs., Inc.*, 668 F.3d 393, 403 (6th Cir. 2012) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "This standard does not require 'detailed factual allegations.'" *HDC, LLC v. City of Ann Arbor*, 675 F.3d 608, 614 (6th Cir. 2012). But "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). In short, to avoid dismissal, the plaintiff's well-pled factual allegations must "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Mattera v. Baffert*, 100 F.4th 734, 739 (6th Cir. 2024) (alteration in original) (quoting *Iqbal*, 556 U.S. at 679).

Generally, whether a plaintiff has sufficiently pled its claims depends on the factual allegations within the four corners of the plaintiff's complaint. *See Caraway v. Corecivic of Tenn., LLC*, 98 F.4th 679, 687–88 (6th Cir. 2024); Fed. R. Civ. P. 12(d). But exhibits attached to a complaint may be considered on a motion to dismiss when they are referenced in the complaint and central to the plaintiff's claims. *See Bassett*

*v. NCAA*, 528 F.3d 426, 430 (6th Cir. 2008). UWM's complaint attaches the relevant contracts (ECF Nos. 17-1, 17-2), and their centrality to UWM's breach of contract claim goes without saying. So the Court considers them in evaluating District Lending's motion.

Now for those facts as alleged in the operative complaint.

## II.

When shopping for a mortgage, homebuyers have two basic options: go directly to a retail mortgage lending institution (like a bank) and apply for a loan, or hire an intermediary (like a mortgage broker) to compare wholesale lender and loan options on the borrowers' behalf. (*See* ECF No. 17, PageID.93.) In other words, there are two main channels for residential mortgage loans—retail, where there is direct borrower and lender communication, and wholesale, where brokers match borrowers' needs with lenders' offerings. (*See id.*)

United Wholesale Mortgage, as its name suggests, is a wholesale mortgage lender. District Lending is a mortgage broker. In March 2019, UWM and District Lending entered UWM's standard Wholesale Broker Agreement. (ECF No. 17-1.) UWM agreed to underwrite mortgages for District Lending's qualifying clients, compensate District Lending for each loan closed, and provide "training, marketing and/or information services . . . in furtherance of [District Lending's] business." (ECF No. 17-1, PageID.105–106; *see* ECF No. 17, PageID.93–94.) In return, District Lending agreed to advise its clients about UWM's loan products and to only submit

mortgage loan applications to UWM that met UWM's conditions and requirements. (ECF No. 17, PageID.93–94; ECF No. 17-1, PageID.106.)

Relevant here, the Wholesale Broker Agreement specified two ways the parties' contract could be modified. First, Section 7.01, "Amendment of Agreement," stated: "Except as set forth on Section 7.08, this Agreement may not be amended except in writing executed by authorized representatives of both Broker and UWM." (ECF No. 17-1, PageID.111.) Second, Section 7.08 provided that "[t]his Agreement, and UWM's policies, procedures, requirements and instructions concerning Mortgage Loan Applications and Mortgage Loans, . . . may be amended by UWM from time to time" and that "Broker agrees that the submission of any Mortgage Loan Applications or Mortgage Loans to UWM after such amendment shall be Broker's agreement to the amendment without further signature or consent of any kind." (*Id.*)

The Wholesale Broker Agreement governed the parties' relationship for about two years. Then, in March 2021, UWM announced what it calls its "All-In Initiative" (ECF No. 17, PageID.96), or, as District Lending refers to it, "the Ultimatum" (ECF No. 19, PageID.172). If brokers wanted to continue working with UWM, they would have to stop working with two of its competitors, Rocket Mortgage and Fairway Independent Mortgage. (ECF No. 17, PageID.96.) Unlike UWM, which operates exclusively in the wholesale mortgage channel, Rocket and Fairway operate in both the retail and wholesale channels. (*Id.* at PageID.93, 96–97.) UWM believes their business model "negatively impacts consumers, brokers, and the wholesale mortgage channel in general." (*Id.* at PageID.97.) So UWM "decided to end its business

relationships with Broker Partners who chose to continue originating loans with [Rocket or Fairway] . . . knowing that it could result in ending relationships with some existing Broker Partners but believing that it was necessary to protect the long-term viability of the wholesale mortgage channel." (*Id.* at PageID.96–97.)

