# EXHIBIT 3

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF MICHIGAN

SOUTHERN DIVISION

UNITED WHOLESALE MORTGAGE LLC,

    Plaintiff,

    -vs-                      Case No. 2:23-CV-13176

MADISON ATRINA LLC d/b/a DISTRICT

LENDING,

    Defendant.

_____/

VIDEOTAPED DEPOSITION

| | |
|---|---|
| DEPONENT: | ENRIQUE AUGUSTINE (HENRY) GOMEZ |
| DATE: | Tuesday, March 24, 2026 |
| TIME: | 9:58 a.m. |
| LOCATION: | BUSH SEYFERTH PLLC |
| | 100 West Big Beaver Road, Suite 400 |
| | Troy, Michigan |
| REPORTER: | Karen Fortna, CRR/RMR/RPR/CSR-5067 |
| VIDEO: | Chris Regner |
| JOB NO: | 52625 |

## Premier Litigation Support Solutions

▶ Court Reporting

▶ Process Service

▶ eDiscovery

▶ Document Solutions

▶ Trial Support

✉ production@fortzlegal.com

📞 844.730.4066



UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF MICHIGAN

SOUTHERN DIVISION

UNITED WHOLESALE MORTGAGE LLC,

    Plaintiff,

    -vs-                 Case No. 2:23-CV-13176

MADISON ATRINA LLC d/b/a DISTRICT

LENDING,

    Defendant.

_____/

VIDEOTAPED DEPOSITION

DEPONENT:   ENRIQUE AUGUSTINE (HENRY) GOMEZ

DATE:       Tuesday, March 24, 2026

TIME:       9:58 a.m.

LOCATION:   BUSH SEYFERTH PLLC

            100 West Big Beaver Road, Suite 400

            Troy, Michigan

REPORTER:   Karen Fortna, CRR/RMR/RPR/CSR-5067

VIDEO:      Chris Regner

JOB NO:     52625

APPEARANCES:


    BUSH SEYFERTH PLLC

    By:  Mr. Mahde Y. Abdallah

    100 West Big Beaver Road, Suite 400

    Troy, Michigan  48084

    248.822.7800

    abdallah@bsplaw.com

        Appearing on behalf of the Plaintiff


    MORGANROTH & MORGANROTH PLLC

    By:  Mr. Jason R. Hirsch

    344 North Old Woodward Avenue, Suite 200

    Birmingham, Michigan  48009

    248.864.4000

    jhirsch@morganrothlaw.com

        Appearing on behalf of the Defendant

INDEX

WITNESS

ENRIQUE AUGUSTINE (HENRY) GOMEZ                          PAGE

Examination by Mr. Hirsch                                   7

UNITED WHOLESALE MORTGAGE v MADISON ATRINA          Job 52625
GOMEZ, HENRY 03/24/2026                                    4

                          E X H I B I T S


EXHIBIT                      DESCRIPTION                      PAGE


Exhibit 19      Gomez LinkedIn page . . . . . . . . . 8

Tuesday, March 24, 2026

Troy, Michigan

9:58 a.m.

\*          \*          \*

VIDEOGRAPHER:  Good morning.  We are now on the record.  The time is 9:58:24 on March 24, 2026.

This begins the videotaped deposition of Henry Gomez, taken in the matter of United Wholesale Mortgage LLC versus Madison Atrina, Case No. 23-CV-13176.  We are taking this deposition at the offices of BSP Law in Troy, Michigan.

My name is Chris Regner; I'm the videographer today representing Fortz Legal Support.

Counsel, will you please state your name and whom you represent, after which the court reporter will swear in the witness.

MR. ABDALLAH:  Good morning.  Mahde Abdallah on behalf of Plaintiff United Wholesale Mortgage.

MR. HIRSCH:  Good morning.  Jason Hirsch on behalf of defendant.

\*

&ast;      &ast;      &ast;      &ast;

ENRIQUE AUGUSTINE (HENRY) GOMEZ, having first been duly sworn, was examined and testified as follows:

MR. HIRSCH:  Good morning, sir.

THE WITNESS:  How you doing.

MR. HIRSCH:  My name is Jason Hirsch. I'm one of the attorneys for defendant in this matter.

Let the record show that this is the deposition of Henry Gomez, taken pursuant to notice under the Federal Rules of Civil Procedure.

Sir, please remember to answer verbally so that our court reporter can record your questions -- your answers, rather, okay?

THE WITNESS:  Yep.

MR. HIRSCH:  And if you need a break at any time, please let me know and we'll take a break, so long as there's no question pending at the time, okay?

THE WITNESS:  Yep.

MR. HIRSCH:  You understand you were just sworn in.  I'm going to ask you a series of questions.  Your answers will be given under oath. Do you understand that?

THE WITNESS:  Uh-hum.

THE REPORTER:  Yes?

THE WITNESS:  Yes.  I'm sorry.

MR. HIRSCH:  If at any time you don't understand a question I ask, please let me know and I will attempt to clarify, okay?

THE WITNESS:  Yes.

MR. HIRSCH:  Please make sure to let me finish my entire question before you begin your answer, both to make sure you understand my question and because our court reporter can't record two people talking at the same time, okay?

THE WITNESS:  Yes.

MR. HIRSCH:  And if at any time I should interrupt you or you have not completed your answer, please let me know and I'll let you finish your answer for the record, okay?

THE WITNESS:  Yes.

EXAMINATION

BY MR. HIRSCH:

Q.    Can you state your full name for the record, please?

A.    Legally it's Enrique Augustine Gomez; professionally I use Henry Gomez.

Q.    Sir, could you tell me about your formal education,

beginning with undergraduate college forward?

A.   Yeah.  So after high school, I attended community college for roughly three years and received an associate's in liberal arts.

Q.   Which community college did you attend?

A.   Santa Barbara Community College in Santa Barbara, California.

Q.   And what period of time did you attend Santa Barbara Community College?

A.   It would have been fall of '95 through summer, fall of '98.

          MR. HIRSCH:  Would you mark this as 19, please?

          (Marked for identification:
          Deposition Exhibit No. 19.)

