# EXHIBIT 4

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF MICHIGAN

SOUTHERN DIVISION


UNITED WHOLESALE MORTGAGE, LLC,

     Plaintiff,          Case No. 2:23-cv-13176

     vs.

MADISON ATRINA LLC d/b/a DISTRICT

LENDING,

     Defendant.

_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _/


| | |
|---|---|
| DEPONENT: | STEVE SLIFKO |
| DATE: | Wednesday, February 4, 2026 |
| TIME: | 9:59 AM |
| LOCATION: | BUSH SEYFERTH PLLC |
| | 100 West Big Beaver Road, Suite 400 |
| | Troy, Michigan 48084 |
| REPORTER: | Kristen N. Trachet, CSR-16330 |
| VIDEOGRAPHER: | Bailey Wellman |
| JOB NO.: | 50808 |

UNITED WHOLESALE MORTGAGE v MADISON ATRINA       Job 50808
SLIFKO, STEVE 02/04/2026       2

APPEARANCES:


MAHDE Y. ABDALLAH

      Bush Seyferth PLLC

      100 West Big Beaver Road

      Troy, Michigan 48084

      (248)822-7800

      abdallah@bsplaw.com

      Appearing for Plaintiff


JASON R. HIRSCH

      Morganroth & Morganroth, PLLC

      344 North Old Woodward Avenue, Suite 200

      Birmingham, Michigan 48009

      (248)864-4000

      jhirsch@morganrothlaw.com

      Appearing for Defendant


ALSO PRESENT:

Ryan Byrd

          - - -

UNITED WHOLESALE MORTGAGE v MADISON ATRINA          Job 50808
SLIFKO, STEVE 02/04/2026                                   3

## TABLE OF CONTENTS

WITNESS:  STEVE SLIFKO                                  PAGE

Examination By Attorney Hirsch                      5

Examination By Attorney Abdallah                   73

Re-Examination By Attorney Hirsch                  74

- - -

## EXHIBITS

DEPOSITION EXHIBIT                                     PAGE

Exhibit 3      UWM Initial Disclosures             23

Exhibit 12     Wholesale Broker Agreement -        67
               UWM_DistrictLending0000030 to 49

Exhibit 13     Wholesale Broker Agreement -        67
               UWM_DistrictLending0000050 to 68

Exhibit 18     Mr. Slifko's LinkedIn               11

Exhibit 34     Screen Grab Account Status          62

- - -

Wednesday, February 4, 2026

Approximately 9:59 AM

Troy, Michigan

- - -

THE VIDEOGRAPHER:   Good morning. We are now on the record at 9:59 AM on Wednesday, February 4th, 2026.

This begins the videotaped deposition of Steven Slifko taken in the matter of United Wholesale Mortgage, LLC, verse Madison Atrina, Case No. 23-cv-13176.  We are taking this deposition at the offices of BSP Law in Troy, Michigan.

My name is Bailey Wellman, your legal videographer for today representing Fortz Legal Support.

Counsel, will you please state your name and whom you represent.  After which, our court reporter will swear in the witness.

ATTORNEY ABDALLAH:   Mahde Abdallah on behalf of the plaintiff, United Wholesale Mortgage.

ATTORNEY HIRSCH:   Jason Hirsch on behalf of Defendant.

MS. REPORTER:   Okay.  Great.

Sir, would you please raise your right hand.

Do you solemnly swear or sincerely affirm that the testimony you're about to give will be the truth, the whole truth, and nothing but the truth?

MR. SLIFKO:  I do.

MS. REPORTER:  Thank you.  You can put your hand down.

- - -

STEVE SLIFKO,

having affirmed or been duly sworn, was

examined and testified as follows:

EXAMINATION

BY ATTORNEY HIRSCH:

Q.    Good morning, sir.  We met a moment ago but, again, my name is Jason Hirsch.  I'm one of the attorneys for Defendant in this matter.

Let the record show that this is the deposition of Steven Slifko taken pursuant to Notice under the Federal Rules of Civil Procedure.

Sir, you see we have a court reporter here, so please make sure you answer my questions verbally so it can be taken down by our court reporter.  Okay?

A.    Uh-huh.

Q.  And try not to use things like "uh-huh" and "huh-huh" --

A.  Okay.

Q.  -- because that's a little bit harder for the court reporter to take down.  Okay?

A.  Okay.

Q.  And likewise, no head nods or headshakes, so try to answer verbally.

A.  Okay.

Q.  Thank you.  And sir, if at any time you need a break, just ask and we with certainly take a break. I would just ask you not do that while any question is pending.

You know you've just been sworn in.  You understand that I'll be asking you a series of questions.  And because you were sworn in, your answers will be under oath; you understand that, sir?

A.  Yes, sir.

Q.  And as we just talked about, we have a court reporter here, so please make sure to let me complete my question before you give your answer; both to make sure that you understand the question I'm asking, and because our court reporter can't record -- accurately record it when two people are

talking over each other. Okay?

A. Okay.

Q. And if at any time I interrupt you or you haven't completed your answer, please let me know and I will allow you to finish your answer for the record. Okay?

A. Okay.

Q. Have you ever been deposed before, sir?

A. Yes.

Q. How many times?

A. It was -- I think this would be my second -- or this would be my third.

Q. Okay.

A. It was before.

Q. When did the prior two depositions take place?

A. One was probably 18 months to two years ago. Prior to that, it was probably about 15 years ago.

Q. Let's start with the one furthest back in time.
You said it was about 15 years ago?

A. It'd be my best guess.

Q. What was that matter?

A. It was a matter with another company that I worked with -- for. It was Flagstar Bank. There was a complaint out of the state of New Jersey where a consumer didn't honor their -- the accusation was

that they didn't honor their duty of fulfilling their mortgage and buying the house that they said they were going to buy.

Q.   You weren't personally a party to that case?

A.   No.  I was just witness or worked at the company on both of those.

Q.   Still focusing on the case you told me about involving Flagstar Bank --

A.   Uh-huh, yes.

Q.   -- did you testify at a trial in that case?

A.   Yes.

Q.   All right.  And did that trial take place in New Jersey?

A.   It did.

Q.   Do you remember what court?

A.   I do not.  I think it was in the City of Hackensack.  For some reason that rings a bell to me.

Q.   Do you recall if it was a New Jersey state court or a United States federal court?

A.   It definitely wasn't federal court, but I don't know if it was a state or what county or --

Q.   With respect to the deposition you said took place about 18 months ago, what was that case about?

A.   It was about an individual that was, I guess, suing

United Wholesale Mortgage for wrongful termination.

Q.   And you were not personally a party to that case;
correct, if you know?

A.   I'm not sure what you mean.  I was just a witness.
I was just deposed as an employee of United
Wholesale Mortgage.

Q.   And who was the person who was suing UWM?

A.   Name was Matthew Pray.

Q.   Do you know if that was P-R-A-Y?

A.   I think it's A-Y.

Q.   And did that case -- well, strike that.
Was that case taking place in Oakland
County, if you know?

A.   I don't know.

Q.   Did that case end up going to court, if you know?

A.   Not to my knowledge.

Q.   Okay.  Do you know if that case is still going on?

A.   I heard it was over.

Q.   Why were you a witness in that case?  What was your
involvement?

A.   That particular team member was on my team.

Q.   And what was the basis for the allegation of
wrongful termination, if you know?

A.   I don't remember, no.

Q.   Okay.  So just for the record, can you state your

full name.  I think I didn't ask you that at the outset.

A.   It's actually Steve Patrick Slifko, III, is my legal name.

Q.   And sir, could you tell me about your formal education from undergrad, beginning with undergraduate college forward?

A.   I had a finance major from Michigan State University, and a Master's in Business from Oakland University.

Q.   That that was a BA in Finance from Michigan State; is that right?

A.   Yes.  Yup.

Q.   What year did you receive your BA?

A.   1996.

Q.   And then you said you got an MBA from Oakland University; is that right?

A.   Yes.

Q.   What year did you receive your MBA?

A.   I'm pretty sure it was 1998.  It may have been '99.
It was '99, right before I got married.

Q.   Sir, can you tell me about your employment history then starting from 1996 forward?  In other words, from your graduation from Michigan State forward.