UWM followed its announcement with an Amended Wholesale Broker Agreement (ECF No. 17-2). It had two new provisions—a provision prohibiting brokers from submitting loans to Rocket and Fairway (Section 3.03(x)) and a liquidated damages clause for breaches of that prohibition (Section 7.30). Specifically, Section 3.03(x) stated that "Broker will not submit a mortgage loan or mortgage loan application to Rocket Mortgage or Fairway Independent Mortgage for review, underwriting, purchase, and/or funding." (*Id.* at PageID.123.) And Section 7.30, "Liquidated Damages," directed that "in the event of a violation of Section 3.03(x), Broker shall immediately pay" UWM the greater of $5,000 per loan closed with Rocket or Fairway or $50,000. (*Id.* at PageID.133.) The rest of the amended agreement was identical to the prior Wholesale Broker Agreement. (*Compare* ECF No. 17-1, *with* ECF No. 17-2.)

After UWM's announcement and amendment, UWM and District Lending worked together for another two years without issue. (ECF No. 17, PageID.98–99.) District Lending continued submitting mortgage loan applications to UWM, and when it came time for District Lending's annual contract renewal "[i]n February or March 2022, District Lending reviewed UWM's yearly Agreement renewal package, which contained the All-In Addendum, and approved the renewal through UWM's

5

online broker-facing portal." (*Id.* at PageID.98–99.) So too the next year. (*Id.* at PageID.99.)

But in January 2023, a month before it renewed the amended agreement for the second time, District Lending resumed submitting loans to Rocket and/or Fairway. (*Id.*) It continued to do so, while also submitting loans to UWM, throughout 2023. (*Id.*) In all, says UWM, District Lending submitted "at least 137 mortgage loans to one or both of [Rocket or Fairway]." (*Id.* at PageID.100.)

So in December 2023, UWM sued District Lending for breach of contract. In April 2024, UWM filed a first amended complaint. (ECF No. 17.) The issue presently before the Court is whether this complaint states a plausible claim for relief.

### III.

By the terms of the parties' contract, the Court applies Michigan law. (*See* ECF No. 17-1, PageID.112 ("Governing Law"); ECF No. 17-2, PageID.130–131 (same).) A party asserting a breach of contract must establish by a preponderance of the evidence that (1) there was a contract (2) which the other party breached (3) thereby resulting in damages to the party claiming breach. *Miller-Davis Co. v. Ahrens Constr., Inc.*, 848 N.W.2d 95, 104 (Mich. 2014); *see In re Brown*, 342 F.3d 620, 628 (6th Cir. 2003).

The first element—the existence of a contract—is the focus of District Lending's motion to dismiss. The original agreement is not in dispute. Indeed, UWM and District Lending agree that they entered the Wholesale Broker Agreement, attached to UWM's complaint, in 2019; that the original agreement did not prohibit

6

District Lending from submitting loans to Rocket and/or Fairway; that UWM introduced the prohibition via announcement and via an amended contract in 2021; and that District Lending continued sending mortgage loan applications to both UWM and Rocket/Fairway after that. The main question at this stage is whether UWM plausibly pled that District Lending agreed to the amended terms, or, put another way, whether UWM validly amended the parties' original contract.

District Lending, although not disputing for purposes of its motion that it sent loans to UWM after the amendment was announced, insists that acceptance via conduct under Section 7.08 was not an option here. It argues that Section 7.01 creates a general rule that all contract modifications must be made in writing and signed by both parties. (ECF No. 19, PageID.176–177.) Section 7.08, asserts District Lending, creates a narrow exception to the general rule—a method of contract modification that allows UWM to make *certain types* of amendments without a signed writing, which District Lending may accept via conduct. (*Id.* at PageID.177–179.) But UWM's 2021 amendment was not the "type" of amendment covered by Section 7.08, according to District Lending, so it required a signed writing under Section 7.01 to be valid. (*Id.* at PageID.179–182.) And UWM fails to plausibly allege it ever signed the Amended Wholesale Broker Agreement, the only other way to accept it, so it says UWM's breach of contract claim must fail. (*Id.* at PageID.176–177.) Finally, District Lending argues that even if UWM successfully amended the parties' agreement under Section 7.08, the amendment would be void under Michigan Compiled Laws § 566.1, which

requires additional consideration for modifications not made in a signed writing. (*Id.* at PageID.183–186.) None of these arguments persuade.