BY MR. HIRSCH:

Q.   Sir, our court reporter has just handed you what we've marked as Exhibit 19.  And once you've had a chance to take a look at that, could you tell me if you recognize that document?

A.   Yes.

Q.   What is it?

A.   It's a printout of my LinkedIn profile.

Q.   And sir, is this employment history section accurate?  It sort of starts on, I guess, the

second -- well, I guess it says "Experience" at the very bottom of the first page and it goes on to the second page.

A.   Yes.

Q.   So it looks like, according to this, you worked at Quicken Loans starting in October 2005; is that correct?

A.   Correct.

Q.   What did you do from the time you graduated with your associate's degree professionally until you began working with Quicken Loans in October 2005?

A.   Prior to Quicken Loans, I worked for a smaller mortgage broker in Southfield.  It's, to my knowledge, no longer -- no longer in business.  Atlantis Funding was the name.  And that was, I would guesstimate, 2002 to 2004; roughly two to three years.

          Prior to that, it was retail jobs, Macy's; nothing I would consider to be professional, just kind of part-time jobs.

Q.   Focusing on Atlantis Funding, what did Atlantis Funding do?

A.   They were a mortgage broker, so they provided mortgage options to consumers directly.

Q.   Were they a wholesale or a retail job?

UNITED WHOLESALE MORTGAGE v MADISON ATRINA
GOMEZ, HENRY 03/24/2026

Job 52625
10

A.    It would have been considered a mortgage broker, so they use wholesale lenders for their funding, but they wouldn't be considered a retail lender.  They don't lend their own money.

Q.    Did Atlantis Funding use UWM as a lender?

A.    No.

Q.    Did Atlantis Funding use, I guess it would have been Quicken at that time?

A.    No.

Q.    And what was your role at Atlantis Funding?

A.    Call on leads to borrowers to, you know, either purchase a home or refinance.

Q.    And did you have a mortgage license at the time you worked at Atlantis Funding?

A.    No.  To my knowledge, it wasn't required until a few -- years later.

Q.    Do you know who owned Atlantis Funding?

A.    I can't remember the name.

Q.    Do you know if Mat Ishbia had any ownership interest in Atlantis Funding?

A.    No, I don't believe so, no.

Q.    Do you know if anyone from Mr. Ishbia's family had any interest in -- ownership interest in Atlantis Funding?

A.    No.  I'm sorry, no.

Q.   So after Atlantis Funding, you went to Quicken Loans, right?

A.   Yes.

Q.   Okay.  And your role there was -- it says retail loan originator.  Is that correct?

A.   Correct.

Q.   Okay.  What were your duties as a retail loan originator at Quicken Loans?

A.   It was similar.  We would get leads that we would call out on, so consumers that were looking to either purchase or refinance a mortgage.

Q.   And were you on the wholesale side or the retail side?

A.   They didn't have a wholesale side at that time, so it was strictly retail.

Q.   And it references that you were "Mortgage Banker-President's Club."  Do you see that?

A.   Yep.

Q.   What is President's Club?

A.   So it's just a title given to -- once you achieve a certain number of closings or volume in a certain period of time, it's basically a senior-type title.

Q.   And your next position after Quicken Loans was with United Wholesale Mortgage; is that right?

A.   Correct.

production@fortzlegal.com          fortzlegal.com          Toll Free: 844.730.4066

UNITED WHOLESALE MORTGAGE v MADISON ATRINA
GOMEZ, HENRY 03/24/2026

Job 52625
12

Q.   Why was it that you left Quicken Loans?

A.   I was actually let go from Quicken Loans.

Q.   Do you know why you were let go?

A.   Yeah.  So they have a return call policy, so basically if a consumer called, left a message, the call had to have been returned within a certain period of time, so I had several calls that went past that.

Q.   It looks like your first role at UWM was senior account executive; is that correct?

A.   No, it would have been just account executive at first.

Q.   Just for clarity then, did you in fact start at Quicken Loans in November 2011, which is the date under senior account executive?

A.   You mean United Wholesale Mortgage?

Q.   I'm sorry, United Wholesale Mortgage.  Thank you.

A.   Yeah, I started November 2011.  My title at the time would not have been senior account executive yet.

Q.   Your title when you started would have just been account executive; is that correct?

A.   Correct, yeah.

Q.   Do you know when you attained the title of senior account executive?

UNITED WHOLESALE MORTGAGE v MADISON ATRINA
GOMEZ, HENRY 03/24/2026

Job 52625
13

A.    I couldn't specify a specific date.

Q.    What were your job duties as an account executive?

A.    We were assigned what we call accounts or brokers that were signed up with us and basically our job was to sell them on utilizing United Wholesale for their fundings.

Q.    And did your job duties change when you got the title of senior account executive?

A.    No.

Q.    Next to senior account executive, it says, "Hall of Fame Top 10 Producer."  Do you see that?

A.    Correct, yep.

Q.    What does "Hall of Fame Top 10 Producer" mean?

A.    Essentially I achieved a status where I was in the top 10 of all time account executives at United Wholesale Mortgage as far as loans funded.

Q.    So does that mean number of loans funded or dollar value of loans funded?

A.    Number, units.

Q.    And you're saying that was all time or for a particular time period?

A.    At that time, yeah, so it would have been -- I would say roughly 2017 is when I achieved that and then at that time I would have been top 10 of all previous account executives and current account

executives.

Q.    Okay.  And it says on the LinkedIn profile, under senior account executive, it says November 2011 to the present.  Do you still hold the title of senior account executive?

A.    Yes.

Q.    Okay.  And it looks like in December of 2018, you got the title of -- would that be AVP of sales, right?

A.    Correct.

Q.    Is AVP assistant vice president?

A.    Yes.

Q.    Okay.  And do you hold that title today?

A.    No.

Q.    All right.  What were your job duties as AVP of sales?

A.    So basically it's a non-production role, so I don't have any accounts assigned to me, but I have five teams of account executives, each team has six to eight account executives on it.

        So essentially my duties, I listen to calls, I coach account executives.  Any escalations that -- you know, anything that needs to be escalated past the account executive, I might have to deal with.  And we did, you know, meetings and

huddles daily.