A.   Uh-huh.  I came out of Michigan State and I started

working for a company called Flagstar Bank and their management development program.  And worked my way through there up until -- I think it was -- February of 2014.

And I temporarily worked for a -- a temp agency called Aerotek for a few months.  And then I went to a company called Bridgeview Bank which was headquartered out of Chicago.  I was probably there 15, 16 months.  And then I came over to United Wholesale Mortgage, I think, in July of 2015.

Q.  We can mark this as 18.

(Deposition Exhibit 18 was marked for identification.)

BY ATTORNEY HIRSCH:

Q.  Mr. Slifko, our court reporter's just handed you what we've marked as Exhibit 18.  If you can take a look at that and tell me if you recognize it.

A.  (Witness reviewing document.)

Yup.  Looks like a LinkedIn profile.

Q.  Your LinkedIn profile; correct?

A.  Yes.

Q.  Okay.  And if you could focus for a moment on the Experience section.  It starts at the bottom of the first page and then goes over.  And I think it lines up with some of the things you just told me.

Could you look at that and tell me if that's true and accurate on your LinkedIn profile?

A.   I mean, the dates and where I worked is accurate, yes.

Q.   Okay.  Let's start then with the first position you told me about after college was with Flagstar Bank, and you said you were in a management development program; is that correct?

A.   That's what it was called, yeah.  Management training is what they called it originally.

Q.   What did that involve?

A.   I'm gonna use the term -- in the end it involved in me working in six different departments over a year-and-a-half.  So you did, like, three-month rotations in each department in the organization.

Q.   Okay.  And on your LinkedIn profile it then says you were senior loan officer/home loan center manager.

     Do you see that under "Flagstar Bank"?

A.   Yes.

Q.   What were your duties and responsibilities -- well, strike that.

     Is that one position or two positions?

A.   That'd have been two.

Q.   Okay.

A.   I started when I came out of the management development program.  I started as a loan officer and then worked my way up to a loan home manager.

Q.   Okay.  So --

A.   Both of those were originating loans.  One without leadership, one with leadership.

Q.   Okay.  Okay.  And when you say, "originating loans," that would be retail loans for Flagstar; is that right?

A.   That's correct.

Q.   Okay.  Then the next position you held, it says here, senior vice president; correct?

A.   Yes.

Q.   Okay.  And what were your duties and responsibilities as a senior vice president?

A.   I was in charge of -- depends on what dates, but I was in charge of the consumer direct retail which was, you know, a call center.  And then there were parts where I was in charge of all of the retail distributed as well.

Q.   So the call center was also for retail mortgage loans; is that correct?

A.   Yeah.  By definition, the people that -- we all worked at Flagstar and we did loans for Flagstar.

Q.   And the call center, who would they call?  Did

Flagstar get leads or were people calling in?

How did that work?

ATTORNEY ABDALLAH:  Objection, form.

You can answer.

THE WITNESS:  It was a little bit of both.  It was either we were handling our own service book and business, so most of it was inbound calls from our current client and then outbound calls would've been to our current clients.

BY ATTORNEY HIRSCH:

Q.   And then you said you also oversaw -- I don't recall the words you used -- was it, the retail?

A.   I used the term distributed retail.

Q.   "Distributed retail," what did that involve?

A.   Managing.  We had loan centers all around the country and so I was responsible for managing those leaders that then had the loan officers underneath them.

Q.   Were the loan centers in Flagstar Banks or were those separate?

A.   Some were and some weren't.

Q.   Okay.  And after Flagstar Bank, you told me and your and LinkedIn profile shows, you were at

Q.   Aerotek Staffing Agency; right?

A.   Uh-huh.

Q.   And were you actually employed by Aerotek or did they outsource you to some company?

A.   I was paid and employed by Aerotek, but the little work I did was for Flagstar.  I was technically an employee of Aerotek.

Q.   Okay.  So during the period when you were employed by Aerotek, what work were you performing for Flagstar?

A.   I was just finishing up the project of putting in a lead management system that I had started while I was there.

Q.   Okay.  And why did you leave Flagstar?

A.   They asked me to leave on a downsizing under the WARN Act.

Q.   Okay.  After that -- I guess -- stint with Aerotek, you were at something called BBMC Mortgage; is that right?

A.   Yes.

Q.   What is BBMC Mortgage?

A.   Bridgeview Bank Mortgage Company.

Q.   Is that a wholesale or retail?

A.   That was retail.

Q.   Okay.  And it says here you were branch manager/

senior mortgage banker; is that one position or two separate positions?

A. It's the title they gave us.  We wrote loans and manage the people in the branch.

Q. And you were at BBMC, it says here, from May 2014 to July 2015; is that right?

A. Yeah.

Q. And why did you leave BBMC?

A. I was seeking a better opportunity for myself.

Q. All right.  And your next position then was with United Wholesale Mortgage; correct?

A. That's correct.

Q. Okay.  And we'll call that UWM.  I assume you'll know what that means, right?

A. Okay.

Q. That's okay.  And your position at UWM is sales divisional leader; is that correct?

A. That's correct.

Q. Okay.  And you've held that position the entire time at UWM; is that right?

A. No.

Q. Okay.  What other positions have you held at UWM?

A. When I first joined UWM, it was -- there were other companies that UWM had at the time.  When I started, I was working for a company call Shore

Mortgage, which was a small retail operation where we did loans for friends and family of United Shore or -- or Shore Mortgage, 'cause those were the two companies at the time at United Wholesale Mortgage.

Q.    Okay.  So for what period of time were you at Shore Mortgage?

A.    Call it 2016 and a half, 2017.  At that time we ended up exiting that business and shut that company down.

Q.    Okay.  And Shore Mortgage, you said, was a small retail lender; is that right?

A.    When I came in there were probably ten people.

Q.    Okay.  And you said it did loans for friends and family of United Shore employees?

A.    Correct.  We did employee loans of their friends and family loans.

Q.    Okay.  Could anybody walked in there or did you have to be referred?

A.    We didn't do any advertising, so they would've had to have been referred.

Q.    Do you know why United Wholesale Mortgage also operated a specific retail mortgage arm for friends and family?

            ATTORNEY ABDALLAH:  Objection, foundation.

UNITED WHOLESALE MORTGAGE v MADISON ATRINA
SLIFKO, STEVE 02/04/2026

Job 50808
18

You can answer.

THE WITNESS:  I don't know.

BY ATTORNEY HIRSCH:

Q.    The loans that were originated by Shore Mortgage, those would all go through United Wholesale Mortgage?

ATTORNEY ABDALLAH:  Objection, foundation.

THE WITNESS:  No, they went through Shore Mortgage.

BY ATTORNEY HIRSCH:

Q.    So who was the lender on those loans?

A.    Shore Mortgage.

Q.    Okay.  Okay.  So after the time you spent at Shore Mortgage, what was your next position with United Wholesale Mortgage?

A.    It was a -- I think we called a correspondent specialist.

Q.    And for what period of time were you a correspondent specialist?

A.    I think I'd call it December of 2019 until then, 'cause that's the date I know I became a division leader.

Q.    And what were your duties as a correspondent specialist?

A.   I worked with owners of companies that were correspondents, you know, or people that were mortgage brokers that wanted to become a correspondent.  You know, walk them through that process.

Q.   Did you have a particular group of correspondents who you worked with or could it just be anybody?

A.   We all had groups of ones that were under our names.

Q.   And your next role then was as sales divisional leader; is that right?

A.   That's correct.

Q.   Okay.  And you said you started around --

A.   I think it was December 2019 is my best guess, yeah.

MS. REPORTER:  You've gotta let him finish his question.  Thank you.

BY ATTORNEY HIRSCH:

Q.   And you've had that role since that time; correct?

A.   Correct.

Q.   What are -- well, what are your current duties in that role?

A.   I'm in the -- the main duty is to work with our account executives and train them in sales and assist in any way we can with them.

Q.   Do you have a particular group of AEs that fall under your purview?

A.   Yes.

Q.   Okay.  How many?

A.   I'm gonna guess at about 45.

Q.   And when you became the correspondent specialist, was that your first experience in the wholesale mortgage industry?