## A.

Start with District Lending's attempt to cabin the plain language of Section 7.08. According to the broker, Section 7.08 creates a narrow exception to Section 7.01 that only allows UWM to make amendments that affect "Mortgage Loan Applications and Mortgage Loans submitted to UWM, *not* the general overarching terms of the agreement between UWM and District Lending." (ECF No. 19, PageID.179 (cleaned up).) It argues that the amendments at issue here, which would bar District Lending from sending loans to Rocket and Fairway, "have nothing to do with Mortgage Loan Applications or Mortgage Loans submitted to UWM," so they are not "the type of amendment" UWM could make without a signed writing. (*Id.* at PageID.180 (cleaned up).)

The clear and unambiguous contract language precludes District Lending's argument. "A fundamental tenet of [Michigan] jurisprudence is that unambiguous contracts are not open to judicial construction and must be *enforced as written*." *Rory v. Cont'l Ins. Co.*, 703 N.W.2d 23, 30 (Mich. 2005). "Absent an ambiguity or internal inconsistency, contractual interpretation begins and ends with the actual words of a written agreement." *Universal Underwriters Ins. Co. v. Kneeland*, 628 N.W.2d 491, 494 (Mich. 2001); *see Bodnar v. St. John Providence, Inc.*, 933 N.W.2d 363, 373 (Mich. Ct. App. 2019) ("A court's primary obligation when interpreting a contract is to determine the intent of the parties. The parties' intent is discerned from the

contractual language as a whole according to its plain and ordinary meaning." (citations omitted)). "If the contract language is clear and unambiguous, its meaning is a question of law." *Port Huron Educ. Ass'n, v. Port Huron Area Sch. Dist.*, 550 N.W.2d 228, 237 (Mich. 1996). "Only when contractual language is ambiguous does its meaning become a question of fact." *Holland v. Trinity Health Care Corp.*, 791 N.W.2d 724, 727 (Mich. Ct. App. 2010).

Recall that Section 7.08 provides, in relevant part: "This Agreement, and UWM's policies, procedures, requirements and instructions concerning Mortgage Loan Applications and Mortgage Loans, . . . may be amended by UWM from time to time . . . ." (ECF No. 17-1, PageID.111.) District Lending's interpretation requires ignoring the first three words of Section 7.08. It insists that Section 7.08 authorizes UWM to amend only "UWM's policies, procedures, requirements and instructions concerning Mortgage Loan Applications and Mortgage Loans." But Section 7.08 expressly applies to "This Agreement" overall. (*See* ECF No. 21, PageID.214 ("The plain language of Section 7.08—indeed the first two words of it—answers whether the All-In Addendum could plausibly fall within its allowable amendment methods.").) The Court must "give[] effect to every word, phrase, and clause' while avoiding 'interpretations that would render any part of the document surplusage or nugatory.'" *Bayberry Grp., Inc. v. Crystal Beach Condo. Ass'n*, 964 N.W.2d 846, 852 (Mich. Ct. App. 2020) (quoting *Tuscany Grove Ass'n v. Peraino*, 875 N.W.2d 234, 237 (Mich. Ct. App. 2015)).

The text of Section 7.01 underscores the broad application of Section 7.08. "[Michigan courts] read contracts as a whole, giving harmonious effect, if possible, to each word and phrase." *Wilkie v. Auto-Owners Ins. Co.*, 664 N.W.2d 776, 781 n.11 (Mich. 2003); *see Reardon v. Kelly Servs.*, 210 F. App'x 456, 459 (6th Cir. 2006) ("A court must consider the entirety of the contractual text whenever construing any portion of a contract."). Section 7.01 states: "Except as set forth [i]n Section 7.08, this Agreement may not be amended except in writing executed by authorized representatives of both Broker and UWM." (ECF No. 17-1, PageID.111.) So Section 7.01 describes how "this Agreement" may be modified and specifically cross-references Section 7.08, which in turn describes a second way "[t]his Agreement" may be modified. Indeed, Section 7.08 specifies that that UWM may "from time to time" amend "[t]his Agreement, and UWM's policies, procedures, requirements and instructions concerning Mortgage Loan Applications and Mortgage Loans"; that UWM "will endeavor to provide broker[s] with prompt notice" of any amendment and may do so by posting the amendment to its website (which District Lending must "regularly check and monitor"); that District Lending manifests acceptance of the amendment through "submission of any Mortgage Loan Applications or Mortgage Loans to UWM . . . without further signature or consent of any kind"; and that UWM's amendment then applies to "pending[] and/or future Mortgage Loan Applications" submitted by District Lending to UWM. (*Id*.)