Q.   And next to AVP of sales, it also says division leader.  Is that the same position --

A.   Yes.

Q.   -- or are those separate positions?

A.   It's the same, yeah.

Q.   Now you said you're no longer AVP of sales, correct?

A.   That's correct.

Q.   Okay.  So what is your -- what was your next position after AVP of sales?

A.   Senior -- I went back to being a senior account executive after AVP of sales.

Q.   And when did you go back to being a senior account executive?

A.   September 2022.

Q.   And what was the -- well, strike that.

     Is that your current position?

A.   Yes.

Q.   Is there a reason that the LinkedIn profile, under AVP of sales, says to present?

A.   Simply just hasn't been updated.

Q.   Was it a lateral move back to senior account executive?

A.   Not necessarily.  It was back into a production

role.  So I had accounts assigned to me back in my name personally.  Instead of running a division, I just went back to running a smaller team.

Q.  Was it a demotion?

A.  Essentially.

Q.  Do you know why you were removed from the position of AVP of sales?

A.  Yeah.

Q.  Why?

A.  Well, at the time, volume started to contract in the mortgage business, we weren't hiring as many account executives, and by -- I guess by nature, sales positions, people leave and we just weren't replacing them, so it got to a point where all of our divisions had maybe half of the account executives that we once had, so at that point there was maybe three or four divisions that were consolidated, basically broken up and moved into other divisions.

Q.  So when you transitioned from AVP of sales back to senior account executive, did someone replace your former position as AVP of sales or was it a contraction?

A.  It was a contraction.  I wasn't replaced.

Q.  What did you do to prepare for the deposition

today?

A.    I had several meetings with Mohamed [sic] and our internal UWM counsel.

Q.    Okay.  I don't want to know anything you said at the meetings, but how many meetings did you have?

A.    Two.

Q.    And when did those meetings take place?

A.    First one was last Thursday, 9:00 a.m., and then the second one was yesterday afternoon via Zoom.

Q.    How long was the first meeting?

A.    They both were about an hour.

Q.    And who was present for the first meeting on Thursday?

            THE WITNESS:  Was his name Ryan?

            MR. ABDALLAH:  Yes.

            THE WITNESS:  Ryan Byrd, who is our UWM -- part of our legal counsel.  Mohamed was there and then --

            MR. ABDALLAH:  I'll just correct for the record -- Henry, it's okay -- my name is Mahde.

            THE WITNESS:  Mahde.  I'm sorry.

            MR. ABDALLAH:  That's okay.

            THE WITNESS:  Okay.  I apologize.

            MR. HIRSCH:  I was going to ask.

            MR. ABDALLAH:  It happens all the time.

THE WITNESS:  I'm sorry.

MR. ABDALLAH:  You're good.

THE WITNESS:  Then I don't recall the other person's name.

MR. ABDALLAH:  That's okay.

BY MR. HIRSCH:

Q.   And who was present at the Zoom meeting that took place yesterday?

A.   It was yesterday, yeah.

Q.   That would be Monday, yes.

A.   Myself, Ryan and Mahde.  And then there was another gentleman on the Zoom meeting; I don't recall his name.

Q.   Okay.  Did you review any documents to prepare for the deposition today?

A.   Yes.

Q.   What documents did you review?

A.   Basically the preposition [sic] note.  He printed it out and gave me a copy of it.  And my LinkedIn profile.

Q.   When you say "the note," was that the notice --

A.   The notice, correct.  I'm sorry.

Q.   Let me just finish my question.

Was that the notice for the date and time of your deposition today?

A.      Correct.

Q.      Okay.  Do you know what this case is about?

A.      Yes.

Q.      What is it about?

A.      There's a pending lawsuit between UWM and District Lending.

Q.      Do you know what the nature of the lawsuit is?

                MR. ABDALLAH:  Objection.  Form.  You can answer.

                THE WITNESS:  To my understanding, it's a breach to the all-in addendum.

BY MR. HIRSCH:

Q.      You mentioned District Lending, correct?  Were you familiar with District Lending before this lawsuit?

A.      No.

Q.      Do you know why you're being deposed today?

A.      Yes.

Q.      Why?

A.      I think initially I was thought to have at one time worked directly with District Lending, but that's not the case.

Q.      So you never worked directly with District Lending, correct?

A.      Correct; it was never an account that was assigned to me.

Q.   Was it ever an account that was assigned to one of the account executives you oversaw when you were AVP?

A.   Yes.

Q.   Do you know who at UWM designated you as an individual who might have information regarding District Lending's relationship with UWM?

A.   I do not know.

Q.   And just to be clear, District Lending also sometimes is known as Madison Atrina.  Have you ever heard that name before?

A.   Not prior to the prep deposition.

Q.   And using that name doesn't change any of the answers you just gave me in terms of your relationship -- lack of relationship with District Lending, correct?

A.   Correct.

Q.   Okay.  And if I call them District Lending going forward, you'll understand that they are also known or have also been known as Madison Atrina?

A.   Yes.

Q.   Okay.  Do you have any knowledge about District Lending's agreement to UWM's wholesale broker agreement?

A.   I would imagine it's the same as all of our -- I

don't think it's any different than what any of our other broker partners would have agreed to.

Q.  So you don't have any specific knowledge as to whether District Lending agreed or didn't agree to any particular version of the wholesale broker agreement?

A.  No.

Q.  Do you have any knowledge about District Lending's agreement to any amendments to UWM's wholesale broker agreement?

A.  No.

Q.  Do you have any knowledge of District Lending's submission of mortgage loans or loan applications to Rocket Mortgage since March 4, 2021?

A.  No.

Q.  Do you have any knowledge of District Lending's submission of mortgage loans or applications to Fairway Independent Mortgage since March 4, 2021?

A.  No.

Q.  Have you reviewed the amended complaint filed by UWM in this case?

A.  No.

Q.  Did you have any input into the allegations made by UWM in this case?

A.  No.

UNITED WHOLESALE MORTGAGE v MADISON ATRINA    Job 52625
GOMEZ, HENRY 03/24/2026    22

Q.   Are you familiar with any of District Lending's defenses in this case?

A.   No.

Q.   Were you involved in any internal discussions at UWM that led to the decision to implement the all-in initiative?

A.   No.

Q.   Are you familiar with the all-in initiative?

A.   Yes.

Q.   What is it?

A.   I haven't read the agreement, so I can't say verbatim.  Essentially it's an agreement between UWM and our broker partners that they agree to no longer do business with Rocket or Fairway.