A.   In a job role, yes.

Q.   What other experience had you had in the wholesale mortgage industry?

A.   Well, when I worked at Flagstar we had a wholesale division, so I was exposed to it, but I didn't have any job responsibilities regarding it.

Q.   Now, I think my question before was -- and you answered was -- to tell me your current duties as a divisional leader, but just to square the circle, did those duties ever change over time or would that apply to your entire term as divisional sales leader -- sales divisional leader, I'm sorry.

A.   The -- yeah, that role hasn't changed.

Q.   Okay.  In that role do you have any direct interaction with independent mortgage brokers?

A.   Yes.

Q.   Do you have a particular group of independent

mortgage brokers who fall under your purview?

A. Yes.

Q. And those are the mortgage brokers who are assigned to the 45 or so account executives under your purview?

ATTORNEY ABDALLAH: Objection, foundation.

You can answer.

THE WITNESS: Yes.

BY ATTORNEY HIRSCH:

Q. What sort of interactions do you have, then, with the independent mortgage brokers?

A. Most of it is if something were to be escalated to me. If there was situation where an account executive was out of the office or, you know, somebody called when an AE was out of office, they would then send it to me, the division leader, which I would either, you know, then handle their question or redirect it to where it needed to go.

Q. Do you understand that the defendant in this case is a company called Madison Atrina, I think more commonly known as District Lending?

A. Yup. I've learned that recently, yes.

Q. Okay. And is it okay if I call them "District Lending" throughout this deposition; you'll know

who I mean?

A.   Yes.  Now, I will.

Q.   Okay.  Do you understand that -- strike that.  I'm sorry.

Do you understand that UWM has designated you as an individual likely to have information about District Lending's agreement to the all-in addendum?

ATTORNEY ABDALLAH:  Objection, foundation.

You can answer, if you know.

THE WITNESS:  I'm here.

BY ATTORNEY HIRSCH:

Q.   Well, do you know --

A.   I didn't know why I was designated.

Q.   Okay.  Do you know that you were also designated as an individual likely to have some information about District Lending's submission of loans to Rocket or Fairway?

A.   Can you repeat that question?

Q.   Do you know that you were also designated by UWM as a person likely to have some information about District Lending's submission of loans to Rocket or Fairway?

A.   I didn't know that.

Q.   Okay.  All right.  And I take it, then, that you don't know why you were designated like that?

A.   I could guess.

Q.   Well, I don't want you to guess.  I just want --

A.   Nobody told me I was designated to -- because I had knowledge of the things you just said.

Q.   Okay.  Do you know who it was that designated you?

A.   No.

Q.   Let's mark this as Exhibit 3, please.

(Deposition Exhibit 3 was marked for identification.)

BY ATTORNEY HIRSCH:

Q.   Sir, our court reporter has just handed you what we've marked as Exhibit 3.  And you can certainly take your time to look at that and then my question is whether you recognize that document.

A.   I don't.

Q.   Okay.

A.   I was informed that there was something going on within and to preserve anything I had on it and to sign a document --

ATTORNEY ABDALLAH:  I'm gonna object.

Mr. Slifko, to the extent you're testifying about communications you had with

counsel with UWM, I'd advise to not to reveal those communications.

THE WITNESS:  Okay.  Okay.  I've never read this document if it was given to me.

BY ATTORNEY HIRSCH:

Q.    Okay.  And I don't want to know anything that you've said that's subject to the attorney-client privilege, in other words, with your counsel, UWM's counsel.

All right.  In any event, sir, I'd like you to look at -- starting at the bottom of, you know, page 1 where it sort of says Number 1.  I guess not the Roman numeral, but the --

A.    Uh-huh.

Q.    -- the regular number 1.  And then it goes over to page 2, and if you could review that.  It's talking about certain employees or representatives of UWM and it lists some things they might have knowledge about.

Do you see that, sir?

A.    I'll read it now.  (Witness reviewing document.)
Okay.

Q.    Okay.  And you see that your name is listed there under little D on page 2?

A.    Yes.

Q.     Okay.  So now I want to walk through these, sir, and ask you whether you have knowledge about these particular topics.  So we're going to do them one at a time so the record is clear here.

A.     Uh-huh.

Q.     Do you have knowledge regarding District Lending's agreement to the wholesale broker agreement and any amendments?

                    ATTORNEY ABDALLAH:  Objection, form.

                    You can answer.

                    THE WITNESS:  I don't have any direct knowledge.

BY ATTORNEY HIRSCH:

Q.     Okay.  Do you have any indirect knowledge?

A.     Well, every one of our clients is subjected to our agreement.

Q.     Okay.  So you understand that generally all the wholesale brokers are subject to the agreement; is that right?

A.     My understanding is all of them are.

Q.     Okay.  But you have no particular knowledge about District Lending agreeing or not agreeing to the wholesale broker agreement; is that right?

A.     That's correct.

UNITED WHOLESALE MORTGAGE v MADISON ATRINA
SLIFKO, STEVE 02/04/2026

Job 50808
26

Q.   The next topic listed here is District Lending's submission of mortgage loans or mortgage loan applications to Rocket Mortgage or Fairway Independent Mortgage for review, underwriting, purchase, or funding since March 4th, 2021.

Do you have any knowledge about that topic?

A.   I do not.

Q.   Okay.  Now, the next topic it says is claims allegations and defenses in United Wholesale Mortgage's First Amended Complaint.  Let's focus on that first.

Let me ask you first, have you seen United Wholesale Mortgage's First Amended Complaint?

A.   No.

Q.   The second part of that is asking about, I guess, defenses raised in District Lending's Answer to the Complaint.

Have you seen District Lending's Answer to the Complaint?

A.   No.

Q.   So since you haven't seen either of those documents, you don't know one way or the other whether you'd have any knowledge about anything in

there; right?

ATTORNEY ABDALLAH:  Objection, form, foundation.

You can answer.

THE WITNESS:  Correct.

BY ATTORNEY HIRSCH:

Q.    Okay.  You are familiar with the all-in addendum; is that correct?

A.    Yeah, the -- with the section of our agreement, yeah.  I saw it recently.

Q.    Did you have any involvement in the preparation of the all-in addendum?

A.    No.

Q.    Did you have any involvement in the decision to include the all-in addendum?

A.    No.

Q.    Do you know who prepared the all-in addendum?

A.    No.

Q.    Do you know if Mr. Ishbia was involved in the preparation of the all-in addendum?

A.    I do not.

Q.    Do you know Matt Ishbia?

A.    Yes, I do.

Q.    Okay.  And how do you know him?

A.    He's the CEO of the company I work for.

Q.    Okay.  Where does he fall on an organizational chart relative to your position as -- was it -- division leader?

A.    Falls at the top.

Q.    Okay.  Who's between and you Mr. Ishbia on that chart?

A.    You would have a --

ATTORNEY ABDALLAH:  Objection, foundation.

You can answer.

THE WITNESS:  There'd been an executive vice president, then a senior vice president, then vice presidents, and then comes assistant vice presidents or division leaders. And that's just on the sales side, so.

BY ATTORNEY HIRSCH:

Q.    So right above you on the chart, you said, is assistant VP?

A.    No, would be vice president.  I'm assistant vice president, comma, division leader.

Q.    Okay.  Are your roles any different than the ones you've already told me about as assistant vice president?

A.    No.

Q.    Okay.  So who is the vice president then above you

on the org chart?

A.  Currently, it's a gentleman by the name of Josh Frank.

Q.  And how long has Mr. Frank been in that position?

A.  I think I've reported to him for probably a little -- about a year.

Q.  Who preceded Mr. Frank?

A.  Before him, I reported to a gentleman, Nicolas Gaudino.

Q.  Do you recall the time frame in which you reported to Mr. Gaudino?

A.  I don't.  And before him, it was Eric Mojica.  And before him, it was a guy named John Gross.

Q.  Mr. Gaudino is still with UWM; is that right?

A.  Yes.

Q.  Have you ever interacted with Mr. Ishbia on anything having to do with District Lending?

A.  No.

Q.  Have you ever interacted with Mr. Ishbia on anything having to do with the all-in addendum?

A.  No.

Q.  Are you familiar with the liquidated damages provision in UWM's wholesale broker agreement?

A.  Yes, I saw it yesterday.

Q.  Were you familiar at all with it before yesterday?

UNITED WHOLESALE MORTGAGE v MADISON ATRINA  
SLIFKO, STEVE 02/04/2026

Job 50808  
30

A.    I knew it existed, but I couldn't have told you what it said.

Q.    So I take it, then, you never interacted with Mr. Ishbia with respect to the liquidated damages provision; would that be accurate?