The contract language is thus clear that UWM may amend the parties' entire agreement under Section 7.08, not only a narrow subcategory of terms. District

10

Lending's interpretation to the contrary is an unreasonable reading of the text. *See City of Wyandotte v. Consol. Rail Corp.*, 262 F.3d 581, 585 (6th Cir. 2001) (applying Michigan law and explaining that a contract is unambiguous when there is only one reasonable interpretation); *see also ChiRhoClin, Inc. v. Grand River Aseptic Mfg., Inc.*, No. 17-993, 2019 WL 13100196, at *6 (W.D. Mich. June 20, 2019) ("Disagreement between the parties about the proper interpretation of a contract does not require the court to find the contract ambiguous; both interpretations must be reasonable.").

Further resisting this conclusion, District Lending argues that "[a]pplying Section 7.08 to *every* type of amendment to the 2019 Wholesale Broker Agreement would completely gut Section 7.01 and render Section 7.01 as mere surplusage, which would be a legally impermissible reading of the 2019 Wholesale Broker Agreement." (ECF No. 19, PageID.179.) It contends that "there would never be any need for the Parties to execute an amendment under Section 7.01 because, once such an amendment is presented by UWM, it is *de facto* accepted (under Section 7.08) as soon as District Lending submits a mortgage loan application." (*Id.* at PageID.182–183.) Not so.

Sections 7.01 and 7.08 present two different ways the parties can modify the contract—they are independent provisions such that neither makes the other superfluous, redundant, or meaningless. Section 7.01, titled "Amendment of Agreement," establishes that either party can modify the contract in a writing signed by both parties, whereas Section 7.08, "*UWM* Amendments & Website," establishes that UWM, but not brokers, may make prospective unilateral amendments

11

(applicable to "pending[] and/or future" loan applications), provided that UWM "endeavor[s] to provide broker with prompt notice" (e.g., "by posting any such amendments on UWM's website") and the broker accepts through "submission of any Mortgage Loan Applications or Mortgage Loans to UWM after such amendment." (ECF No. 17-1, PageID.111); *see Bhasin v. United Shore Fin. Servs., LLC*, No. 20-13278, 2022 WL 662284, at *10 (E.D. Mich. Mar. 4, 2022) ("Reading [Sections 7.01 and 7.08 of UWM's Wholesale Broker Agreement] together, it appears that the contract can only be amended by either (1) a bilateral amendment in a writing per 7.01 or (2) a prospective amendment by UWM per 7.08."). Read together, Section 7.01 sets out that brokers may only make amendments in a signed writing, while Section 7.08 explains how UWM may propose amendments other than in a signed writing and how brokers may accept or reject UWM-proposed amendments.

Indeed, by providing that "Broker agrees that the submission of any Mortgage Loan Applications or Mortgage Loans to UWM after such amendment shall be Broker's agreement to the amendment without further signature or consent of any kind," Section 7.08 makes clear that (1) a broker's continued loan submission constitutes acceptance and (2) a broker may reject an amendment proposed by UWM by either not submitting loan applications to UWM or terminating the agreement. That, too, is consistent with the other contract terms, which specify that a broker is not required to submit any mortgage loan applications to UWM at all and that either party may terminate the agreement at any time for any reason with seven days advance written notice. (*See* ECF No. 17-1, PageID.111 ("7.03. No Obligations To

12

Make Loans. . . . Broker shall not be obligated to submit any particular mortgage loan applications or any minimum number of loan applications to UWM."); *id.* ("7.06. Termination. This Agreement may be terminated by either party for any reason, with or without cause, breach or other justification, upon seven (7) days prior written notice . . . .").)[1]

UWM thus plausibly alleges that it modified the parties' original agreement under Section 7.08 to include the amended terms. It alleges that it publicly announced its "All-In Initiative" on March 4, 2021 (ECF No. 17, PageID.96) and that "[a]fter UWM's All-In Initiative announcement, District Lending continued to submit mortgage loans to UWM" (*id.* at PageID.98). UWM also says that District Lending breached the amended terms by submitting "at least 137" loans to Rocket and/or Fairway starting in January 2023 through the end of the year. (*Id.* at PageID.99.) As this was a permissible amendment, District Lending is not entitled to dismissal of UWM's breach of contract claim.