Q.   How was it that broker partners would assent to this agreement with UWM?

    MR. ABDALLAH:  Objection.  Foundation. You can answer.

    THE WITNESS:  Electronically.  It was basically on the website.

BY MR. HIRSCH:

Q.   Are you familiar with the actual screens that a broker partner would see when agreeing electronically?

A.   I personally have never seen it, but essentially

from the information that we've gathered, when they logged in after the announcement, the first time that the mortgage broker logged in, they couldn't take any action until they read and either agreed or declined the agreement.

Q.   Where did you get that information from?

A.   That was -- after the announcement was made, that was the instructions that we were given; that's how they would agree to it.

Q.   Who gave you those instructions?

A.   I couldn't tell you specifically.  I mean, there was several sales leaders above us that probably would have conveyed that information to us.

Q.   Was that information in writing?

A.   No, not that I recall.

Q.   When did the all-in initiative go into effect?

A.   Early 2021; I don't know the specific date, but it would have been March of 2021.

Q.   How were the broker partners informed that the all-in initiative was being implemented?

             MR. ABDALLAH:  Objection.  Foundation.
You can answer.

             THE WITNESS:  Essentially there was a livestream announcement that took place.  I would imagine, too, that there would have been some sort

UNITED WHOLESALE MORTGAGE v MADISON ATRINA
GOMEZ, HENRY 03/24/2026

Job 52625
24

of marketing email that went out to all of our contacts as well with that information.

BY MR. HIRSCH:

Q.   When you say you would imagine, did you ever see such a marketing email or are you just guessing?

A.   Not that I recall, but essentially when we make any announcements, it's usually followed up by an email to our clients.

Q.   And the Facebook Live announcement you referenced was made by Mr. Ishbia, correct?

A.   Correct.

Q.   Did you view that announcement live when it was made?

A.   Yes.

Q.   And at the time the announcement was made, you were AVP of sales; is that correct?

A.   Correct.

Q.   Did you know that the all-in initiative was going to be announced before the announcement by Mr. Ishbia?

A.   No.

Q.   Did you have any involvement in preparing the language of the all-in initiative?

A.   No.

Q.   Do you know who was involved in that?

A.    I do not, no.

Q.    What was your reaction when you heard the announcement of the all-in initiative by Mr. Ishbia?

A.    I would imagine I would have been a little surprised by it.

Q.    Did you discuss the announcement with your colleagues at or around the time it was announced?

A.    Yes.

Q.    What was the nature of those discussions?

A.    A lot of questions from account executives and colleagues and, you know, basically just, how do we explain it?  What's the process of them agreeing?  And things like that.  So just kind of a step by step on how to help them log into the website, agree to the addendum or disagree to the addendum.  That essentially would have been it.

Q.    Did you get any written guidance from UWM telling you how to address those questions from AEs?

A.    Not that I recall, no.

Q.    Did anybody react negatively to the implementation of the all-in initiative?

A.    Can you clarify "anyone"?

Q.    Well, did any AEs --

A.    Okay.

Q.   -- for whom you served as AVP react negatively?

A.   I can't specifically say anybody that was in my division, but I would imagine that there was account executives that may have felt that they might lose production from it.

Q.   Did any of the AEs for whom you were AVP at that time lose accounts due to the implementation of the all-in initiative?

A.   I can't say with 100 percent certainty, but I would imagine there had to have been.

Q.   Would that have been brought to your attention at the time?

A.   Yes.

Q.   Do you remember if it was a significant number?

A.   No; it would have been a handful, if that.

Q.   Do you remember the identities of any of the broker partners who decided not to do business with UWM after the announcement of the all-in initiative?

A.   I don't know names specifically offhand; I can't recall.

Q.   Are you familiar with the liquidated damages provision in UWM's wholesale broker agreement?

A.   Yes.

Q.   What is that?

A.   I believe it's 5,000 per funded loan with Rocket or

Fairway after the addendum was assigned and agreed to.

Q.   How did you learn about the liquidated damages provision?

A.   That would have been conveyed to us through -- it might have been through the livestream.

Q.   Did you ever hear that the initial liquidated damages provision was based on loans sent to UWM after a violation of the all-in initiative?

A.   No.

Q.   Did you ever have any communications with any representatives of District Lending after the March 2021 announcement of the all-in initiative?

A.   Not that I recall, no.

Q.   I think you told me you also did not have any direct communications with representatives of District Lending even before the announcement of the all-in initiative; is that right?

A.   Correct.

Q.   Do you know Josh Rapaport?

A.   I do not.

Q.   Did you ever have any discussions with any of the AEs under your purview about District Lending after the announcement of the all-in initiative?

A.   Not that I recall, no.

UNITED WHOLESALE MORTGAGE v MADISON ATRINA       Job 52625
GOMEZ, HENRY 03/24/2026                                          28

Q.   Did you ever have any conversations with any of the AEs under your purview about District Lending before the announcement of the all-in initiative?

A.   Not that I recall, no.

Q.   Who was District Lending's account executive at the time the all-in initiative was announced in March 2021?

A.   Brian Florian.

Q.   And was he one of the account executives under your purview as AVP?

A.   Correct.

Q.   Do you know who preceded Mr. Florian as District Lending's account executive?

A.   Prior to Brian, I don't know who the account executive was.

Q.   And do you know for what period of time Mr. Florian was the account executive for District Lending?

A.   Yes, if I recall, it was about August of 2020 until June of 2021.

Q.   And who followed Mr. Florian as account executive for District Lending?

A.   I believe it was an account executive named Emily Wolford, who is no longer with the company, but she was not in my division.

Q.   Do you know what period of time Ms. Wolford served

as account executive for District Lending?