A.    That's correct.

Q.    Okay.  Do you know Allen Beydoun?

A.    I do.

Q.    Who is Mr. Beydoun?

A.    He's an executive vice president of sales.

Q.    And so he is the executive vice president that is above the senior vice president who is above the vice president; is that right?

              ATTORNEY ABDALLAH:  Objection, form.

BY ATTORNEY HIRSCH:

Q.    In your chain, sorry.

A.    Not today, no.

Q.    Okay.  So Mr. -- what is Mr. Beydoun's position today?

A.    I think he might be chief client officer, I think is what --

Q.    If you know.

              Was Mr. Beydoun ever the EVP in your chain?

UNITED WHOLESALE MORTGAGE v MADISON ATRINA            Job 50808
SLIFKO, STEVE 02/04/2026                                     31

A.     Yes.

Q.     Okay.  For what period of time was he the EVP in your chain?

A.     I would say from the day I started there to, say, maybe 12 to 14 months ago.

Q.     Do you know if Mr. Beydoun was involved in the preparation of the all-in addendum?

A.     I have no idea.  I do not know.

Q.     So you never had any interaction with Mr. Beydoun about the all-in addendum?

                    ATTORNEY ABDALLAH:  Objection, form.

                    THE WITNESS:  Not in the context you're saying, no.

BY ATTORNEY HIRSCH:

Q.     Well, in what context did you?

A.     We -- people have talked about it.  When it came out, we announced it, so I can't say I never said words about it.

Q.     But I mean, all I want to know is whether you've had a discussion with Mr. Beydoun that related to the all-in addendum?

A.     No.

Q.     Have you ever discussed District Lending with Mr. Beydoun?

A.   No.

Q.   Have you ever discussed the liquidated damages provision with Mr. Beydoun?

A.   No.

Q.   Do you know Sarah DeCiantis?  And I apologize if I didn't get her last name correct.

A.   Yes.

Q.   Okay.  Who is she?

A.   She's the executive vice president of marketing.

Q.   Okay.  How often do you interact with Ms. DeCiantis?

A.   Never.

Q.   All right.  So fair to say, then, that you've never discussed District Lending with Ms. DeCiantis?

A.   I have not.

Q.   Did you have any involvement in the preparation of the liquidated damages provision?

A.   No.

Q.   Do you know who was involved in that?

A.   I do not.

Q.   Have you ever communicated with any representatives of District Lending?

A.   I don't believe so.

Q.   I think you said before that generally you would only talk directly to representatives of the

wholesale brokers if an issue would escalate or maybe if an AE is unavailable; is that right?

A.    That is generally correct, yes.

Q.    When those conversations occurred, do you keep any written record of those conversations?

ATTORNEY ABDALLAH:  Objection, form.

THE WITNESS:  No.

BY ATTORNEY HIRSCH:

Q.    Who was the AE assigned to District Lending?

A.    I -- when it was under me, that I learned recently was also designated Alan Tucsok was the account executive when it fell under my division.

Q.    For what period of time did District Lending fall under your division?

A.    I don't know exactly, but I -- from the timing of all this, I think it was probably maybe, like, 45 days to 60 days.

Q.    Well, you were a division leader since 2019; right?

A.    Uh-huh.

Q.    About?

A.    Right.

Q.    And when do you think District Lending terminated its relationship with UWM?

ATTORNEY ABDALLAH:  Objection,

UNITED WHOLESALE MORTGAGE v MADISON ATRINA
SLIFKO, STEVE 02/04/2026

Job 50808
34

form and foundation.

BY ATTORNEY HIRSCH:

Q.    If you know.

A.    I don't know.  I just know when I was working with
      Alan Tucsok.

Q.    So was there a time when Mr. Tucsok switched from
      being under your purview to being under the purview
      of some other division leader?

A.    Yes.

Q.    When did that occur?

A.    I don't know.

Q.    Okay.

A.    We do -- I do not know.

Q.    Do you know why that occurred?

A.    Why what occurred?

Q.    Why Mr. Tucsok changed from being under your
      purview to being under the purview of some other
      division leader?

A.    As a company, we do -- we call them shakeups every
      couple years where we change our divisions all up
      so people get to work with other people.

Q.    Do you know who the division leader Mr. Tucsok fell
      under after you?

A.    I do not.

Q.    Is Mr. Tucsok still with UWM?

scheduling@fortzlegal.com          fortzlegal.com          Toll Free: 844.730.4066

A.    He is not.

Q.    Do you know when he left UWM?

A.    I don't know exactly, no.

Q.    Have you had any communication with Mr. Tucsok after he left UWM?

A.    No.

Q.    Did you ever have any discussion with Mr. Tucsok about District Lending?

A.    I'm sure we talked about it, but.

Q.    Do you recall what you talked about?

A.    The only name that I recognized in this is Josh Rapaport and that is because there had been, at times from other departments, complaining about how he treated our team members, so yes, I talked to Alan about that to let him -- have him talk to Jason to let him know that's not appropriate.

Q.    All right.  I'm -- you just said, "Jason."  Did you mean Josh?

A.    Yeah.  That's --

            (Simultaneous speaking.)

BY ATTORNEY HIRSCH:

Q.    That's okay.

A.    You're Jason.

Q.    I just want to make sure we're not confused for the record.

Do you know who the employees were that complained about how they were being treated by Mr. Rapaport?

A. I don't know who the employees were, no.

Q. Was Mr. Tucsok one of the employees who complained about how he was treated by Mr. Rapaport?

A. No, not to me.

Q. Do you know what Mr. Tucsok did after you told him about these complaints about how UWM employees were being treated by Mr. Rapaport?

A. I asked him to, you know, give him a ring, so I'm sure he did.

Q. Did he ever -- go ahead.

A. I'm good.

Q. Did he ever report back to you about actually giving him a ring?

A. Not that I recall.

Q. Okay. And do you recall any details about the nature of what these complaints were about treatment?

A. I do not remember the details.

Q. And how were those complaints brought to your attention?

A. On that one, it was from a manager in underwriting. Said it was -- claimed he was raising his voice at

them.

Q.     Who was the manager in underwriting?

A.     I don't remember at all.

Q.     When you do this -- I think you called it a --
corporate shake up to change the structure of who
the AEs report to, do the AEs still retain the
particular independent wholesale brokers who they
are the executive for when this move-around
happens?

                ATTORNEY ABDALLAH:  Objection,
form.

                You can answer.

                THE WITNESS:  All right.  So we
refer to them as accounts and, yes, the
accounts, they move with the account executive.

BY ATTORNEY HIRSCH:

Q.     Okay.  Do you recall when the complaints about
Mr. Rapaport were raised?

A.     No.

Q.     But it would've been during the approximately
45-day period where Mr. Tucsok was under your
purview; right?

A.     Yes.

                ATTORNEY ABDALLAH:  Objection,
form, foundation.

BY ATTORNEY HIRSCH:

Q.     So you have no knowledge about the number of loans that District Lending was sending to UWM?

                    ATTORNEY ABDALLAH:  Objection, form.

                    THE WITNESS:  Correct.

BY ATTORNEY HIRSCH:

Q.     You have no knowledge about the number of loans UWM -- strike that.  I'm sorry.

              You have no knowledge about the number of loans District Lending was sending to Rocket; is that right?

A.     I have no knowledge.

Q.     Okay.  And you don't know if that happened at all; correct?

A.     I -- correct.

Q.     What is your understanding of the all-in addendum, if you have one?

A.     My understanding is that we're agreeing that if somebody use -- sends loan to Rocket or Fairway Independent, there's liquidated damages and it's a violation of the agreement.

Q.     Does UWM track loans that the wholesale brokers send to Rocket?

                    ATTORNEY ABDALLAH:  Objection,

form.

THE WITNESS:  I'm not part of any of that.