## B.

Even if District Lending's interpretation of Section 7.08 were reasonable or persuasive, UWM also plausibly alleges it amended the contract under Section 7.01.

District Lending incorrectly argues that "UWM does not even *allege* that the purported 'amendment' was ever signed" (ECF No. 19, PageID.176) and "does not

---

[1] The Court notes that UWM also makes a persuasive argument that the "All-In Addendum" would even constitute an amendment to "UWM's policies, procedures, requirements and instructions concerning Mortgage Loan Applications and Mortgage Loans." (ECF No. 21, PageID.220–221.) But the Court need not address or adopt it after rejecting District Lending's interpretation of the contract.

13

identify the date or even months it contends District Lending 'approved' the Unsigned Amendment to the 2019 Wholesale Broker Agreement" (*id.* at PageID.177 n.3). But UWM does allege that District Lending signed the Amended Wholesale Broker Agreement—it specifically asserts that District Lending twice accepted the amended terms "through UWM's online broker-facing portal." (ECF No. 17, PageID.99; *see* ECF No. 21, PageID.212.) UWM also alleges the timing of District Lending's acceptance— "February and March 2022" for District Lending's first review and approval and "February 2023" for its second. (ECF No. 17, PageID.98–99.) As UWM responds, "It is hard to understand what is so 'vague' or 'conclusory' about UWM's allegations that 'in February and March 2022, District Lending reviewed UWM's yearly Agreement renewal package, which contained the All-In Addendum, and approved the renewal through UWM's online broker-facing portal' and 'in February 2023, District Lending reviewed UWM's yearly Agreement renewal package, which again contained the All-In Addendum, and approved the renewal through UWM's online broker-facing portal.'" (ECF No. 21, PageID.225 (cleaned up) (quoting ECF No. 17, PageID.99).) So District Lending's assertion that UWM "does not even *allege* that the purported 'amendment' was ever signed" is simply not accurate.

What District Lending seems to most take issue with is UWM's failure to attach a signed amended agreement to its complaint, in contrast with UWM's attachment of the signed original agreement executed in 2019. It asserts that what UWM attaches—its form Amended Wholesale Broker Agreement—is "undisputedly *not* signed by either Party" and thus "cannot be valid based on Section 7.01 as a

14

matter of law." (ECF No. 19, PageID.176–177 (emphasis in original).) It even insists that "UWM's allegation [that District Lending accepted the amended agreement] is *entirely belied and contradicted by* the Unsigned Amendment to the 2019 Wholesale Broker Agreement, . . . which, on its face, *confirms* that the Unsigned Amendment to the 2019 Wholesale Broker Agreement was never signed by the Parties." (*Id.* at PageID.187 (emphasis added).)

District Lending's arguments go too far. Simply put, nonattachment does not equal nonexistence. And UWM's attachment of an unsigned form agreement does not somehow "confirm" that the amended agreement was never signed or "contradict" UWM's plausible allegation that District Lending electronically approved the amendment in both 2022 and 2023. UWM says the attachment is "simply an example of where the All-In Addendum Terms (Sections 3.03(c) and 7.30) were incorporated into the Agreement." (ECF No. 21, PageID.224.) As UWM further points out, "nothing about the example document submitted with the Complaint contradicts UWM's to-be-accepted-as-true allegations." (*Id.* at PageID.209.) Whether UWM can ultimately carry its burden of showing District Lending did agree to the Amended Wholesale Broker Agreement (electronically via the online portal or otherwise) is a distinct issue that will be addressed during discovery—i.e., a fact issue not suited to a motion to dismiss.

## C.

Finally, District Lending argues that UWM's amendment is "void as a matter of law" under Michigan Compiled Laws § 566.1, even if valid under Section 7.08,

because "[n]o additional consideration was provided." (ECF No. 19, PageID.183.) In response, UWM says it has "sufficiently allege[d] there was adequate consideration for the amendment in the form of the parties' continued relationship after notice of the All-In Addendum, obviating any application of [the statute's] restrictions." (ECF No. 21, PageID.221–222.) District Lending protests that the parties' continued business relationship cannot be consideration under the preexisting duty rule, and thus cannot save UWM's claim under Michigan Compiled Laws § 566.1, because "the Parties' business relationship already existed pursuant to the 201[9] Wholesale Broker Agreement and would have continued to exist under those terms." (ECF No. 19, PageID.185.)