A.   She would have gotten it June of 2021 and I don't know how long she would have had it for.

Q.   Is Mr. Florian still with UWM?

A.   No.

Q.   Do you know when he left UWM?

A.   Not specific dates; 2022, '23 maybe.

Q.   Why was it that Mr. Florian ceased being the account executive for District Lending in around June 2021?

A.   I couldn't tell you specifically why.

Q.   Did you make that change?

A.   No.

Q.   Do you know who did make that change?

A.   No.

Q.   Do you know if that change was requested by District Lending?

A.   I do not.

Q.   Who was the UWM account executive for District Lending after Ms. Wolford?

A.   I believe it was Natalie Reider, R-E-I-D-E-R, also no longer with UWM.

Q.   And was Ms. Reider under your purview as AVP?

A.   She was for a period of time.

Q.   For what period of time was Ms. Reider the AE for

District Lending?

A.   Specific dates, I couldn't tell you.

Q.   Can you tell me approximate dates?

A.   Yeah.  I know it was a very short period of time. I would guess December 2021 to mid January 2022, which I believe is when she resigned from UWM.

Q.   And do you know why Ms. Wolford ceased being the AE for District Lending?

A.   I do not know.

Q.   And Ms. Reider stopped being the AE because she left UWM?

A.   Correct.

Q.   Is that right?

A.   Correct.

Q.   So who was the next AE for District Lending?

A.   That I do not know.

Q.   Do you know Alan Tucsok?

A.   I do.

Q.   Was he ever an account executive under your purview when you were AVP?

A.   No.

Q.   How do you know Mr. Tucsok?

A.   He was there for a long time, you know, over ten years, so I just knew him as a colleague before he resigned or retired or -- I'm not sure what

happened, but...

Q.   Do you know if Mr. Tucsok was ever the AE for District Lending?

A.   I do not.

Q.   Did you ever provide any instructions to the AEs you supervised as to how to present the all-in initiative to broker partners?

A.   Yeah, I mean, I would have probably coached on how to overcome objections or to answer questions about it.

Q.   Did you have any written material that you provided to your AEs on that topic?

A.   No.

Q.   And were you the one that crafted those responses or was that based on material you got from UWM?

A.   I don't think we ever received any written guidance on it, so it more than likely would have just been a collaboration of myself and other account executives on how they handled it, how they handled questions and objections to it.

Q.   So what were some of the things you told your account executives to help them overcome any reluctance by the broker partners to continue doing business with UWM after the announcement of the all-in initiative?

A.   Yeah, the biggest one was really just protecting the wholesale channel, making sure that the brokers that originate loans could continue to serve those clients in the future because we didn't solicit their clients, we didn't have any retail presence, we didn't market towards their clients or anything like that.

A lot of brokers were just kind of hesitant even though they weren't signed up with either Rocket or Fairway, just questions on, "Hey, why would I agree to not use somebody?" and things like that.  So it was just more of make sure that they are focusing and -- focusing on the why that we're doing it and the long-term goal of it.

Q.   And prior to the announcement of the all-in initiative, broker partners could send loans to any lender they chose, right?

A.   Any lenders that they were signed up with, yes.

Q.   Well, UWM didn't prohibit them from signing up with any lender prior to the all-in initiative; is that right?

A.   Not that I'm aware of, no.

Q.   So what changed at the time the all-in initiative was implemented?

MR. ABDALLAH:  Objection.  Foundation.

THE WITNESS:  I couldn't give you a specific reason why.

BY MR. HIRSCH:

Q.    Are you aware of any broker partners who continued to send loans to Rocket Mortgage after the implementation of the all-in initiative?

A.    No specific knowledge of any particular brokers, no.

Q.    Did you ever tell any broker partner that UWM would not enforce the all-in initiative?

A.    No.

Q.    Did you ever hear of anyone telling broker partners that UWM would not enforce the all-in initiative?

A.    No.

Q.    Did you ever hear from any broker partner that they were told UWM would not enforce the all-in initiative?

A.    No.

Q.    Are you aware of any broker partner who sent loans to Rocket or Fairway after the all-in initiative who were not sued by UWM?

A.    No.

Q.    Did you ever tell any broker partner that UWM would not enforce the liquidated damages provision of the wholesale broker agreement?

A.   No.

Q.   Did you ever hear that UWM had told any broker partner that it would not enforce the liquidated damages provision?

A.   No.

Q.   Did you ever hear from any broker partner that they had been told UWM would not enforce the liquidated damages provision?

A.   No.

Q.   Are you aware of any situation where UWM did not enforce the liquidated damages provision?

A.   No.

Q.   Did the services UWM provided to its broker partners change after March 2021?

A.   Not that I recall, no.

Q.   Were you involved in any issue where District Lending wanted to transfer certain loan and appraisal information out of UWM in or around September 2023?

A.   Not that I'm aware of, no.

Q.   Did you ever hear that that took place?

A.   No.

Q.   Was it ever brought to your attention that District Lending was sending loans to Rocket or Fairway after the implementation of the all-in initiative?

A.   No.

Q.   Was it ever brought to your attention that any broker partner had been sending loans to Rocket or Fairway after the implementation of the all-in initiative?

A.   No.

Q.   So that was never an issue that got escalated to you and your position as AVP; is that correct?

A.   Brokers doing -- wanting to terminate their agreement with us?

Q.   Well, brokers allegedly sending loans to Rocket or Fairway after the implementation of the all-in initiative.

A.   That would have been something that I would have maybe called out on the -- to the broker to see if that's something that they wanted to terminate their relationship with UWM, but those decisions are escalated past me.  I can't make a decision to terminate an account.

Q.   So did you ever have that conversation with any broker partner?

A.   Yes, I'm sure I have.

Q.   Which ones?

A.   I could not recall, I mean, several years ago.

Q.   How many?

A.   It wouldn't have been many.  We didn't have a lot of brokers not want to sign the addendum, so I couldn't give you a specific number, but it wouldn't have been many.

Q.   But again, just so we're clear, I'm talking about the ones who UWM contended had signed the addendum but were violating the terms by also sending loans to Rocket or Fairway.

A.   Okay.  No.

Q.   Okay.  Does UWM have a database where it can see with which lenders its broker partners closed loans?

A.   Yes.

Q.   What is that called?

A.   I'm not sure the vendor that we use.  It's essentially public information; loan officers have access to it, real estate agents have access to it, I just don't know the vendor that we specifically use.