BY ATTORNEY HIRSCH:

Q.    Do you know if it occurs?

A.    I know we have the data where every loan goes.  If they're --

Q.    Do you know how that data is stored?

A.    No.  No.

MS. REPORTER:  What was your answer?

THE WITNESS:  No.

BY ATTORNEY HIRSCH:

Q.    Do you know who has access to that data?

A.    Yeah, the individual account executives have access to their accounts.

Q.    Are the individual account executives instructed to monitor that data to determine if any of their accounts are sending loans to Rocket?

A.    Yes.  And I know other people, it's -- I know it's monitored, but I don't know who's actually monitoring it.

Q.    Has it ever come to your attention that one of the accounts under your purview was sending loans to Rocket after the time the all-in addendum was

UNITED WHOLESALE MORTGAGE v MADISON ATRINA                     Job 50808
SLIFKO, STEVE 02/04/2026                                            40

implemented?

A. Not directly, no.

Q. Has it ever happened indirectly?

A. Yes.

Q. What -- how many times did it happen indirectly?

A. I have no idea.

Q. More than once?

A. I can recall under mine one or two times.

Q. Okay. Can you tell me about those one or two times?

A. I just did.

Q. Okay. Who -- who were the accounts involved?

A. I have no idea.

Q. Who were the account executives involved?

A. I don't recall.

Q. What was the -- well, strike that.

What actions did you take when it came to your attention indirectly?

A. We have a process that the AEs follow by filling out a task, and that task goes to another team. So that's where my knowledge ends.

Q. Okay. Is a task a hard-copy form? An electric form?

A. It's an electric form internally.

Q. Do you know if a task was filled out with respect

to District Lending?

A.   I do not.

Q.   You said after the task is filled out, it goes to a different department?

A.   I used the term "team."

Q.   Team, I'm sorry.  What team does it go to?

A.   I honestly don't know.

Q.   Okay.  Are you familiar with something called Model Match, Inc.?

A.   No.

Q.   Do you know where UWM obtains the data about where mortgage loans are going?

A.   No.

Q.   Who was responsible for recruiting independent brokers to sign up with UWM?

A.   We have -- we have two teams.  I'm not sure which one it is.  I always get them confused, but business development or wholesale development.

Q.   And so the sales team that you're involved in doesn't interact until someone has signed up to be a wholesale broker with UWM; is that --

A.   That's correct.

Q.   And so you did not have any involvement in the process to recruit brokers to sign up with UWM; is that correct?

A.     That's correct.

Q.     Were you aware of a Facebook Live video posted by Mr. Ishbia in March of '21 where he announced the all-in initiative?

ATTORNEY ABDALLAH:  Objection, form and foundation.

THE WITNESS:  Yes.

BY ATTORNEY HIRSCH:

Q.     Have you seen it?

A.     We -- we all watched it live.

Q.     So was that a company-wide event when this was announced?

A.     For the sales team.

Q.     Okay.  Were you watching the video stream or were you actually watching physically Mr. Ishbia who was being streamed out to --

A.     Video stream.

Q.     Okay.  Where did you watch this?

A.     At my desk.

Q.     Okay.  Did you know that the all-in initiative was coming before this video stream?

A.     No.

Q.     Prior to this announcement, UWM's wholesale broker agreements did not include any prohibition on doing business with other lenders; right?

ATTORNEY ABDALLAH:  Objection, foundation.

THE WITNESS:  I never saw the agreement prior to, so I don't know.

BY ATTORNEY HIRSCH:

Q.   Well, had you ever heard that doing business with any other lender was a violation prior to Mr. Ishbia's announcement?

ATTORNEY ABDALLAH:  Objection, form.

THE WITNESS:  No.

BY ATTORNEY HIRSCH:

Q.   Do you know why the all-in addendum was added at this point in time?

ATTORNEY ABDALLAH:  Objection, foundation.

THE WITNESS:  On that particular date, no.

BY ATTORNEY HIRSCH:

Q.   Do you know why it was added, period?

ATTORNEY ABDALLAH:  Same objection.

THE WITNESS:  What was stated in the video -- I mean, the gist of it is that we're a wholesale, we support the wholesale

community, and that any loan that's done within retail is one less loan that we can get and we didn't want to provide our tools to clients that were utilizing a company that was hurting the wholesale community.

BY ATTORNEY HIRSCH:

Q.   Well, there are other retail lenders besides the two named in the all-in addendum; right?

A.   Yeah, there's all kind of retail lenders across the county.

Q.   Do you know why those particular two retail lenders, Rocket and Fairway, were named in the all-in addendum?

ATTORNEY ABDALLAH:  Objection, foundation.

THE WITNESS:  Because they did wholesale and retail.

BY ATTORNEY HIRSCH:

Q.   Are there other entities that do both wholesale and retail?

A.   Since then, yeah, there is.

Q.   Well, I mean, you told me when you were at Flagstar, they also had a wholesale division; right?

A.   Uh-huh.

Q.   Do you know if they -- Flagstar still has both?

A.   I believe they shut down their wholesale division.

Q.   Okay.  Are you aware if anything had changed in terms of UWM's market share in March of 2021, that prompted the addition of the all-in addendum to the wholesale broker agreement?

A.   No.

Q.   Do you know how the brokers were informed about the inclusion of the all-in addendum?

            ATTORNEY ABDALLAH:  Objection, form, and foundation.

            THE WITNESS:  The video was one piece, and then I know that when an owner of a company signed into our website or portal, it presented it to them in a digital form.

BY ATTORNEY HIRSCH:

Q.   Have you seen what that looked like yourself?

A.   Not a live version, no.

Q.   You've seen a mockup that showed you what it would look like for a wholesale broker logging in?

A.   Yes.

Q.   Okay.  What did it look like?

A.   It looked like the section of the addendum or the agreement that covers that verbiage.

Q.   And then what had to happen?

What did the broker have to do?

A.   They click agree or disagree.

Q.   Okay.  What happened if they clicked disagree?

A.   Then we terminated the relationship with them.

Q.   Was the clicking of disagree a termination or did something else have to happen?

A.   I don't follow you.

Q.   Well, did clicking that button saying, I disagree, did that automatically terminate the relationship or was there some other protocol that had to be followed?

A.   Well, I know that clicking the button didn't automatically turn their access off, so.

Q.   Okay.  Did UWM provide you with any guidance as to how to present the all-in addendum to the wholesale brokers?

A.   Just what was on the live video.

Q.   And it's your understanding that in order to continue to do business with UWM, it was mandatory to agree to the all-in addendum; is that right?

A.   I don't believe it was -- I don't know the answer to that.

Q.   Are you aware of any independent brokers who did not agree to the all-in addendum and continued to do business with UWM?

A.    No.

Q.    Did you ever receive any pushback from any wholesale broker about not wanting to agree to the all-in addendum?

A.    People -- you know, there were people that complained about it upfront.

Q.    Who complained about it?

A.    I don't have any specifics.

Q.    Of the people that complained about it, do you know how many terminated their relationship with UWM versus ultimately agreed to it anyway?

A.    I do not.

Q.    Are you aware of any independent wholesale brokers who UWM claims violated the all-in addendum, aside --

          ATTORNEY ABDALLAH:  Objection --

BY ATTORNEY HIRSCH:

Q.    Sorry -- aside from District Lending?

          ATTORNEY ABDALLAH:  Objection, form and foundation.

          THE WITNESS:  I've seen some stuff in industry articles that there were other ones.

BY ATTORNEY HIRSCH:

Q.    Do you recall any of the other ones you've seen?

A.    The names, I do not.

Q.    Do you recall if any of the other ones fell under your purview?

A.    I -- I don't know.

ATTORNEY ABDALLAH:  Jason, we're about an hour in.  Whenever's a good time for --

ATTORNEY HIRSCH:  Okay.  Yeah, this is a fair time.

ATTORNEY ABDALLAH:  Okay.

ATTORNEY HIRSCH:  That's good.

THE VIDEOGRAPHER:  Off the record at 10:59 AM.

(Recess taken at 10:59 AM.)

(Back on the record at 11:06 AM.)

THE VIDEOGRAPHER:  We are back on the record at 11:07 AM.