District Lending's argument starts off well enough.

It is true that Michigan Compiled Laws § 566.1 requires that contract modifications are either made in a signed writing or supported by new consideration. *See, e.g., Power-Tek Sols. Servs., LLC v. Techlink, Inc.*, 403 F.3d 353, 359 (6th Cir. 2005) ("Michigan courts have universally interpreted section 566.1 as rendering invalid any alleged agreement changing, modifying or discharging a contract where that alleged agreement is neither reduced to writing nor supported by additional consideration."). So District Lending is right that, if UWM's amendment were not in a signed writing, additional consideration would be necessary.

District Lending is also correct that "doing what one is legally bound to do is not consideration for a new promise. *Yerkovich v. AAA*, 610 N.W.2d 542, 546 (Mich. 2000); *see Romero v. Buhimschi*, 396 F. App'x 224, 233 (6th Cir. 2010) (explaining

16

that the preexisting duty rule applies regardless of "whether the promise at issue is a modification to an existing agreement" or "a new agreement"). Consideration exists "if the promisee in return for a promise does anything legal which he is not bound to do or refrains from doing anything which he has a right to do." *Stott v. Stott*, 242 N.W. 747, 747 (Mich. 1932). So "a second agreement imposing additional obligations in order to receive what [a party] was owed under the first agreement" is generally invalid for lack of consideration under the preexisting duty rule. *Adell Broad. v. Apex Media Sales*, 708 N.W.2d 778, 781 (Mich. Ct. App. 2005) (per curiam).

District Lending argues that is the dynamic here—the amendment would have District Lending promise to not submit loans to Rocket and Fairway in exchange for UWM's "performance or promise to perform that which [UWM] was already required to do under the terms of the existing agreement." *Yerkovich*, 610 N.W.2d at 546. UWM disagrees, asserting that neither UWM nor District Lending had a legal obligation to continue working together after UWM's amendment yet continued to do so anyway, thus constituting consideration. *See Adell*, 708 N.W.2d at 782–83 ("[T]he consideration for the amended agreement was the continuation of the parties' business relationship."). UWM has the better argument.

To explain why, consider an example.

A company hires a marketing firm to create an advertisement for a specific product. Until that advertisement is complete, the marketing firm is legally bound (by the parties' contract) to continue working on the ad. If the company then agrees to pay the marketing firm more money to complete the already agreed-upon work

because the firm refuses to finish the work otherwise, that agreement is generally[2] invalid for lack of consideration. *See Grand Trunk W. R.R. Co. v. H. W. Nelson Co., Inc.*, 116 F.2d 823, 834 (6th Cir. 1941). Indeed, all the marketing firm promised in exchange for the raise was its preexisting duty to perform—its completion of the work it had a legal obligation to complete according to the original contract.

But what if the original agreement was for the company and marketing firm to work together on an ongoing basis, with the firm completing advertisements when it suited both parties? And what if the company and firm agreed that they could stop working together at any point, provided that the firm finished, and the company paid for, any advertisements already in progress at the time of the termination? In that scenario, if the company agreed to pay the marketing firm more money so the firm would finish an in-progress project it already promised to complete, the preexisting duty rule would likely preclude the firm from enforcing the company's promise to get more money. If instead the company agreed to pay the firm a higher rate for all its ads going forward, and in exchange all the firm did was continue working with the company, the firm could sue for a breach of contract if the company refused to pay. It was under no legal obligation to continue working with the company, unlike its preexisting duty to finish in-progress ads. Neither the firm nor the company was entitled to a continued business relationship. *Compare Yerkovich*, 610 N.W.2d at 546

---

[2] There is an exception, not relevant here, where unforeseen circumstances arise and impose new burdens on performance, such that the promise to pay more is made to compensate the added challenges. *See Grand Trunk*, 116 F.2d at 834 (citing *United States v. Cook*, 257 U.S. 523, 526 (1922)).