Q.   Are you familiar with CoreLogic?

A.   Yes, it's a credit company.

Q.   Is that the vendor that also does the database with closed loans, do you know?

A.   It could be.  I don't know.

Q.   Have you ever heard of UWM versus Everybody?

A.    Yes.

Q.    What is that?

A.    That's an integrated -- it's integrated into Salesforce, which we use on a daily basis, and that allows us to pull information on funded loans that -- funded loans that our brokers closed.

Q.    And would you use the UWM versus Everybody to monitor the broker partners you manage to determine with whom they were closing loans?

A.    Yeah, I did have access to it.

Q.    Did you use it --

A.    Yes.

Q.    -- to check if they were closing loans with Rocket or Fairway?

A.    I used it for all lenders, so it wasn't specifically for Rocket or Fairway; it showed us all lenders that they use, type of loans they did, volume, states that they're funding loans in, things like that, yes.

Q.    After the implementation of the all-in initiative, if you saw that a broker partner had closed loans with Rocket or Fairway, what steps would you take?

            MR. ABDALLAH:  Objection.  Form.  You can answer.

            THE WITNESS:  So in those situations, the

account executive would have a direct conversation with the broker on whether they're still using Rocket, and if they wanted to terminate their agreement, usually it would just be an email from the broker stating that they want to be released from the agreement with UWM.

BY MR. HIRSCH:

Q.    And have you personally had those sorts of conversations with --

A.    I have.

Q.    -- broker partners?

A.    Yes, I have.

Q.    Which ones?

A.    I couldn't recall the names of them.

Q.    How many?

A.    I mean, a handful, maybe 10, 12.

Q.    Of those 10 to 12, do you remember how many decided to terminate their relationship versus continuing the relationship?

A.    I do not know.

Q.    Of those 10 to 12, did any dispute that they were actually closing loans with Rocket after the all-in initiative?

A.    Not that I recall.

Q.    Did you have any involvement in the termination of

District Lending as a broker partner?

A.    No.

Q.    Who is Nicolas Gaudino?

A.    His title, I want to say, is vice president of sales.

Q.    Have you ever had any discussions about District Lending with Mr. Gaudino?

A.    No, not that I recall.

Q.    Who is Allen Beydoun?

A.    He is our executive vice president.

Q.    Did you ever have any discussions about District Lending with Mr. Beydoun?

A.    No.

Q.    Did you ever have any discussions about the all-in initiative with Mr. Beydoun?

A.    No.

Q.    Did you ever have any discussions about the all-in initiative with Mr. Gaudino?

A.    No.

Q.    In February of 2024, you were a senior account executive again; is that correct?

A.    Yes.

Q.    And at that time, you had no involvement with District Lending, correct?

A.    No.

Q.   What is the client support -- client priority support team?

A.   I don't know their full functions.  I only reach out to them if I -- if a broker is adding a new licensed loan officer to their name, so I reach out to them to have them added to our system so that we can get, like, credentials and log-in information to that loan officer.  I don't know if they have other functions aside from that; I would imagine they would, but not that I'm aware of.

Q.   Do you know if they have any function related to the termination of broker partners?

A.   I do not know.

Q.   Did you ever have any involvement in asking District Lending to come back as a broker partner with UWM after it had been terminated?

A.   Not that I recall, no.

Q.   Who is Adriana Bifarella?

A.   She's -- she works in our, what we call broker development team, so she works on getting new brokers signed up.

Q.   Do you know if that would include inviting former broker partners to come back to work with UWM?

A.   I don't think that she would, that that would be part of her role.  I don't know, but I don't think

it is.

Q. Who is Hassan Elherchi?

A. He's an account executive.

Q. Was he an account executive who worked under your purview when you were AVP?

A. No.

Q. Do you know if Mr. Elherchi was ever an account executive for District Lending?

A. I do not know.

Q. If a former broker partner of UWM is invited back to UWM, do you know who would make that reach-out?

A. I don't know the specific team that would -- you're saying that would basically renew their approval with us and --

Q. Let me ask maybe a different question.

A. Okay.

Q. Maybe a better question.

If a broker partner has been terminated, could -- is there any rules for whether their former AE would have to be the AE to reach out to invite them back, if you know?

A. I don't think so. I don't think -- are you asking would only the previous AE be the one allowed to invite them back to --

Q. Right.

A.   Okay.  I don't think so, no.

Q.   Okay.  Do you know who Eric Stein is?

A.   I do.

Q.   Who is Mr. Stein?

A.   He was a former account executive at UWM.

Q.   Was he an account executive who worked under your purview as an AVP?

A.   No.

Q.   Do you know if Mr. Stein was ever the account executive for District Lending?

A.   I do not know.

Q.   Who is Kyle Chamberlain?

A.   He's also an account executive.

Q.   Was Mr. -- was Kyle Chamberlain an account executive who worked under your purview when you were AVP?

A.   No.

Q.   Do you know if Kyle Chamberlain was ever the account executive for District Lending?

A.   I do not know.

Q.   Do you know Sam Naser or Naser, N-A-S-E-R?

A.   Yes.

Q.   Who is that?

A.   Sam is an account executive.

Q.   Was Sam an account executive who worked under your

Q. purview when you were an AVP?

A. Yes.

Q. Was Sam ever the account executive for District Lending?

A. Not that I'm aware of.

Q. Who is Robert Shkreli? S-H-R-K-E-L-I [sic].

A. Also an account executive.

Q. Was Mr. Shkreli an account executive who worked under your purview when you were AVP?

A. Yes.

Q. Was Mr. Shkreli ever the account executive for District Lending?

A. Not that I'm aware of.

Q. Did UWM have any policy about asking former broker partners who had violated the all-in initiative to come back, to ask them to come back?

A. Policy? I wouldn't necessarily say that there was a written policy, but I would imagine that account executives who kept in touch with accounts would have, you know, followed up with them to try to get them back.

Q. Who is Sarah DeCiantis?

A. She -- her official title, I don't know, but she's basically head of our marketing team.

Q. Did you ever have any discussions with

Ms. DeCiantis about District Lending?