BY ATTORNEY HIRSCH:

Q.    Sir, are you on any medication today that would impact your memory in any way?

A.    No.

Q.    Are you aware that UWM offered that brokers who allegedly violated the all-in addendum would be allowed to come back without penalty to UWM if they agreed to send a certain percentage of loans to

UWM?

ATTORNEY ABDALLAH:  Objection, form, and foundation.

THE WITNESS:  No.

BY ATTORNEY HIRSCH:

Q.   Do you recall a situation in or around September 2023, when District Lending was not being allowed to transfer certain appraisal information out of UWM?

A.   No.

Q.   Do you know whether anybody told District Lending that the all-in addendum would not be enforced?

A.   No.

Q.   Did you ever hear that anyone from UWM told any independent broker that the all-in addendum would not be enforced?

A.   No.

Q.   When UWM added the all-in addendum, did it provide any new or additional services to independent wholesale brokers?

ATTORNEY ABDALLAH:  Objection, foundation.

THE WITNESS:  Not that I recall.

BY ATTORNEY HIRSCH:

Q.   Do you know whether UWM has enforced the all-in

addendum against all the broker partners?

          ATTORNEY ABDALLAH:  Objection, foundation.

          THE WITNESS:  I don't know.

BY ATTORNEY HIRSCH:

Q. And so you don't know if there are any broker partners who sent loans to Rocket and UWM, but were not sued by UWM?

A. Correct, I do not know.

Q. Are you familiar with a company called Kevron?

A. No.

Q. Are you familiar with a company called Midland Funding?

A. No.

Q. Are you familiar with a company called America's Moneyline?

A. No.

Q. Are you familiar with a company called Atlantic Trust?

A. No.

Q. Are you familiar with a company called E Mortgage Capital?

A. Yes.

Q. What is E Mortgage Capital?

A. It's a mortgage company.

Q.    It is a wholesale mortgage company?

A.    A --

              (Simultaneous speaking.)

BY ATTORNEY HIRSCH:

Q.    I'm sorry.  Let me ask a different question.  I
      apologize.

              Is it a broker partner of UWM?

A.    If you're referring to the E Mortgage Capital out
      of California, yes.

Q.    Do you know whether E Mortgage Capital also sends
      loans to Rocket?

A.    I do not know.

Q.    Do you know who owns E Mortgage Capital?

A.    I knew the name.  His name is Sam.  I don't know
      his last name.  And that's not his legal name,
      either.

Q.    You're not sure, I understand.

A.    Yeah, I'm not sure.

Q.    Was E Mortgage Capital under the purview of one of
      the account executives who fell under your purview?

A.    I don't believe during that time period, but about
      a year-and-a-half ago, they did fall under me, but
      they don't today.

Q.    Do you know who is the account executive for
      E Mortgage Capital?

A.   There's a team of roughly ten account executives that handle that account.

Q.   There's a team of ten --

A.   Account executives.

Q.   Sorry.
             -- because of its size?

A.   Uh-huh.

Q.   Can you name me any of the ten on that team?

             ATTORNEY ABDALLAH:  I'm just gonna put a standing objection on this line of questioning related to E Mortgage Capital related to relevance.

             But you can continue.

             THE WITNESS:  No, I don't know anybody today.

BY ATTORNEY HIRSCH:

Q.   Okay.  Do you know anybody ever?

A.   That was?

Q.   Yes.

A.   When they were under me?

Q.   Yes.

A.   Yeah.  There was Joe Pietrobono was one of the account executives on it when it was under me.

Q.   Any others you can recall?

A.   There was a guy named Bockart, but I don't think he

works at UWM anymore.

Q.   Do you know what percentage of its loan originations E Mortgage Capital sends to UWM during the time it was under your purview?

A.   No, I do not.

Q.   Are you familiar with a company called UMortgage?

A.   Yes.

Q.   What is UMortgage?

A.   It's one of our partners.

Q.   Okay.  Is UMortgage one of the partners who is serviced by an account executive under your purview?

A.   Not today, yes.

                    ATTORNEY ABDALLAH:  I'm gonna put the same relevance objection to this line of questioning to UMortgage as well.

BY ATTORNEY HIRSCH:

Q.   Okay.  When was UMortgage under your purview?

A.   My best guess is it started last March.

Q.   Who was the -- well, strike that.

                    Who was the account executive for UMortgage?

A.   There's a few on that account as well.

Q.   Okay.  Can you tell me the ones you remember?

A.   Yeah.  Robert Shkrelli, Alex Coleman.

Q.   Any others you recall right now?

A.   Those are the ones that are on it right now.

Q.   Okay.  Do you know whether UMortgage essentially sends all its loans to UWM?

A.   I don't know.

Q.   Okay.  Do you know who owns UMortgage?

A.   I know his last name is Casa and I've seen him on Facebook, but I've never had a conversation with him.

Q.   Okay.  Would that be Anthony Casa; does that ring a bell?

A.   Yeah, it does.

Q.   Do you know if Anthony Casa has any relationship with Mr. Ishbia?

A.   Beyond being a partner, no.

Q.   Have you ever spoken to Mr. Casa?

A.   Technically I've spoken to him once about eight years ago when he was in our office for two seconds, but I haven't talked to him since.  It was more of an introduction.

Q.   Okay.  Are you familiar with a company called Loan United Wholesale?

A.   That one, no.

Q.   Okay.  Do you know anything about UWM's termination of District Lending?

A.    No.

Q.    Do you recall ever seeing a termination letter from UWM to District Lending?

A.    No.

Q.    Do you recall ever seeing an email from District Lending to UWM indicating that it wanted to terminate?

A.    No.

Q.    If a broker partner under your purview wants to terminate, does that get up to your level if they tell their AE, Hey, I want to terminate?

A.    An AE may bring that to us, but then it goes over to another team that handles that.

Q.    Okay.  And I'm sorry, I know we discussed this before, but was Mr. Tucsok under your purview in November of 2023?

A.    No.

Q.    Okay.  What is the client support priority team, if you know?

ATTORNEY ABDALLAH:  Objection, form, and foundation.

THE WITNESS:  I'm not familiar with any team with that particular name.

BY ATTORNEY HIRSCH:

Q.    Okay.  Are you aware that District Lending's

relationship with UWM has been terminated?

A.    No one from UWM's ever told me that, no.

Q.    Well, are you aware of it in any other respect?

A.    I'm only aware of -- that we're here, so technically I don't know if it's terminated at this point.

Q.    Okay.  Do you know who Adriane Bifarella is -- Adriana Bifarella?  I'm sorry.

A.    I do.

Q.    Who is she?  I think it's a she.

A.    Yeah, it is.  Adriana, she either works on the -- again, I always get them confused -- the business development team or the wholesale development team.

Q.    Do you know who Kyle Chamberlain is?

A.    I know he's an account executive, but I wouldn't be able to point him out in a lineup.

Q.    So he is not an account executive who is --

A.    He --

(Simultaneous speaking.)

BY ATTORNEY HIRSCH:

Q.    Let me just ask the question.  I'm sorry.

Is he an account executive under your purview?

A.    No.

Q.    Okay.  When a broker partner has terminated its

relationship with UWM, do you have any involvement in requests to bring that broker partner back into doing business with UWM?

A.   I mean, if somebody reached out and said they wanted to come back, we would refer them back over to -- again, it's either wholesale development or business development.

Q.   Are you aware of any instances where UWM reaches out to a past broker partner who's no longer a broker partner and asks them to come back?

A.   That, no, I'm not aware.

Q.   Okay.  Do you know who Boykin Golden is?

A.   No.

Q.   Do you know what Mortgage Matchup is?

A.   Yes.

Q.   What is it?

A.   It's a website where consumers can go to look up a mortgage broker.

Q.   That site only lists brokers who have wholesale broker agreements with UWM; is that correct?

            ATTORNEY ABDALLAH:  Objection, foundation.

            THE WITNESS:  Yeah --

BY ATTORNEY HIRSCH:

Q.   If you know.

A.      -- I don't know.

Q.      Do you know who operates that website?

A.      No.

Q.      Do you know if that website is owned by UWM?

A.      I believe it is, but I technically don't know.

Q.      Do you know the amount of liquidated damages per loan UWM claimed its entitled to under the amended wholesale broker agreement?