18

(finding that second agreement between insured and insurance company lacked consideration because insurance company had preexisting duty under insurance policy to pay plaintiff's medical expenses), *with Innovation Ventures v. Liquid Mfg.*, 885 N.W.2d 861, 871 (Mich. 2016) (finding sufficient consideration where, "[i]n exchange for the plaintiff's acknowledgment that [defendants] wished to continue doing business with the plaintiff, [defendants] agreed to the . . . agreements"), *and Crestwood Membranes, Inc. v. NSF Int'l*, No. 13-664, 2014 WL 229333, at *7 (M.D. Pa. Jan. 21, 2014) (summarizing Michigan preexisting duty rule and concluding under Michigan law that "the consideration present in *Adell* for the amended agreement which the Court found valid is the same consideration present here, *i.e.*, the continuation of the business relationship between" the parties).

This example scenario echoes *Adell Broadcasting*, *supra*, the case on which UWM relies. And it captures the key distinction between a promise to perform a preexisting duty and a promise to continue a business relationship: when either party may opt out of a contract at any point, neither party is contractually obligated to continue the relationship, and a continued relationship is mutual consideration. *See Adell*, 708 N.W.2d at 782; *Mich. State Med. Soc. v. Blue Cross Blue Shield*, No. 269415, 2006 WL 3755237, at *3 n.6 (Mich. Ct. App. Dec. 21, 2006) (per curiam). Indeed, another court in this District just rejected this identical lack of consideration argument raised by another UWM broker challenging the same amendment. *See United Wholesale Mortg., LLC v. Atl. Tr. Mortg. Corp.*, No. 24-10216, 2025 WL 907883, at *9 (E.D. Mich. Mar. 25, 2025) ("Michigan law indicates that continuation

of the parties' business relationship is sufficient consideration for their amended agreement.").

True, in the example scenario, the marketing firm's continued business relationship was exchanged for higher pay by the company, and in *Adell*, the television station and marketing firm each amended the terms of their agreement in ways that certainly seemed to benefit both. *See Adell*, 708 N.W.2d at 780. District Lending insists that distinguishes this case, where it says UWM imposed a new "one-sided" limitation rather than a clear benefit like greater compensation. (ECF No. 22, PageID.238 (emphasizing that in *Adell* "the amendment resolv[ed] grievances on both sides").) But "courts do not inquire into the sufficiency of consideration: '[a] cent or a pepper corn, in legal estimation, would constitute a valuable consideration.'" *Innovation*, 885 N.W.2d at 871 (alteration in original) (quoting *Gen. Motors Corp. v. Dep't of Treasury*, 644 N.W.2d 734, 738 (Mich. 2002)). And "[c]onsideration exists . . . 'whether there is any actual loss or detriment to [the promisee] or actual benefit to the promisor or not.'" *In re Louise K.*, Nos. 345908, 345909, 2019 WL 5418343, at *4 (Mich. Ct. App. Oct. 22, 2019) (per curiam) (quoting *Stott*, 242 N.W. at 747). So in *Adell*, the court's conclusion that the parties' continued business relationship constituted sufficient consideration was not based on the actual substance of the parties' modifications. What mattered was that after the amendments, the parties continued working together when either could have terminated the agreement. *See Adell*, 708 N.W.2d at 783 (finding that the defendant marketing firm "continued to represent" the plaintiff and the plaintiff "actively

20

contacted potential clients" for the defendant and did not "hire[] another marketing firm to handle the business" it hired the defendant to handle and concluding that "the consideration for the amended agreement was the continuation of the parties' business relationship").

Here, the parties' contract specifically states that District Lending is not required to submit any loans to UWM and that UWM is not required to underwrite any loans that District Lending submits. It makes equally clear that either party can terminate the contract at any point for any reason, with seven days' written notice and with the caveat that pending loans would be unaffected. And UWM alleges that, despite having no legal obligation to do so, the parties continued working together after the contract amendment. So UWM has pled sufficient consideration to support its breach of contract claim. *See Atl. Tr. Mortg.*, 2025 WL 907883, at *7–9 (concluding under same contract language and similar facts that UWM "sufficiently plead consideration supporting the amendment to the parties' Agreement by the All-In Addendum," *id.* at *9, in "the form of the parties' jointly continued business relationship after notice of the All-In Addendum," *id.* at *7).

## IV.

For the reasons above, the Court DENIES District Lending's motion to dismiss United Wholesale Mortgage's complaint (ECF No. 19).

District Lending shall file an Answer to the amended complaint within 14 days of entry of this Order.

SO ORDERED.

Dated: March 31, 2025

s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES DISTRICT JUDGE