A.    No.

Q.    Did you ever have any discussions with Ms. DeCiantis about the all-in initiative?

A.    No.

Q.    Did you ever have any discussions with Ms. DeCiantis about the liquidated damages provision?

A.    No.

Q.    You mentioned before that you understood the liquidated damages provision involved $5,000 per loan sent to Rocket or Fairway, correct?

A.    Loans funded; not just necessarily sent, but actually closed and funded.

Q.    Do you have any idea how that $5,000 figure was computed?

A.    No.

Q.    And you had no involvement in coming up with that calculation, correct?

A.    No.

          MR. ABDALLAH:  Jason, we've been going about an hour.  When you get a good time for a break just --

          MR. HIRSCH:  Yeah, let's take a short break now.

UNITED WHOLESALE MORTGAGE v MADISON ATRINA          Job 52625
GOMEZ, HENRY 03/24/2026                                    45

VIDEOGRAPHER:  Please stand by.  The time is now 10:57 and we are off the record.

(Whereupon a break was taken from 10:57 a.m. to 11:03 a.m.)

VIDEOGRAPHER:  The time is now 11:03 and we are back on the record.

BY MR. HIRSCH:

Q.    Do you know someone named Josh Leary?

A.    No.

Q.    Do you know a Jeff Campbell?

A.    No.

Q.    Do you know a former broker partner called Kevron?

A.    No.

Q.    Do you know a former broker partner called Midland Funding?

A.    No.

Q.    Do you know a former broker partner called Atlantic Trust?

A.    No.

Q.    Do you know a former broker partner called America's Moneyline?

A.    No.

Q.    Did UWM have a minimum percentage of loans it wanted from a broker partner in order to continue the relationship?

MR. ABDALLAH:  Objection.  Foundation.

THE WITNESS:  No.

BY MR. HIRSCH:

Q.   Are there any broker partners who send more than 90 percent of their loans to UWM?

MR. ABDALLAH:  Objection.  Foundation.

THE WITNESS:  I would imagine so, yeah.

BY MR. HIRSCH:

Q.   Are any of the broker partners who you have ever been the AE for, do any of those send more than 90 percent of their loans to UWM?

A.   Yes.

MR. ABDALLAH:  Objection.  Foundation.

BY MR. HIRSCH:

Q.   Do any of those send more than 95 percent of their loans to UWM?

MR. ABDALLAH:  Objection.  Foundation.

THE WITNESS:  Are we still talking about my accounts?

MR. HIRSCH:  For the ones you would know, right, your accounts, at any time.

THE WITNESS:  Yeah, I don't think more than 95 percent just because we don't do every mortgage type that's available, so I would say 95 probably exceeds what our highest broker percentage

would be.

BY MR. HIRSCH:

Q.    You told me before that you understood one reason for the all-in initiative was a concern that the select retail partners -- that would be Rocket Mortgage and Fairway -- would take loans out of the wholesale channel because they also had a retail side; did I get that correct?

A.    Yep.

Q.    Did UWM track whether any other lenders who also had a retail side would do the same thing?

          MR. ABDALLAH:  Objection.  Foundation.

          THE WITNESS:  We can't track any lender. I don't think -- I'm not aware of any other specific lenders that we focus specifically to monitor, no.

BY MR. HIRSCH:

Q.    Do you know why you focused on Rocket and Fairway?

A.    I cannot tell you why, no.

Q.    Do you have any specific evidence that Rocket would move loans that were in the wholesale channel over to the retail channel?

A.    No direct evidence, no.

Q.    Do you have any indirect evidence?

A.    No.

UNITED WHOLESALE MORTGAGE v MADISON ATRINA                    Job 52625
GOMEZ, HENRY 03/24/2026                                              48

Q.    Same question as to Fairway.

A.    No.

Q.    You agree with me that an independent mortgage broker has a responsibility to its client to find the best loan based on that client's particular facts and circumstances; is that correct?

            MR. ABDALLAH:  Objection.  Foundation.

            THE WITNESS:  I would say there's multiple facets to choosing a lender to send a specific loan to.

BY MR. HIRSCH:

Q.    So facets would include rate; that would be one?

A.    That would be one.

Q.    Term of the loan would be one?

A.    I mean, that kind of factors in with the rate.  The term of the loan dictates the rates.

Q.    Okay.  Maybe how fast the turnaround is for closing?

A.    Sure, yes.

Q.    Okay.  What others would you include?

A.    Ease of use, direct communication with underwriting, being able to talk directly to the people that are underwriting your files, being able to draw closing docs same day you get your clear to close, the fact that UWM puts the mortgage broker's

name on payoff statements.  I mean, there's a

number of reasons why -- aside from rate that a

broker would send business to UWM.

Q.   Well, not send -- not just to send to UWM --

A.   Yeah.

Q.   -- but to select the lender.

A.   Uh-hum.

Q.   So taking all those factors into account, does an

independent mortgage broker have an obligation to

select the best overall loan for its client based

on that client's particular needs and

circumstances?

          MR. ABDALLAH:  Objection.  Form and

foundation.

          THE WITNESS:  Okay.

          MR. ABDALLAH:  You can answer.

          THE WITNESS:  Okay.  Yeah, I would -- all

that would be taken into consideration when a

mortgage broker chooses who to send a particular

loan to.

BY MR. HIRSCH:

Q.   And if an independent mortgage broker couldn't send

loans to Rocket, let's say, if that mortgage broker

determined Rocket had the best loan, it would be

precluded from doing that based on the all-in

initiative, right?

MR. ABDALLAH:  Objection.  Form. Speculation.  Foundation.

THE WITNESS:  Correct.  They couldn't -- they could use Rocket as long as they did not have an active agreement with United Wholesale Mortgage.

BY MR. HIRSCH:

Q.    But if a broker partner did have an agreement with United Wholesale Mortgage, even if that broker determined a particular borrower's loan would be better suited at Rocket, the broker partner couldn't send it to Rocket, right?

MR. ABDALLAH:  Objection.  Foundation.

THE WITNESS:  Not correct.  They could send it to Rocket as long as they didn't have an active agreement with United Wholesale Mortgage.