ATTORNEY ABDALLAH:  Objection, form.

THE WITNESS:  I read it yesterday so, yes.

BY ATTORNEY HIRSCH:

Q.      So do you recall that number is $5,000 per loan; does that ring a bell?

A.      It does.

Q.      Do you have any idea how UWM came up with that amount?

A.      No.

Q.      Did you have any involvement in that?

A.      No.

Q.      Have you ever had any involvement in any attempt to calculate what UWM makes per loan from a broker partner?

A.      No.

Q.    So you've been with UWM since July of 2015; right?

ATTORNEY ABDALLAH:  Objection, form, and misstates -- mischaracterizes prior testimony.

MS. REPORTER:  What was your answer?

ATTORNEY ABDALLAH:  You can answer.

THE WITNESS:  Yes.

BY ATTORNEY HIRSCH:

Q.    And you agree with me that the all-in addendum was implemented around March of 2021; is that right?

A.    I'll take your word for it.

Q.    So before March of 2021, did you ever hear that UWM was damaged in any way if a loan went to a retail lender?

A.    No.

Q.    Okay.  Did you have any involvement in preparing a list of loans that District -- strike that.

Did you have any involvement in preparing a list of loans that UWM claims District Lending sent to Rocket or Fairway after the all-in addendum?

A.    No.

Q.    Do you know anybody who was involved in that?

A.    No.

Q.    Did you ever hear about such a thing at all?

A.    No.

Q.    Okay.  Are you aware that there were different versions of the liquidated damages provision in the wholesale broker agreement?

A.    No.

Q.    Did you ever hear that there was any change to the term of the liquidated damages provision in the wholesale broker agreement?

A.    No.

Q.    Do you agree that an independent mortgage broker has a responsibility to its client to find the most favorable mortgage loan terms available?

                    ATTORNEY ABDALLAH:  Objection, form.

                    THE WITNESS:  What would you define as "most favorable" in your question?

BY ATTORNEY HIRSCH:

Q.    Well, taking into account -- well, strike that.

                    What terms do you think are important to a consumer of mortgage loans?

A.    The cost, speed, the -- you know, the product that fits their credit profile, that fits their down-payment requirements or limitations.

Q.    You would agree that rate is also important?

A.    It's one of the things, yup.

Q.    So taking those things into account, would you
      agree that an independent mortgage broker has a
      duty to its client to find a loan that has the best
      terms based on those factors?

              ATTORNEY ABDALLAH:  Objection,
      form, and foundation.

              You can answer.

              THE WITNESS:  I guess what's the
      definition of "best" in your opinion?

BY ATTORNEY HIRSCH:

Q.    Well, you listed some factors, right, cost, speed,
      the type of product, the down-payment, and rate;
      right?

A.    Uh-huh.

Q.    Okay.  So you don't think we can determine best if
      we consider all those factors in the circumstances
      of the client?

A.    Well, I think it's up to the client that would
      determine which one is best for them after
      providing the information to them.

Q.    Well, doesn't UWM advertise that independent
      mortgage brokers help clients reach that
      conclusion?

A.     Yes.

Q.     Okay.  Do you know whether UWM monitored the rates and terms of loans offered by Rocket or Fairway?

A.     I don't know.

Q.     Are wholesale broker agreements with UWM always signed electronically or are some of them signed physically, wet ink?

                ATTORNEY ABDALLAH:  Objection, form.

                THE WITNESS:  I'm not sure.  I don't know.

                ATTORNEY HIRSCH:  Let's mark this as 34, please.

                (Deposition Exhibit 34 was marked for identification.)

BY ATTORNEY HIRSCH:

Q.     Sir, we've just handed you what our court reporter has marked as Exhibit 34, and I want you to have a chance to review that.

                But now my question is:  Does that look like to you the screen a broker partner sees when they are approving a renewal package, if you know?

A.     I do not know.

Q.     Okay.  And I understand you don't recognize this screen, but do you see where it says, "Assigned to

AE," and then it says, "AE House Account"?

Do you see that?

A. Uh-huh.

Q. Do you know what, "AE House Account" means?

A. Not in this context, no, I don't.

Q. Have you heard that used in any context?

A. Yeah. When we -- when we don't have an AE assigned to an account, we call it a "house account."

Q. Do you recall a time when UWM refused to process District Lending's loans in the pipeline until District Lending executed an amended wholesale broker agreement?

A. No.

Q. Do you recall a time when UWM refused to process loans in the pipeline for any broker partner until it executed an amended wholesale broker agreement?

ATTORNEY ABDALLAH: Objection, foundation.

THE WITNESS: No.

BY ATTORNEY HIRSCH:

Q. Were you aware of any call between Allen Beydoun and Josh Rapaport?

A. No.

Q. Have you ever heard of an independent mortgage broker called Top Mortgage, LLC?

A.    No.

Q.    Have you ever heard of an independent mortgage broker called Compass Lending?

A.    No.

Q.    Have you ever heard of an independent mortgage broker called Arboretum Mortgage Corporation?

A.    No.

Q.    Do you know who Henry Gomez is?

A.    Yes.

Q.    Who is Mr. Gomez?

A.    He's one of our account executives.

Q.    Do you know if Mr. Gomez was ever on the District Lending accounts?

A.    I don't know.

Q.    Does Mr. Gomez work under your purview?

A.    No.

Q.    Did he ever work under your purview?

A.    No.

Q.    Do you know who Mikele McMacken is?  I apologize if I pronounced that name wrong, also.

A.    Yes, Mikele.

Q.    I can spell --

             (Simultaneous speaking.)

             THE WITNESS:  I know the name, but I don't know who the person is.  They're an

account executive.

BY ATTORNEY HIRSCH:

Q.    Do you know if District Lending was an account that belonged to Mikele McMacken?

A.    I don't know.

Q.    Does Mikele McMacken work under your purview?

A.    No.

Q.    Did Mikele McMacken ever work under your purview?

A.    No.

Q.    Do you know who Sean Fahey is?

A.    Yes.

Q.    Who is he?

A.    He's one of my peers.  He's a division leader as well.

Q.    Okay.  Do you know if -- well, strike that.

When Mr. Tucsok left your sort of purview, do you know if he went over to Mr. Fahey's purview?

A.    I don't know.

Q.    Do you know if Mr. Fahey was ever in charge of the account executive who had the District Lending accounts?

A.    I don't know.

Q.    Who is Heather Demy?

A.    I know who she is.  She does our payroll for our

sales people now.

Q.   Do you know what team she's on?

A.   Technically, no.  I know where she sits.  I don't
know everything she does.  I just know she's
involved with payroll for our commissions.

Q.   Did you ever discuss District Lending with
Mr. Fahey?

A.   No.

Q.   What did you do to prepare for your deposition
today?

A.   I met with these two gentlemen for an hour
yesterday maybe.

ATTORNEY ABDALLAH:  Yeah, and
I'll caution you, you can answer about details
about what you did to prepare, just do not
reveal any of the communications with counsel.

THE WITNESS:  They just asked me
questions just like you did.

BY ATTORNEY HIRSCH:

Q.   Did you review any documents yesterday?

A.   The only document that I reviewed was a portion of
the agreement with the provisions that you
discussed.

Q.   And that was the first time you had seen that
provision?

UNITED WHOLESALE MORTGAGE v MADISON ATRINA  
SLIFKO, STEVE 02/04/2026  
Job 50808  
67

A.    Probably since the day it came out, yeah.

Q.    And when you say that provision, are you talking about the all-in provision or the liquidated damages provision or both?

A.    Both.

Q.    Okay.  Do you recall if the liquidated damages provision you saw yesterday based the calculation of liquidated damages on loans the broker partner sent to Rocket or loans the broker partner sent to UWM?

A.    I don't -- I'm not sure I understand your question.

ATTORNEY HIRSCH:  All right.  Let's take a short break.  I'm probably almost done, I just want to go over a few things.

ATTORNEY ABDALLAH:  Okay.

THE VIDEOGRAPHER:  Off the record at 11:37 AM.

(Recess taken at 11:37 AM.)

(Back on the record at 11:42 AM.)

(Deposition Exhibit 12 and 13 were marked for identification.)