BY MR. HIRSCH:

Q.    So they would have to terminate their agreement with United Wholesale Mortgage, set up an agreement with Rocket and send that one loan to Rocket; is that right?

A.    Or use any of the other hundred wholesale lenders that's available.

Q.    But if Rocket was the best for that particular

loan, it wouldn't be able to send it to Rocket, correct?

MR. ABDALLAH:  Objection.  Form and foundation.  You can answer.

THE WITNESS:  Correct; if they had an active agreement with United Wholesale Mortgage, correct.

BY MR. HIRSCH:

Q.    Does UWM have less product offerings for borrowers with credit ratings between 580 and 620 than Rocket Mortgage?

MR. ABDALLAH:  Objection.  Foundation.

THE WITNESS:  I don't know what product offerings Rocket has, but we offer everything that's required by law.

BY MR. HIRSCH:

Q.    Before the implementation of the all-in initiative, was UWM losing market share to Rocket?

A.    I do not know.

Q.    Did UWM ever refuse to process loans in the pipeline for a broker partner until it executed a version of the wholesale broker agreement containing the all-in initiative?

MR. ABDALLAH:  Objection.  Foundation.

THE WITNESS:  Not that I'm aware of.

BY MR. HIRSCH:

Q.    Are you aware of any other lenders who have both wholesale and retail business divisions?

A.    Yes.

Q.    Who are those?

A.    Freedom Mortgage.   I believe PennyMac as well.

Q.    Freedom Mortgage and PennyMac are not select lenders under the terms of the wholesale broker agreement, correct?

                MR. ABDALLAH:   Objection.   Form.   You can answer.

                THE WITNESS:   Are you referring to the all-in addendum?

BY MR. HIRSCH:

Q.    Yeah, I'm sorry, have you heard the term "select retail lenders"?

A.    No.

Q.    Okay.   Let me ask the question again.   Freedom Mortgage and PennyMac are not prohibited lenders under the terms of UWM's current wholesale broker agreement; is that right?

A.    Correct.

Q.    Do you know why Freedom Mortgage and PennyMac aren't excluded given that they have both wholesale and retail sides?

A.   I do not know.

Q.   Who is Heather Demy?

A.   Another team member at United Wholesale Mortgage. I do not know her specific title now.  She's changed roles several times.  She's been with the company for, I don't know, ten-plus years.

Q.   Did you ever have any discussions with Ms. Demy about District Lending?

A.   No.

Q.   Did you ever have any discussions with Ms. Demy about the all-in initiative?

A.   No.

Q.   Did you ever have any discussions with Ms. Demy about the liquidated damages provision?

A.   No.

Q.   Who is Mikele McMackin?

A.   Another account executive.

Q.   Was Ms. McMackin an account executive who worked under your purview when you were AVP?

A.   No.

Q.   Do you know if Ms. McMackin was ever the account executive for District Lending?

A.   I do not know.

Q.   Have you ever had any discussions with Ms. McMackin about District Lending?

A.    No.

Q.    Have you ever had any discussions with Ms. McMackin about the all-in initiative?

A.    No.

Q.    Have you ever had any discussions with Ms. McMackin about the liquidated damages provision?

A.    No.

Q.    Who is Steve Slifko?

A.    Steve Slifko's current title is assistant vice president.

Q.    Have you ever had any discussions with Mr. Slifko about District Lending?

A.    No.

Q.    Have you ever had any discussions with Mr. Slifko about the all-in initiative?

A.    No.

Q.    Have you ever had any discussions with Mr. Slifko about the liquidated damages provision?

A.    No.

Q.    We mentioned Mat Ishbia before, right?

A.    Uh-hum.

Q.    Have you ever had any discussions with Mr. Ishbia about District Lending?

A.    No.

Q.    Have you ever had any discussions with Mr. Ishbia

about the all-in initiative?

A.   No.

Q.   Have you ever had any discussions with Mr. Ishbia
about the liquidated damages provision?

A.   No.

Q.   Who is Sean Fahey?

A.   Sean is also an assistant vice president.

Q.   Have you ever had any discussions with Mr. Fahey
about District Lending?

A.   No.

Q.   Have you ever had any discussions with Mr. Fahey
about the all-in initiative?

A.   No.

Q.   Have you ever had any discussions with Mr. Fahey
about the liquidated damages provision?

A.   No.

MR. HIRSCH:   Okay.   If we can take a
short break, I just want to take one more quick
look at my checklist.

VIDEOGRAPHER:   Please stand by.   The time
is now 11:16.   We are off the record.

(Whereupon a break was taken
from 11:16 a.m. to 11:19 a.m.)

VIDEOGRAPHER:   The time is now 11:19 and
we are back on the record.

BY MR. HIRSCH:

Q.    Sir, we talked before about Alan Tucsok; do you recall?

A.    Yes.

Q.    Did you ever discuss District Lending with Mr. Tucsok?

A.    No.

Q.    Did you ever discuss the all-in initiative with Mr. Tucsok?

A.    No.

Q.    Did you ever discuss the liquidated damages provision with Mr. Tucsok?

A.    No.

Q.    I think you said you did learn at some point that District Lending had been closing loans with Rocket Mortgage after the implementation of the all-in initiative; is that right?

A.    No, I didn't say that.

Q.    Okay.  Are you aware that District Lending had been closing loans with Rocket Mortgage after the implementation of the all-in initiative?

A.    I'm not aware of it except for this.

Q.    So you did not become aware of it except for your preparation for this case?

A.    Correct.

MR. HIRSCH:  Okay.  I have nothing further.  Thank you.

MR. ABDALLAH:  No questions.

VIDEOGRAPHER:  Please stand by.  This is the end of the deposition of Henry Gomez.  The court reporter will now take orders for transcripts.

MR. HIRSCH:  Yeah, I mean, I'll take the transcript and the video.

MR. ABDALLAH:  I'll just take the trans. Electronic is fine, PDF.

VIDEOGRAPHER:  So video for Mr. Hirsch?

MR. HIRSCH:  Yes.

VIDEOGRAPHER:  Thank you very much.  This ends the deposition of Mr. Henry Gomez.  The time is currently 11:20 a.m.

(Deposition concluded at 11:20 a.m.)