THE VIDEOGRAPHER:  Back on the record at 11:42 AM.

BY ATTORNEY HIRSCH:

Q.    All right.  Sir, we were talking a moment ago about

UNITED WHOLESALE MORTGAGE v MADISON ATRINA
SLIFKO, STEVE 02/04/2026

Job 50808
68

the -- what you reviewed yesterday in a document.
And our court reporter has now put in front of you
what we've marked as Exhibits 12 and 13.

A.    Okay.

Q.    And they do look similar, so I want to make sure in
my questions to ask it correctly, and if you could
make sure you're looking at the right document.

A.    Okay.

Q.    You're certainly free to review the whole document,
but I'd like you to start with Number 12, and I
want you to specifically look at Section 7.30.
It's located on what we call a Bates
number, the number in the lower right-hand corner
48 -- that ends in 48.  And if you'd take a moment
to look at that and I'm going to ask you a
question.

A.    (Witness reviewing document.)
Okay.

Q.    Okay.  Do you recall if this is the liquidated
damages provision you told me you reviewed
yesterday?

A.    I couldn't say one way or another to be honest.

Q.    Okay.

A.    Looks similar.

Q.    Okay.  Before we go on to the next one, I want to

bring your attention to one thing.

Do you see that 7.30?  And I'm looking sort of at sub little I.  The end of that section, it just says, "per loan closed with UWM."

Do you see that?

A.    Uh-huh.

Q.    Okay.  Now, I'd like you to look at Exhibit 13, once again at Section 7.30.  This time, it starts at Bates number -- at the bottom of a Bates number that ends in 68.

ATTORNEY ABDALLAH:  And I'm gonna object to this line of questioning under the guise -- under the basis that the liquidated damages provision, as reflected in Exhibit 12, is not at issue in this case.

ATTORNEY HIRSCH:  Okay.

THE WITNESS:  (Witness reviewing document.)

BY ATTORNEY HIRSCH:

Q.    And if you just let me know when you've had a chance to look at that.

A.    Okay.

Q.    Okay.  And I know the two look similar.

Do you know if this is the liquidated damages provision you reviewed yesterday?

A.    I can't say with a hundred percent certainty, but I think it is.

Q.    Okay.  And if you look on this one, sort of the little sub I at the end of that it says:

             "Per loan closed with Rocket
        Mortgage, Fairway Independent Mortgage, or
        subject to section 3.03x an acquired
        lender."

             Do you see that piece of it?

A.    Uh-huh.

Q.    And you'd agree with me that piece is a little different than the piece we looked at in Exhibit 12 which talked about per loan closed with UWM; right?

A.    Yup.

Q.    Okay.

A.    Yes.

Q.    Do you know why this change occurred?

A.    No.

Q.    Do you know when this change occurred?

A.    No.

Q.    Were you ever notified that this change had occurred?

A.    No.

Q.    Do you know if independent brokers were notified that this change occurred?

ATTORNEY ABDALLAH:  Objection, foundation.

THE WITNESS:  I mean, when you say "notified," I know in this agreement it states that, you know, any time you log into our system, you're subjected to the most current agreement.

BY ATTORNEY HIRSCH:

Q.    So --

A.    It would've whenever it happened, it would be part of the agreement.

Q.    So what is the difference, then, with a broker logs into the system just to, let's say, submit a loan application versus renewal packages?

A.    Those are two separate systems.

Q.    Okay.  So amendments can happen -- just agreements to amendments can happen just by logging in to do a loan application; is that right?

ATTORNEY ABDALLAH:  Objection, foundation, calling for a legal conclusion.

THE WITNESS:  I don't follow you.

BY ATTORNEY HIRSCH:

Q.    Well, you said every time that a broker partner logs in, they're agreeing to whatever the then

current version of the broker agreement is; did I get that right?

A.   That's what the agreement says, yes.

Q.   Okay.  So what's the difference, then, when a broker partner does a renewal package?

What are they agreeing to in a renewal package?

A.   Well, it's more of -- I'm sure the agreement is in there, but they do a full updating of all of their financials to make sure they still qualify to be a client of ours.

Q.   Okay.

A.   Licensing, yeah.

Q.   I'm sorry.  Go ahead.

A.   I'm good.

Q.   Okay.  How frequently does each broker partner have to do a renewal package?

A.   On their anniversary each year.

ATTORNEY HIRSCH:  Okay.  I have nothing further, sir.  Thank you.

THE WITNESS:  Okay.

ATTORNEY ABDALLAH:  Just a few questions.

- - -

EXAMINATION

BY ATTORNEY ABDALLAH:

Q.   Mr. Slifko, there was some testimony today about UWM monitoring a broker's loan activity with other lenders.

Is that monitoring specific to a certain lender or to all lenders?

A.   It's to all lenders.

Q.   Okay.  So UWM doesn't monitor loan activity for any specific lender; correct, to your knowledge?

A.   Correct.

Q.   I'm sorry.  Is that correct?

A.   Correct.

Q.   Okay.  After March of 2021, has UWM provided any new or additional products or services offered to mortgage brokers?

A.   Yes.

Q.   Okay.  And do you have any knowledge of -- do you have -- prior to March of 2021, did you have any knowledge of UWM being harmed by a loan being closed in the retail channel as opposed to the wholesale channel?

ATTORNEY HIRSCH:  Objection as to form.

THE WITNESS:  I mean, I'm gonna

say, yes.  I mean, any time a loan goes to retail, that's one less loan we get into wholesale channel.

BY ATTORNEY ABDALLAH:

Q.    And do you have any knowledge as to whether UWM is -- sorry.  Do you know have knowledge as to whether UWM -- I'm gonna strike that again.

Prior to March 2021, did you have any knowledge of whether UWM was harmed when a loan is closed with the retail channel as opposed to the wholesale channel?

ATTORNEY HIRSCH:  Objection as to form.

Go ahead.

THE WITNESS:  We believe we're harmed every time that happens, because there's money going to another channel versus our own.

ATTORNEY ABDALLAH:  I have no further questions.

ATTORNEY HIRSCH:  I have a couple follow-ups.

- - -

RE-EXAMINATION

BY ATTORNEY HIRSCH:

Q.    Mr. Abdallah just asked you a question about the

monitoring of broker loan activity; do you recall that?

A. Yes.

Q. And you said, I think, that UWM monitors loans that go to all other lenders; right?

A. Correct.

Q. All right.  UWM only sues if loans go to the particular lenders identified in the wholesale broker agreement; right?

A. It's my understanding, yes.

Q. 'Cause those are the only things that are breaches of the agreement; right?

A. That's correct.

Q. And a moment ago, Mr. Abdallah also asked you some questions about loans going to the retail channel and damages that -- whether UWM is damaged when that happens; right?

ATTORNEY ABDALLAH:  Objection, form.

THE WITNESS:  I thought he used the word "harm."

BY ATTORNEY HIRSCH:

Q. Did he use the word "damage"?  You don't recall?

A. You did when you asked me the question.  I thought he just said "harm."

Q.   Okay.  Let's use the word "harm" then.  You recall he asked you some questions about whether UWM was harmed if a loan closes in a retail channel; right?

A.   Correct.

Q.   What did you mean by "harm"?

A.   That if you're out in the world and a loan goes to them versus staying within the wholesale channel, that's one less loan that the wholesale lenders get to do.

Q.   Okay.

A.   So we miss out.  We lose.

Q.   Okay.  Well, UWM also loses if a loan goes to a different wholesale lender; right?

A.   But it goes to the wholesale channel, and that's what we support.

Q.   All right.  Well, when UWM had Shore Mortgage, that was retail; right?

A.   Uh-huh.

                ATTORNEY HIRSCH:  Okay.  Nothing further.

                ATTORNEY ABDALLAH:  No further questions.

                THE VIDEOGRAPHER:  This concludes today's deposition.  The time is 11:52 AM.

UNITED WHOLESALE MORTGAGE v MADISON ATRINA          Job 50808
SLIFKO, STEVE 02/04/2026                                                        77

MS. REPORTER:  Would you like to order the transcript?

ATTORNEY HIRSCH:  Yup.

ATTORNEY ABDALLAH:  PDF.

(Deposition concluded at 11:52 AM.)

- - -