# EXHIBIT 5

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF MICHIGAN

SOUTHERN DIVISION


UNITED WHOLESALE MORTGAGE, LLC,

    Plaintiff,          Case No. 2:23-cv-13176

    vs.

MADISON ATRINA LLC d/b/a DISTRICT

LENDING,

    Defendant.

_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _/




DEPONENT:       MIKELE McMACKEN

DATE:           Monday, March 16, 2026

TIME:           10:02 AM

LOCATION:       BUSH SEYFERTH PLLC

                100 West Big Beaver Road, Suite 400

                Troy, Michigan 48084

REPORTER:       Kristen N. Trachet, CSR-16330

                Fortz Legal Support, LLC, 8577

VIDEOGRAPHER:   Bailey Wellman

JOB NO.:       51797

APPEARANCES:


WILLIAM E. McDONALD, III

       Bush Seyferth PLLC

       100 West Big Beaver Road

       Troy, Michigan 48084

       (248)822-7807

       mcdonald@bsplaw.com

       Appearing for Plaintiff


JASON R. HIRSCH

       Morganroth & Morganroth, PLLC

       344 North Old Woodward Avenue, Suite 200

       Birmingham, Michigan 48009

       (248)864-4000

       jhirsch@morganrothlaw.com

       Appearing for Defendant

                    - - -

UNITED WHOLESALE MORTGAGE v MADISON ATRINA          Job 51797
MCMAKEN, MIKELE 03/16/2026                                      3

```
            TABLE OF CONTENTS

WITNESS:   MIKELE McMACKEN                    PAGE


 Examination By Atty Hirsch                     5

                - - -

               EXHIBITS

DEPOSITION EXHIBIT                            PAGE

           (None offered.)

                - - -
```

Monday, March 16, 2026

Approximately 10:02 AM

Troy, Michigan

                    - - -

                    THE VIDEOGRAPHER:  Good morning. We are now on the record at 10:02 AM on Monday, March 16th, 2026.  This begins the videotaped deposition of Mikele McMacken taken in the matter of United Wholesale Mortgage, LLC, versus Madison Atrina, Case No. 2:23-cv-13176.

                    My name is Bailey Wellman.  I'm your legal videographer representing Fortz Legal Support.  We are taking this deposition at the offices of BSP Law in Troy, Michigan.

                    Counsel, will you please state your name and whom you represent, after which, our court reporter will swear in the witness.

                    ATTY McDONALD:  William McDonald on behalf of United Wholesale Mortgage and on behalf of the witness.

                    ATTY HIRSCH:  Jason Hirsch on behalf of Defendant.

                    - - -

                    MIKELE McMACKEN, having affirmed or been duly sworn, was

UNITED WHOLESALE MORTGAGE v MADISON ATRINA
MCMAKEN, MIKELE 03/16/2026

examined and testified as follows:

EXAMINATION

BY ATTY HIRSCH:

Q.   Good morning.  My name is Jason Hirsch.  I'm one of the attorneys for Defendant in this matter.

Let the record show that this is deposition of Mikele McMacken taken pursuant to Notice under the Federal Rules of the Civil Procedure.

Ma'am, you understand you have to answer my questions verbally so our court reporter can record your answers; correct?

A.   Yes.

Q.   And I'll be asking you a series of questions.  You were just sworn in.

You understand your answers are under oath; correct?

A.   Yes.

Q.   Please make sure to let me finish my entire question before you answer, both to make sure that you understand the question and because our court reporter can't record two people talking over each other.  Okay?

A.   Okay.

Q.   And if you need a break at any time, please let me

UNITED WHOLESALE MORTGAGE v MADISON ATRINA          Job 51797
MCMAKEN, MIKELE 03/16/2026                                          6

Q.   know and we can certainly take a break so long as there's no question pending at the time.  Okay?

A.   Okay.

Q.   If you don't understand a question at any time, please let me know and I'll do my best to try to clarify it.  Okay?

A.   Okay.

Q.   And if I should interrupt you at any time or you have not completed your answer, please let me know and I'll let you finish your answer for the record. Okay?

A.   Okay.

Q.   Can you please state your full name for the record?

A.   Mikele Anne McMacken.

Q.   Can you tell me about your formal education beginning at undergraduate college forward?

A.   So your question is what college did I go to?

Q.   What undergraduate college and any education after that.

A.   So "undergraduate," you mean like what college?

Q.   Yes.

A.   Okay.  Macomb Community College I went to for a short period of time.

Q.   Did you obtain any degree from Macomb Community College?

A.    I did not.

Q.    What period of time did you attend Macomb Community College?

A.    I don't remember the dates.

Q.    What year did you graduate from high school?

A.    2003.

Q.    And what high school did you attend?

A.    I went to a few high schools.

Q.    Okay.  What high school did you graduate from?

A.    Our Lady of the Lakes.

Q.    And for what period of time did you attend Our Lady of the Lakes?

A.    Seventh grade through junior year.  One of the years.

Q.    And where did you attend for senior year of high school?

A.    I had -- basically, I had to make up elective classes.  So it was electives, part of that through community college.  The rest was through L'anse Creuse North to complete my graduation.

Q.    But your high school diploma was issued by Our Lady of the Lakes?

A.    Yes.  Yes, sir.

Q.    Okay.  Can you tell me about your employment history from the time you graduated from high

school forward?

A.   Sure.  When I graduated high school, I was working at Hungry Howie's at a pizza establishment for a little while until I started a job at Chammps Americana.  During that time I was fully enrolled at Paul Mitchell the School until I went to London for Jemma Kidd.

So I was employed with Chammps Americana the entirety of my career through Paul Mitchell and Jemma Kidd and graduation.

Q.   Now, you said when you were at Chammps Americana, you were attending school; is that right?

A.   Uh-huh.

Q.   And that would be at Our Lady of the Lakes?

A.   No, this was after that.  So beauty school was 9:00 to 5:00 and that was at Paul Mitchell.  And then at 5:00, I would leave and go straight to Chammps Americana and work 'til close, which is 2:00 AM.

Q.   And did you graduate from beauty school?

A.   I did.

Q.   And did you obtain any sort of license after beauty school?

A.   I did.  I did.

Q.   What is that?

A.   It's just -- just you're licensed to -- you can go

and do hair if you wanted to.

Q.   And that's with --

A.   In the board -- the state board.

Q.   And that's the state of Michigan; correct?

A.   Uh-huh.

Q.   And then you said you went to London; is that right?

A.   Yup.

Q.   Okay.  And what did you do in London?

A.   Professional makeup.

Q.   And did you work for anyone in London or were you an independent contractor?

A.   When I was in London, I wasn't working for anybody. It was just schooling.

Q.   And what school were I attending in London?

A.   Jemma Kidd.

Q.   I'm sorry.  You said that's pronounced "Jemma Kidd"?

A.   Yeah.

Q.   Okay.  And did you graduate from Jemma Kid?

A.   I did.

Q.   And what do you receive upon graduation?

A.   It's a certificate of completion.

Q.   Okay.  And what period of time did you work at Chammps?

A.   I don't recall the exact dates, but -- I don't remember the exact dates.

Q.   Okay.  What period of time were you in London?

A.   I don't remember the exact dates.

Q.   Okay.  Do you --

A.   This is a long time ago.

Q.   Do you remember the approximate dates?

A.   If I think about it for a while, I probably could.

Q.   When did you receive your certificate of completion from Jemma Kidd?

A.   It was around 2006, 2007 I'm guessing, because I don't remember the exact dates.  I'd have to actually look at my certificates.

Q.   And what did you do after you received your certificate from Jemma Kidd?

A.   After I left London, I came home.

Q.   Okay.  And what did you do professionally when you came home?

A.   Well, I continued to do makeup professionally.  I opened my LLC.

Q.   And what's the name of your LLC?

A.   When it was open, it was Pretty Girl by Makeup -- or Pretty Girl by Mikele Makeup.  Pretty Girl by Mikele.

Q.   And for what period of time did that LLC operate?

UNITED WHOLESALE MORTGAGE v MADISON ATRINA
MCMAKEN, MIKELE 03/16/2026

Job 51797
11

A. I would have to look. I don't remember.

Q. Do you remember when the LLC was dissolved?

A. I don't remember the exact dates, no.

Q. Is it no longer in existence; is that correct?

A. It is not. That's correct.

Q. Okay. What was the next thing you did professionally after Pretty Girl by Mikele?

A. I continued to bartend, so I was still bartending when I was doing makeup.

Q. Okay. Where did you bartend?

A. Well, I was at Chammps Americana for quite some time. And then in -- I believe it was '08 or '09, I went to a Red Ox Tavern and bartended there.

Q. Okay. And then what did you do after your bartending at Red Ox Tavern?

A. I worked there for about nine and half, ten years, and then I came to -- I applied to UWM.

Q. Okay. And what year did you apply to UWM?

A. I started in 2019.

Q. And you started as a correspondent specialist; is that correct?

A. That's correct.

Q. Okay. And what were your duties as a correspondent specialist for UWM?

A. Daily role was auditing loans, reviewing the

entirety of a file.  And then once all conditions were satisfied, I would then purchase the loan off the line.  I would use UWM's, you know, need to purchase the loan off the line because we were an investor as a correspondent.

Q. And for what period of time were you a correspondent specialist?

A. A year and a few months.

Q. Okay.  And what was your next position after correspondent specialist?

A. Account executive.

Q. And what were your duties as an account executive?

A. It's a lot of duties.  Do you want to -- do you want to be more specific with that?

Q. Well, what did your job entail?  What did you do on a day-to-day basis on as an account executive?

A. Making phone calls, bringing loans in, helping brokers grow their business, answer any questions on a loan-level basis.

Q. And is that still your current position today?

A. I'm still an account executive.

Q. All right.  Do you have any other positions at UWM?

A. I am also a team lead.  I'm in leadership, so I'm a senior account executive and a team leader so, yes, there is more.

UNITED WHOLESALE MORTGAGE v MADISON ATRINA                    Job 51797
MCMAKEN, MIKELE 03/16/2026                                          13

Q.   What additional duties do you have as senior
     account executive and team leader?

A.   I'm also overseeing my team of six within their
     role and escalations or timecard issues and
     management.  And just as a coach.

Q.   When did you become a senior account executive?

A.   I don't remember the day.

Q.   Okay.  Is team leader a separate position or --

A.   It is.

Q.   Okay.  Now, let me finish my question.

     When did you become a team leader?

A.   Over a year ago.

Q.   Was that before or after you became a senior
     account executive?

A.   It was after.

Q.   You said as a team leader, you have six people on
     your team; is that right?

A.   As of right now, yes.

Q.   Who are those people?

A.   You want their full names?

Q.   Yes.

A.   Chase Martin, Jackson Muraco, Stacey Littleton,
     Rashawn Hardy, Brian Watz.

Q.   As an account executive, did you manage a certain
     set of broker partners?

A.    Yes.

Q.    And as a senior account executive, do you still manage a certain set of broker partners?

A.    Yes.

Q.    As an account executive or senior account executive, did you manage the relationship with Madison Atrina that does business as District Lending?

             ATTY McDONALD:  Object to form.

             Go ahead and answer.

             THE WITNESS:  It -- at a certain point, yes, it was my account.

BY ATTY HIRSCH:

Q.    Okay.  If I call them "District Lending," will you know who I'm talking about?

A.    Yes.

Q.    For what period of time was District Lending your accounts?

A.    I don't remember the dates.

Q.    Was District Lending -- well, strike that.

             Do you know what this case is about?

             ATTY McDONALD:  Object to form, foundation.  I'll also object to the extent this evades the attorney-client privilege or work product doctrine.

So you can answer the question without disclosing anything that you talked about with the lawyers with UWM.

THE WITNESS:  Ask me the question again.

BY ATTY HIRSCH:

Q.    Do you know what this case is about?  I think that's just a "yes" or "no" actually.

A.    Yes.

ATTY McDONALD:  Object to form, same objections.

Go ahead.

BY ATTY HIRSCH:

Q.    What is this case about?

ATTY McDONALD:  Same objections.

Go ahead and answer.

THE WITNESS:  I don't have details.  I don't -- I'm not positive.

BY ATTY HIRSCH:

Q.    Well, you told me you knew generally what it was about.

What do you understand that it's about?

A.    I know that I'm here because there was something that has to do with a contract.  I don't have details outside of that.

Q.    Do you know that you UWM identified you as a person who might have information about certain topics related to this case?

A.    Yes.

Q.    Do you know who designated you as an individual that might have information about certain topics related to this case?

ATTY McDONALD:  Object to the extent this evades the attorney-client privilege or work product.

You can answer without disclosing any discussions you've had with the lawyers for UWM.

THE WITNESS:  No.

BY ATTY HIRSCH:

Q.    Do you know why you were identified as a person who might have knowledge about these certain topics related to this case?

ATTY McDONALD:  Same objections.

But go ahead.

THE WITNESS:  Yes.

BY ATTY HIRSCH:

Q.    Okay.  Why is that?

A.    'Cause I was account executive of them for a period of time.

Q. What knowledge do you have about District Lending's agreement to UWM's Wholesale Broker Agreement?

A. Knowledge do I have -- say it again.

Q. What knowledge do you have about District Lending's agreement to UWM's Wholesale Broker Agreement?

A. I don't.

Q. Do you know what a Wholesale Broker Agreement is?

A. I do.

Q. What is it?

A. Like, our Wholesale Broker Agreement, when any broker signs up with UWM, is that what you're referring to?

Q. Well, I want to know what you understand the Wholesale Broker Agreement to be.

A. Well, I understand that anyone that signs up with UWM has to sign an agreement, our wholesale agreement in order to send loans to UWM.

Q. Okay. How do you know that?

A. Because it's part of the process.

Q. Okay. What knowledge do you have about amendments to the Wholesale Broker Agreement?

A. I don't.

Q. What knowledge do you have about District Lending's submission of mortgage loans or loan applications to Rocket Mortgage or Fairway Mortgage since

UNITED WHOLESALE MORTGAGE v MADISON ATRINA
MCMAKEN, MIKELE 03/16/2026

Job 51797
18

March 1st -- since March 4th, 2021?

A.   I don't.

                ATTY McDONALD:  Object to form.

                Go ahead.

BY ATTY HIRSCH:

Q.   Have you reviewed the Amended Complaint in this
case?

A.   Not that I'm aware of, no.

Q.   Are you familiar with the All-In Initiative?

A.   Yes.

Q.   What is it?

A.   It's part of the broker agreement.

Q.   Do you know what it requires a broker partner to do
or not do?

A.   I know that there's verbiage in the broker
agreement that says there is two lenders that
you're not sending loans to, if you're sending
loans to UWM.

Q.   Do you know who those two lenders are?

A.   I do.

Q.   Who are they?

A.   Fairway and Rocket.

Q.   Do you know why those two lenders are pro -- why
broker partners are prohibited from sending loans
to those two lenders?

UNITED WHOLESALE MORTGAGE v MADISON ATRINA        Job 51797
MCMAKEN, MIKELE 03/16/2026                            19

A.      I have my opinion.

Q.      What's your opinion?

A.      My opinion is to protect UWM.

Q.      To protect UWM --

                    ATTY McDONALD:   Hold on.   I

don't think she's done with her answer.

                    THE WITNESS:   I'm not.

BY ATTY HIRSCH:

Q.      Okay.   Go ahead.

A.      It's protecting -- it's my opinion to protect UWM

        because of how much money we invest in our brokers,

        whether it's marketing, leads, lead generation,

        business-partner relations, partner academies.   All

        the things that we do to invest into our broker

        partners, my understanding is it's to -- it's to

        protect UWM.   Protect our brokers, so it stays in

        house, that's my understanding.

Q.      Do you know why it's those two lenders in

        particular?

A.      No.

Q.      There are lots of other lenders; correct?

A.      Correct.

                    ATTY McDONALD:   Object to form

and scope.

BY ATTY HIRSCH:

Q.    When was the All-In Initiative implemented?

A.    I don't know the exact day.

Q.    When did you first become aware of the all in initiative?

A.    When it was announced.

Q.    Did you watch the announcement by Mr. Ishbia?

A.    I did.

Q.    How would a broker partner become bound to the terms of the All-In Initiative?

                ATTY McDONALD:  Object to form, foundation.

                Go ahead and answer, if you know.

                THE WITNESS:  I -- I don't know.

BY ATTY HIRSCH:

Q.    Okay.  How were broker partners informed about the All-In Initiative?

                ATTY McDONALD:  Object to form and foundation.

                Go ahead.

                THE WITNESS:  When the announcement was made, I'm sure there was -- again, I don't want to guess on this.  I know that what my role was when it was announced.

BY ATTY HIRSCH:

Q.    Was it part of your duties to inform broker partners about the All-In Initiative?

A.    When it came out, yes.

Q.    And did you do that?

A.    Yes.

Q.    How did you do that?

A.    It was a phone call.

Q.    So you individually called each of the broker partners under your purview as an account executive; is that correct?

A.    Correct.

Q.    Was there a script as to what you were to tell them?

A.    Not that I can recall.

Q.    Did UWM tell you what to tell the broker partners?

A.    Not that I can recall, no.

Q.    What did you tell the broker partners that you spoke to?

A.    I wouldn't be able to recall my exact conversation.

Q.    Do you remember the nature of what you told them?

A.    But I could say that it was a general conversation. It was basically, Hey, do you have loans in process with Rocket?  If the answer was yes, okay, what -- at a certain point in time, you can finish those

loans out and continue your loans with UWM or vice versa, but you're not going to have loans at the same time with Rocket and UWM.

Generally speaking, that sounds about the conversation that would've been had.

Q. Did you get any pushback from any broker partners about the implementation of the All-In Initiative?

A. Not that I can remember specifically.

Q. How many broker partners were under your purview at the time the All-In Initiative was implemented?

A. I don't remember.

ATTY McDONALD:  Object to form.

BY ATTY HIRSCH:

Q. Did any broker partners for whom you were the account executive choose to leave UWM after the All-In Initiative was implemented?

A. Yes.

Q. How many?

A. One.

Q. Which one?

A. I don't remember the name of the account.

Q. Did that account tell you why they were leaving?

A. Yes.

Q. What did they tell you?

A. They don't -- they don't like anybody to tell them

what decisions that they can make.  They didn't want anyone telling them one way or another what they could do.

Q.  Did you make them any offer to try to get them to stay with UWM?

A.  That wouldn't have been my place.

Q.  Do you know if anyone had made them any offer to try to get them to stay with UWM?

A.  No.

Q.  Did you have any involvement in preparing the All-In Initiative?

A.  No.

Q.  Did you know the All-In Initiative was coming before the announcement by Mr. Ishbia?

A.  No.

Q.  Do you know who was involved in preparing the All-In Initiative?

A.  No.

Q.  Do you know who made the decision to implement the All-In Initiative?

A.  No.

Q.  Who is Mat Ishbia?

A.  He's our CEO.

Q.  Have you ever discussed the All-In Initiative with Mr. Ishbia?

A.    No.

Q.    Have you discussed the All-In Initiative with any
      of your colleagues?

            ATTY McDONALD:  Object to form.

            Go ahead and answer.

            THE WITNESS:  I -- I don't know.

I'm -- I don't know.

BY ATTY HIRSCH:

Q.    When you were making these phone calls to inform
      broker partners about the All-In Initiative, did
      you discuss what you would say with any other
      account executives?

A.    At that time, did I --

Q.    Contemporaneously, yes.

A.    So your question is did I discuss, like, with
      myself -- hold on.  I don't understand the
      question.

Q.    At or around the time you were going to inform
      broker partners about the All-In Initiative, did
      you have any discussions with other account
      executives about what you would be saying, how the
      information would be conveyed?

A.    Not that I can recall.

Q.    Did you explain to the broker partners what they
      would have to do to accept the All-In Initiative?

A.    If by that you mean moving forward to stay in good stands with UWM or stay in our pipeline to finish pipeline then, yes, that was part of the conversation, if that's the question.

Q.    Well, what did you explain about that?

A.    That that's it.  That's it.  That's all I have.

Q.    Did you explain what happened if they continued to send loans to Rocket?

A.    No.

Q.    Did anybody ask you what would happen if they continued to send loans to Rocket?

A.    Not that I can remember.

Q.    Did you inform any of the broker partners that they would be required to execute any sort of addendum in order to continue to do business with UWM?

                ATTY McDONALD:  Object to form, foundation.

                Go ahead.

                THE WITNESS:  I can't recall any or having anybody sign an addendum, no.

BY ATTY HIRSCH:

Q.    Did you tell any broker partner that if they did not agree to continue to do business with UWM under the terms of the All-In Initiative, their loans in the pipeline with UWM would not be processed?

A.    No.

Q.    Do you know if that happened?

            ATTY McDONALD:   Object to form,
      foundation.

            Go ahead.

            THE WITNESS:   No.

BY ATTY HIRSCH:

Q.    "No," you don't know?   Or "no," it didn't happen?

A.    No.   I don't know that it happened so, no.

Q.    You don't know one way or the other?

A.    No.

Q.    Was District Lending one of the broker partners who
      you contacted to tell about the All-In Initiative?

A.    No.

Q.    Was District Lending one of your accounts at the
      time the All-In Initiative was implemented?

A.    No.

Q.    Do you know who the account executive for District
      Lending was at the time the All-In Initiative was
      implemented?

A.    No.

Q.    Were you the account executive for District Lending
      before or after the All-In Initiative was
      implemented?

A.    I was their account executive after the All-In came

out.

Q. Did you have any conversation with anyone at District Lending about the All-In Initiative?

A. Not that I can remember.  This is years ago, so I don't -- I don't remember.  I'm --

Q. Do you remember for how long you served as the account executive for District Lending?

A. Probably about a year.

Q. Do you -- strike that.

Why did you cease serving as account executive for District Lending?

A. Our division -- the division that he was a part of, okay, or that I was a part of, dissolved, so all the account executives moved.

In that move, you were able to choose a few accounts to come with you wherever you decided to go, and I did so and they were not an account that I chose to bring with me.

Q. When did that dissolution of your division occur?

A. I don't remember the dates.

Q. Do you know who became the account executive for District Lending after you chose not to take them with you?

A. Yes.

Q. Who was that?

A.    Alan Tucsok.

Q.    Did you ever have any discussions with Mr. Tucsok about District Lending?

A.    Yes.

Q.    How many conversations did you have with Mr. Tucsok about District Lending?

A.    Just one that comes to mind.

Q.    When did that one conversation with Mr. Tucsok occur?

A.    It was within a couple of weeks of the dissolve of my division, so within two to three weeks of when the account was no longer in my name.

Q.    What was the form of that conversation?  Was it by phone or email?

A.    No, it was -- it was just a walking up on the sales floor.

Q.    In-person conversation?

A.    Yup.

Q.    Who approached who?

A.    Alan approached me.

Q.    Okay.  And what was the nature of the conversation you had with Mr. Tucsok?

A.    He just said thanks.  Thanks for the account, Mikele.

Q.    And what did you say to Mr. Tucsok?

UNITED WHOLESALE MORTGAGE v MADISON ATRINA
MCMAKEN, MIKELE 03/16/2026

Job 51797
29

A. I said, You're welcome.

Q. And that was the entire conversation with Mr. Tucsok?

A. Yeah.

Q. Okay. And Mr. Tucsok was being sincere about that as far as you know? That wasn't sarcastic?

A. I wouldn't know what his intentions were.

Q. Did you perceive Mr. Tucsok as being sincere about the "Thank you"?

A. I don't recall. He said, Thank you. We were friends so I don't know. I said, You're welcome. It's just in passing, so.

Q. Do you know why he was thanking you?

A. I don't.

Q. Had District Lending been a good account during the time you were account executive?

A. They did loans. They did a decent amount of loans.

Q. You did not have any issues with District Lending during the time you were account executive; is that right?

A. What do you mean by "issues"?

Q. Any problems with them?

A. Can you be more specific with "problems"?

Q. Did they raise any complaints about UWM to you?

A. Yeah.

Q. What complaints did District Lending raise to you while you were -- while you were District Lending's account executive?

A. It would be -- I can't recall every single one, but I do know there was a constant complaint circle with the account and how our underwriting works, how -- just every part of our process.

Q. And did you take any steps to address the complaints raised by District Lending?

A. Always, yeah.

Q. Okay. What steps did you take?

A. Anytime someone complains, it usually goes up to our leadership. So if there was a complaint, we take the steps and bring it to our leadership.

So if it was underwriting, I'd reach out to a senior agent in underwriting and address those.

Q. When you would reach out about a complaint, would you do that in writing?

A. It would depend.

Q. Does UWM have a system to log complaints raised by broker partners?

ATTY McDONALD: Object to form, foundation.

Go ahead and answer.

THE WITNESS:  So there is client requests that would be the process for complaints or escalations.  That wouldn't be my process to escalate.

BY ATTY HIRSCH:

Q.    Did you have to raise any concerns about any behaviors by District Lending during the time you were their account executive?

A.    There was one that comes to mind.

Q.    And what is that one that comes to mind?

A.    Leadership reaching out on the broker owners communication style and berating employees, using unprofessional words to team members.

Q.    Do you recall who the specific person was who had used unprofessional words?

A.    Josh Rapaport.

Q.    Did Mr. Rapaport ever use unprofessional words or language with you?

A.    Do you want me to remember specifically?  Is that the question?  'Cause I'm --

Q.    Well, the question is:  Did he ever do that with you, use unprofessional language?

      Were you the person that he used unprofessional language with or one of the people?

      ATTY McDONALD:  Object to form.

Go ahead and answer, if you can.

THE WITNESS:  Not that I can recall.

BY ATTY HIRSCH:

Q.   Did you ever view any of the communications that in which Mr. Rapaport's supposedly used unprofessional language?

A.   Did I hear a phone call, is that --

Q.   Well, I guess first, was there anything in writing, any email or written communication that you saw that used any unprofessional language?

A.   No.  No.

Q.   Okay.  Did you ever hear any oral communication where Mr. Rapaport used unprofessional language?

A.   I did hear a phone call, yes.

Q.   Okay.  Who was the phone between?

A.   It was an underwriter and Josh.

Q.   Do you know the identity of the underwriter?

A.   I don't.

Q.   Why was it that you were listening to the conversation?

A.   'Cause leadership reached out and told me I had to have a conversation with the broker because that kind of communication is not appropriate, nor will we proceed if that continued.

UNITED WHOLESALE MORTGAGE v MADISON ATRINA          Job 51797
MCMAKEN, MIKELE 03/16/2026                                        33

So I had to reach out and tell him we will not talk to employees or team members like this.

Q.   But I thought you told me this was a conversation between a Mr. Rapaport and a underwriter you were listening to?

A.   Right.   Correct.

Q.   This is not when you reached out --

(Simultaneous speaking.)

ATTY McDONALD:   Let her finish her answer, please.

BY ATTY HIRSCH:

Q.   Go ahead.

A.   Sometimes when there's issues, phone calls -- recordings of phone calls get sent to us.  I don't have access to that, so a phone call recording was sent to me.

Q.   Okay.  So you reviewed a certain phone call recording?

A.   Yes.

Q.   And what inappropriate language did Mr. Rapaport use with the underwriter?

A.   Specifically what I remember, is that what you want?

Q.   It's what you remember.

A.   He said:  You must be hired off the street.  You hire fucking retards off the street.  She's a fat fucking retard and you shouldn't have these people working here.  Something along those lines.

Q.   And who was the "she" in that sentence when you're saying "she's"?

A.   That would've been the underwriter he was speaking with that he was upset about.

Q.   Okay.  Does UWM retain these recordings?

A.   I don't know.  Know that a certain amount of time we have them.  As a team lead, I would say that I'm able to listen to my team's call, but I only have a week to listen to those.  So I don't know how the rest of the company works as far as how long we retain that far.

Q.   And so do you recall when you listened to this recording?

A.   It was after the phone call in the same day of when the instance happened.

Q.   Can you give me a month and a year?

A.   I cannot.

Q.   Can you give me a year?

A.   No.  I'd have to look.

Q.   Where would you look to find that out?

A.   I would have to go -- probably look in my social

media so see what division I was on during that time, because we do move around a lot.

Q. After you listened to that phone call, you reached out to Mr. Rapaport directly; is that correct?

A. Yes.

Q. Okay. And what was the nature of the conversation you had with Mr. Rapaport?

A. I asked him what he was upset about, what was going on, obviously to be empathetic. I wanted to make sure that our partners are okay and if something happened, I want to address it.

And he said, yes. He was upset with underwriting and he did say all those things. I said, Don't do that anymore. If you want to be upset, call me, I can help mitigate this, but you can't be talking to underwriters and team members like this.

Q. And did Mr. Rapaport make any unprofessional comments in the conversation with you?

A. Not that I can recall.

Q. And did you take any further action with respect to District Lending after the conversation with Mr. Rapaport?

A. No.

Q. Did any other incident ever come to your attention

after your conversation with Mr. Rapaport?

A.    No.

Q.    Did you make any written report about this incident?

A.    No.

Q.    Are you familiar with the liquidated damages provision in the Wholesale Broker Agreement?

A.    No.

Q.    Do you know what that is?

A.    No.  Not that I can recall, anyways.

Q.    Have you ever heard about any monetary penalty that would be imposed upon a broker partner if they violated the All-In provision?

                    ATTY McDONALD:  Object to form and foundation, mischaracterization of the document.

                    Go ahead.

                    THE WITNESS:  Penalty, no.

BY ATTY HIRSCH:

Q.    Other than the call you told me about with Mr. Rapaport, did you have any other communications with anyone at District Lending?

A.    While they were my account?

Q.    Or at any time.

A.    Yes.

Q.   Okay.  Who else did you speak to at District Lending?

A.   It was a processor, her name was Tami Matthews.

Q.   Okay.  What conversations did you have with Ms. Matthews?

A.   I mean, on a day-to-day level -- loan level things, VOIs, getting docs signed, normal things in conversations I'd have with a processor.

Q.   What are "VOIs"?

A.   Verification of income.

Q.   Did you ever speak to a Josh Leary at District Lending?

A.   No.

Q.   Did you ever speak to someone named Jeff Campbell at District Lending?

A.   No.

Q.   I think you testified a little bit earlier that your understanding of the All-In Initiative was to protect UWM because of how much money it'd invest in its broker partners; is that correct?

A.   Correct.

Q.   Those broker partners can send loans to any lender except for Rocket Mortgage and Fairway following the implementation of the All-In Initiative; is that correct?

ATTY McDONALD:  Object to form.

Go ahead.

THE WITNESS:  That is what is --
that's what is listed, yeah.

BY ATTY HIRSCH:

Q.    And UWM invests in broker partners that send
loan -- that send loans to other lenders excluding
those two; correct?

A.    Correct.

Q.    So how is it that the All-In Initiative was
protecting UWM if those independent brokers could
still send loans to any other lender except for the
two identified in the All-In Initiative?

ATTY McDONALD:  Object to form
and foundation.

Go ahead and answer, if you can.

THE WITNESS:  Well, my opinion
on this is all the things that UWM does to help
the broker channel, to help grow the broker
channel, and to help grow brokers, period,
there is a few lenders that don't necessarily
align with the same business ideas as UWM.

So with that being said, if, for
example, UWM is giving millions of dollars to
fly people out to make sure you have a

continuing education, to make sure you have marketing material for your listing agents, to make sure that you continue to get your licensing at a discounted rated, just for any of those brokers to then take that money that we've invested and then give it back to the retail channel, I would see that as we're still protecting UWM.

We still want to protect the wholesale channel, less of the retail.  If you're giving that money back away, then we're at a loss.  UWM would be losing our investment.  So I look at it, we're protecting our investment.  That's my understanding.

BY ATTY HIRSCH:

Q.    Well, doesn't UWM lose that investment if any of the broker partners simply decide to use another wholesale lender?

            ATTY McDONALD:  Object to form, foundation, speculation.

            Go ahead.

            THE WITNESS:  I don't believe so.

BY ATTY HIRSCH:

Q.    Why not?

ATTY McDONALD:  Same objections.

Go ahead.

THE WITNESS:  My opinion is that a lot of the other lenders are still necessary, right, brokers still need to be able to send loans to other lenders.  But are those lenders then taking that borrower and turning it around and putting in their retail channel, the answer to that is "yes" or "no."

So if they're not doing that, are they giving it back to the broker?  Are they helping the broker grow and retain their own clients?  Or are they taking that client and making it their own?  Whereas, my opinion, some retail channels are taking that and turning it into their own.  It doesn't help the broker themselves.

BY ATTY HIRSCH:

Q.    So you're -- go ahead.

A.    Plenty of other lenders do exist.  The ones that have the retail channel is going to be taking away from the broker, to me, would be ones that would hurt the company.  That's my opinion.

Q.    Do you have any evidence that Rocket Mortgage would take a loan from the wholesale channel and move it

to the retail channel?

          ATTY McDONALD:  Object to form and foundation.

          Go ahead.

          THE WITNESS:  No.

BY ATTY HIRSCH:

Q.    Do you have any evidence that Fairway Mortgage would take a loan from the wholesale channel and move it to the retail channel?

          ATTY McDONALD:  Object to form and foundation.

          THE WITNESS:  Personally, no.

BY ATTY HIRSCH:

Q.    Okay.  Do you have evidence of any lender who does both wholesale and retail, taking loans from the wholesale channel and moving them to the retail channel?

          ATTY McDONALD:  Object to form, foundation.

          Go ahead.

          THE WITNESS:  No.

BY ATTY HIRSCH:

Q.    Would UWM monitor the loans its broker partners sent to various lenders?

A.    You're asking me if UWM would monitor?

Q.   Yes.

A.   And answer on UWM's behalf?

Q.   If you can answer the question.  If you know whether UWM monitors those loans, yes, you have to answer.

A.   Sure.  Yes.

Q.   Did you have any involvement in monitoring loans that broker partners for whom you were the account executive, where they were sending loans?

A.   Yes.

Q.   How would you do that?

A.   I would look on UWM Versus Everybody which is a tool that shows closed loans and where they were closed at.

Q.   Is that an internal tool at UWM, if you know?

A.   There is -- it is an internal tool.

Q.   Do you know where the data in that tool comes from?

A.   Not specifically, but I would assume that it's from an MLS because it's after the loans are closed so it's all public knowledge.

So I don't know exactly where, no.

Q.   How frequently would you check that data for a particular broker partner?

A.   Like at any given time?  Like now in my every day or are we talking about five years ago?

Q.   At the time you were an account executive did you have a set schedule when you would check the loans --

A.   No.

Q.   Let me finish my question.
     -- you would check the loans that a particular broker partner sent to other lenders through this UWM v Everybody?

A.   No, there was no set schedule.

Q.   Okay.  How did you decide when you would do that?

A.   Through -- I mean, there was no rhyme or reason. For example, if I hadn't talked to one of my brokers in a week, and I'm like, What the heck's going on, I know I talk to this guy every day, I might check to see if a loan was closed somewhere else.  But there is no set specific when I would look at that information.  We have access to it at any time, so we can look at it any time.

Q.   Do you know how current the information is in the UWM Versus Everybody?

A.   Yeah.  It's within 30 days of accuracy of closed loans.

Q.   So what would you do if you discovered that one of your broker partners who was one of your accounts when you were an account executive was sending

loans to other lenders?

A.    Well, it would depend.

Q.    What would it depend on?

A.    It would depend on how the shop was.  Is the shop a one-man shop?  Is the shop a three-man shop?  Did they just hire somebody new?  It would be a few steps or processes that I would go through before I reached out.

Q.    Okay.

A.    Excuse me.  But let's just pretend that it was a brokerage shop that had three people and they just hired a fourth.  Okay.  Never signed up with Rocket and then I login and I check UWM Versus Everybody, and it shows there was two loans closed with Rocket.

      Okay.  Based off a timeline, I would probably assume it would be a newer person they hired on, okay, but either way, I would call their broker owner and have a conversation with them.

Q.    You're talking about at the time period after the All-In Initiative?

A.    Yup.

Q.    Is that correct?

A.    Yup.  Yup.

Q.    And what would be the nature of that conversation

you would have if you noticed that some loans had
gone to Rocket?

A.   It would just be something along the lines of:
Hey, Mr. Broker, you know we have an All-In
agreement, you know that we can't have active loans
with Rocket and UWM at the same time.  Do you have
an active loan with Rocket?

And then I would let them give their
answer however they responded we would reiterate
and then that'd be the end of the conversation.
Hey, I remind you of the rules, this is what the
rules are.  Period.  End of discussion.

Q.   Well, why would you ask them if they had a loan
with Rocket because you already know the answer
from the database; right?

A.   It's closed loans, though.  That's a closed loan.
So from my database, it's a closed loan.
Therefore, if they hire a fourth person, in my
example, the loan was closed and they brought
somebody else on.  I don't know which LO it was
attached to.  I just know it was in the company.

Q.   So you mean it could've been done by that
particular LO before they came over to the company
that had the agreement with UWM?

A.   Correct.

UNITED WHOLESALE MORTGAGE v MADISON ATRINA
MCMAKEN, MIKELE 03/16/2026

Job 51797
46

Q.    Okay.  And if they said they were doing loans with Rocket, would you take any steps to escalate that?

A.    My next step would just be letting my direct leader know.

Q.    Okay.  And who was your direct leader at the time you were the account executive for District Lending?

A.    Okay.  My direct leader at the time would've been Shkreli -- Robert Shkreli, but that conversation was never had as far as my knowledge with Josh. This was just conversations I had with my accounts.

Q.    Okay.  I understand.

A.    Okay.

Q.    With respect to any of your accounts, did you ever have to notify Mr. Shkreli that they were doing loans with Rocket?

A.    Not that I -- not to my knowledge, no.

                ATTY McDONALD:  We've been going about an hour.  Is this a good time for a restroom break?

                ATTY HIRSCH:  Yeah, this is fine.

                THE VIDEOGRAPHER:  Off the record at 10:58 AM.

(Recess taken at 10:58 AM.)

(Back on the record at 11:11 AM.)

THE VIDEOGRAPHER:  We are back on the record at 11:11 AM.

BY ATTY HIRSCH:

Q.    You had not noticed that District Lending had sent any loans to Rocket during the time you were District Lending's account executive; is that correct?

A.    Not that I would remember.

Q.    Well, if you had noticed that, you would've had a conversation with District Lending about that; correct?

A.    Correct.

Q.    And you also don't remember having such a conversation; correct?

A.    Correct.

Q.    At any time did you learn that District Lending had sent loans to Rocket Mortgage?

ATTY McDONALD:  Object to form.

THE WITNESS:  While I was the account executive?

BY ATTY HIRSCH:

Q.    At any time.

A.    No.

UNITED WHOLESALE MORTGAGE v MADISON ATRINA                      Job 51797
MCMAKEN, MIKELE 03/16/2026                                            48

Q.    Are you familiar with something called CoreLogic?

A.    I'm aware of the name, yeah.

Q.    Do you know what it is?

A.    To me, that would be where we pull credit from.  As one of the -- one of the companies CoreLogic.

Q.    Did you ever prepare any list of loans District Lending had sent to Rocket or Fairway?

A.    No.

Q.    Are you aware of any agreements UWM had with any broker partner that allowed the broker partner to alter the terms of the Wholesale Broker Agreement?

            ATTY McDONALD:  Object to form, foundation.

            Go ahead and answer, if you know.

            THE WITNESS:  Read that again for me one more time.

BY ATTY HIRSCH:

Q.    Are you aware of any separate agreements that UWM had with any broker partner that modified the terms of UWM's standard Wholesale Broker Agreement?

            ATTY McDONALD:  Same objections.

            Go ahead.

            THE WITNESS:  No.

BY ATTY HIRSCH:

Q.   Are you aware of any broker partner who UWM permitted to send loans to Rocket or Fairway after the implementation of the All-In Initiative?

A.   No.

Q.   And I think you told me you didn't remember the exact time period during which you were the account executive for District Lending; is that right?

A.   Correct.

Q.   Okay.  Were you involved in any discussions about District Lending transferring loans and appraisal information out of UWM in or around September of 2023?

A.   No.

Q.   Do you know if you were still the account executive for District Lending in or around September 2023?

A.   No.

Q.   "No," you don't know?  Or "no," you weren't?

A.   Both.  No, I don't know but, no, I also don't believe I was the AE at the time.

Q.   Okay.  Do you know if Mr. Tucsok was the AE at that time?

A.   I don't know for sure.

Q.   Are you aware of any other account executives assigned to the District Lending account other than

you and Mr. Tucsok?

A.    No.

Q.    Did UWM enforce the All-In Initiative in any case where it discovered that a broker partner had sent loans to Rocket or Fairway after the initiation of the All-In provision?

ATTY McDONALD:  Object to form and foundation.

Go ahead and answer, if you know.

THE WITNESS:  I wouldn't know that.

BY ATTY HIRSCH:

Q.    Are you aware of any case where UWM declined to enforce the All-In provision after it had learned that a broker partner had sent loans to Rocket or Fairway?

ATTY McDONALD:  Object to form and foundation.

Go ahead and answer.

THE WITNESS:  No, I wouldn't know that, either.

BY ATTY HIRSCH:

Q.    Did you ever tell any broker partner that it would be okay to continue to do loans with Rocket or

Fairway after the implementation of the All-In Initiative?

A.   No.

Q.   Did you ever hear that any UWM representative had told any broker partner that it would be okay to continue to do loans with Rocket or Fairway after the implementation of the All-In Initiative?

A.   Did I ever hear any other account executives tell somebody?

Q.   Did you ever hear of that occurring?

A.   No.

Q.   Are you familiar with a company called E Mortgage Capital?

A.   Familiar?  I've heard the name.  I don't know them.

Q.   Did you ever serve as the account executive for E Mortgage Capital?

A.   No.

Q.   Did you ever hear that E Mortgage Capital was sending loans to Rocket after the implementation of the All-In Initiative?

               ATTY McDONALD:  Object to form and foundation.

               THE WITNESS:  No.

BY ATTY HIRSCH:

Q.   Are you familiar with a company called UMortgage?

UNITED WHOLESALE MORTGAGE v MADISON ATRINA
MCMAKEN, MIKELE 03/16/2026

Job 51797
52

That's "U" like the letter U.

A. I know the account.

Q. Were you ever the account executive for UMortgage?

A. No.

Q. Are you familiar with a company called Loan United Wholesale?

A. No.

Q. Are you familiar with a company called Top Mortgage, LLC?

A. No.

Q. Are you familiar with a company called Compass Lending?

A. No.

Q. Are you familiar with a company called Arboretum Mortgage Corporation?

A. No.

Q. Do you know what MMI data is?

A. Yeah.  I think so, but my brain is drawing a blank here.

Q. Are you familiar with a company called Model Match, Inc.?

A. No.

Q. What do you understand MMI data to be?

A. I don't know.  I kind of drew a blank here in the moment.

Q.    So --

A.    I'm just gonna say I don't know.

Q.    Okay.

A.    Come back to me in a minute, but right now, I don't know.

Q.    If it does, you can let me know.

A.    Okay.

Q.    Okay.  Do you know whether District Lending is still a broker partner with UWM?

A.    I don't.

Q.    Do you know if District Lending was terminated as a broker partner with UWM?

A.    I don't.

Q.    And I take it then you did not have any involvement in any termination of District Lending; would that be correct?

A.    Correct.

Q.    Who is Allen Beydoun?

A.    He is -- he's a senior leader.

Q.    Do you know what Mr. Beydoun's role is?

A.    Not without looking in my phone to see what his exact title is, but he's in senior leadership.

Q.    During the time that you were the account executive for District Lending, did Mr. Beydoun have any involvement with the District Lending account?

A.    Not that I'm aware of.

Q.    Did you ever discuss District Lending with Mr. Beydoun?

A.    No.

Q.    Who is Nicholas Gaudino?

A.    Nick Gaudino is in senior leadership as well.

Q.    Do you know what Mr. Guadino's role is?

A.    He is -- I don't know.  I don't know the exact title.  I want to say SVP, but -- he's a senior leadership.  I don't know the exact title.

Q.    During the time you were the account executive for District Lending, did Mr. Guadino have any involvement in the District Lending accounts?

A.    No, not that I'm aware of.

Q.    Did you ever talk to Mr. Guadino about District Lending?

A.    No.

Q.    What is the client's priority supports team?

A.    CPS -- client priority support, what are they?

Q.    Yes, what is it?

A.    It's a team.

Q.    What does it do?

A.    I don't know all of their duties, but if you want a general of what they do, licensing, renewals. They're part of renewals and licensing.

Q.   Do you know who is the team lead for the client priority support team?

A.   No.

Q.   Did you know who the team lead was at any time?

A.   No.

Q.   Did you have any interaction with the client priority support team regarding District Lending?

A.   Not that I'm aware of, no.

Q.   Did UWM terminate its agreement with any broker partner for whom you were the account executive at any time?

              ATTY McDONALD:   Object to form, foundation.

              THE WITNESS:   I can recall of one.

BY ATTY HIRSCH:

Q.   What's the one you recall?

A.   I don't remember the broker ID, but I did get an email from one of my brokers saying they wanted to go all out.

Q.   So that particular termination what related to the All-In Initiative; is that correct?

A.   Correct.  They wanted to submit loans to Rocket so they let me know.

Q.   And I -- just to be clear on my question, was it

UWM that terminated that relationship or was it the broker partner that terminated that relationship?

A.   Well, the partner is the one that reached out requesting the termination.

Q.   Okay.

A.   So the broker requested the termination.  In which case, I then put a task in.

Q.   What do you mean you, "put a task in"?  What does that involve?

A.   So if a broker says they want to go all out and they don't want to continue the relationship with UWM, there's a task.  So within U Zone, it's part of the process.

So you put a task in.  It goes to senior leadership, so I could say, Hey, this account says they longer want to do business with us and then it goes to senior leadership.  So it wouldn't have been UWM, I guess, that requested the termination; it was the broker partner.

Q.   Okay.  So you're not aware of any broker partner where UWM initiated the termination; is that correct?

A.   That's correct.

Q.   Okay.  Are you aware of any broker partner who was terminated for any other reason?

ATTY McDONALD:  Object to form and foundation.

THE WITNESS:  No.

BY ATTY HIRSCH:

Q.   Do you know Adriana Bifarella?  I may be pronouncing that name incorrectly.

A.   Adriana Bufarella -- Bifarella?

Q.   B-I-F-A-R-E-L-L-A.

A.   I know her name.

Q.   Do you know what her role is at UWM?

A.   I'm not positive.

Q.   Have you ever had any interaction with Ms. Bifarella?

A.   Not that I can recall.

Q.   Do you know Kyle Chamberlain is?

A.   I know who he is.

Q.   Okay.  Do you know Kyle Chamberlain's role at UWM?

A.   Yeah.  He's an account executive as well.

Q.   Do you know if Mr. Chamberlain was ever the account executive for District Lending?

A.   Not that I know of, no.

Q.   Did you ever have any discussions with Mr. Chamberlain about District Lending?

A.   No.

Q.   Do you know who Sam Naser is, N-A-S-E-R?

A.  Yes.

Q.  Who is Mr. Naser?

A.  He's an account executive.

Q.  Do you know if Mr. Naser was ever the account executive for District Lending?

A.  Not that I know of.

Q.  Did you ever have any discussion with Mr. Naser about District Lending?

A.  Nope.

Q.  I think you mentioned Mr. Shkreli before; is that right?

A.  He's my leader.

Q.  Okay.  Did you ever have any discussions with Mr. Shkreli about District Lending?

A.  Not that I can recall.

Q.  I only have a first name on this one, but do you know a Carlton with UWM?

A.  Say it again.

Q.  Carlton.  I believe that's a first name. C-A-R-L-T-O-N.

A.  No.

Q.  Did you ever hear that anyone had requested that District Lending come back to do business with UWM?

A.  No.

Q.  Do you know Boykin Golden?  I may have pronounced

that name incorrectly, but I can spell it.

A.   I don't -- I don't know who he is.  I've seen him on emails come through.  I don't know what team he's a part of either.

Q.   So fair to say you've never had any communications with Mr. Golden about District Lending?

A.   Correct.  I've never talked to him.

Q.   Do you agree that an independent mortgage broker has a responsibility to their client to find the best loan available based on the client's particular circumstances?

ATTY McDONALD:  Object to form, foundation, calls for speculation.

Go ahead and answer.

THE WITNESS:  Yes.

BY ATTY HIRSCH:

Q.   Did UWM monitor the rates and terms offered by Rocket or Fairway?

A.   Did UWM monitor?

Q.   Yes.

A.   How -- how would I know that?

Q.   Well, if you wouldn't know, your answer is you don't know.

A.   I don't know.  I don't know that.

Q.   All right.  Did any broker partner ever tell you

that UWM was not offering competitively priced loans relative to Rocket or Fairway?

A.    Not that I can recall.

Q.    Does UWM offer mortgage products for borrowers with credit ratings of 580 and 620?

A.    Yes.

Q.    Do you know if Rocket has a broader range of product offerings for borrowers with credit ratings of 580 and 620?

ATTY McDONALD:  Object to foundation.

THE WITNESS:  I don't know that.

BY ATTY HIRSCH:

Q.    If Rocket or Fairway had a better interest rate or better loan terms for a particular borrower than UWM, shouldn't an independent broker recommend that that borrower go to Rocket or Fairway?

ATTY McDONALD:  Object to form and foundation, speculation.

Go ahead and answer, if you can.

THE WITNESS:  Read that again for me, please real quick.  I'm sorry.

BY ATTY HIRSCH:

Q.    If Rocket or Fairway offered a significantly better interest rate or loan terms for a particular

borrower, shouldn't the independent broker advise that that borrower go to Rocket or Fairway?

ATTY McDONALD:  Same objections.

THE WITNESS:  Well, it would be my opinion that everything doesn't fall into a rate or a term when it comes to being the best option.

BY ATTY HIRSCH:

Q.    So what factors would you consider beyond rate and term?

A.    Payment, customization.  There's a lot of things in my opinion that are nuances that come up that aren't just a rate and a term.  Payment, MI.

There's more than a few, but there is different ways where certain lenders can make a rate look really attractive, but the cost for it might not be exactly as it was on the LE, if you will, so.  But there's more than just rates and terms that would fall into that.  That's my opinion.

Q.    And you would agree with me that one job of an independent mortgage broker is to take into account all those criteria to determine what the best product would be for a particular borrower?

ATTY McDONALD:  Object to form

and foundation, speculation.

Go ahead.

THE WITNESS: Yes.

BY ATTY HIRSCH:

Q. And if in the opinion of the independent mortgage broker, the overall deal taking into account all those criteria was better at Rocket or Fairway than UWM, the independent mortgage broker should recommend the borrower go to Rocket or Fairway; right?

ATTY McDONALD: Object to form, foundation, speculation.

THE WITNESS: In the case -- in this case would -- read the question again 'cause I want to make sure I answer this correctly.

ATTY HIRSCH: Can you read it back, please.

(Record repeated as requested.)

ATTY McDONALD: Object to form, foundation, speculation.

THE WITNESS: My opinion would be sure.

BY ATTY HIRSCH:

Q. But under the terms of the All-In Initiative, an

independent mortgage broker who was working with UWM couldn't do that; right?

ATTY McDONALD:  Object to form, foundation, speculation incomplete hypothetical.

Go ahead.

THE WITNESS:  I don't agree with that because they can always supply options. The independent mortgage broker can still say, Hey, you've got Rocket right here, you've got Fairway right here, you've got UWM, Newrez, and PennyMac.  Okay.  Here's all your choices.

They could always say, Here's your choices; it would be then on the borrower to choose which one they thought worked best for them.

BY ATTY HIRSCH:

Q.    Have you ever known an independent mortgage broker to include an option for a lender with which it couldn't do business?

ATTY McDONALD:  Object to form and foundation.

Answer if you can.

THE WITNESS:  No.

UNITED WHOLESALE MORTGAGE v MADISON ATRINA
MCMAKEN, MIKELE 03/16/2026

Job 51797
64

BY ATTY HIRSCH:

Q.   UWM would benefit financially if Rocket lost wholesale market share; right?

          ATTY McDONALD:  Object to form, foundation, speculation.

          THE WITNESS:  I'm gonna have to have you read the -- UWM would what?

BY ATTY HIRSCH:

Q.   Benefit financially if Rocket lost market share in the wholesale channel?

          ATTY McDONALD:  Object to form, foundation, speculation.

          THE WITNESS:  I don't know how to answer that.

BY ATTY HIRSCH:

Q.   Okay.  Why don't you know how to answer that?

A.   Because I -- I feel like that's an opinion.  I don't want to give an opinion.

Q.   Okay.  Well, you've given a number of opinions today; right?

A.   Yeah, but how would I know?  I don't know that for sure.

Q.   Did you ever hear that the real motivating factor for UWMs implementation of the All-In Initiative was to cause Rocket to lose market share?

UNITED WHOLESALE MORTGAGE v MADISON ATRINA                Job 51797
MCMAKEN, MIKELE 03/16/2026                                                65

A.    No.

Q.    Do you know whether UWM gained market share since the implementation of the All-In Initiative?

A.    I don't know those directly attach to each other, so no.

Q.    I didn't ask if they were attached.  I just asked if it happened.

A.    Has the market share increased since the All-In addendum?

Q.    Yes.

A.    Yes.

Q.    I think you told me a little bit earlier that one of the reasons for implementing the All-In Initiative and excluding Rocket and Fairway was because those two lenders, you believe, did business practices damaged the wholesale channel; would that be accurate?

A.    That was my opinion, yeah.

Q.    Okay.  And one way you said it was damaged is because at least those two lenders take wholesale loans and move them to the retail channel; is that correct?

A.    Yes.

Q.    And when you say they take a wholesale loan and move it to the retail channel, that loan's already

done; right?

ATTY McDONALD:  Object to form.

THE WITNESS:  You mean the first loan, right?  So if they bring a loan over the retail channel is that loan done.

BY ATTY HIRSCH:

Q.    That's a completed loan; right?

A.    Correct.

Q.    So what loan is it that you're saying gets moved to the retail channel?

A.    Anything after that.  The first purchase then the refinance that won't go back into the wholesale channel.  That will stay in the retail channel.

Q.    And you have no evidence of that; correct?

ATTY McDONALD:  Object to form, asked and answered.

THE WITNESS:  No.

BY ATTY HIRSCH:

Q.    Okay.  And you don't know if any particular loan actually has a follow-up refinance; right?

A.    What do you mean?

Q.    There's no guarantee that a borrower refinances any particular loan; right?

A.    It's not guaranteed.

Q.    Do you know the percentages, often that happens?

A.    Well, I would go off of the number I know, the first mortgage is 11 after that.  So a lifetime they're going to have 11 mortgages.

Q.    Well, that's not --

A.    Let's start with the one --

Q.    I was just focusing on refinances.  Are you still focused on refinances or are you just telling me the total number of the mortgages someone might have in their lifetime?

A.    I'm going off of the total number of mortgages someone might have in their lifetime.

Q.    Okay.  So you're saying it's not just the loan that moves to retail channel; you're suggesting the customer for that loan that moves to the retail channel?

A.    Yeah.

Q.    Okay.  So why is it that is a customer who's getting a completely new loan, why are the chances better they would go to retail channel than the wholesale channel?

        ATTY McDONALD:  Object to form, foundation, speculation.

        Go ahead.

        THE WITNESS:  Because retail is able to cold call and reach out and call on

that customer.  Whereas wholesale doesn't have that option.  Wholesale, the borrower stays with the broker.  Once it goes into the retail channel, that's kind of open forum for anyone that wants to reach out to try to refinance that borrower.

BY ATTY HIRSCH:

Q.    Why can't an independent broker also called to follow up any loan it initiated?

ATTY McDONALD:  Object to form and foundation.

Go ahead and answer, if you know.

THE WITNESS:  Well, they could. You could still stay in front of your borrowers, yeah.

BY ATTY HIRSCH:

Q.    So they could do the exactly same thing you're saying retail does; correct?

A.    They could, yes.

Q.    Okay.  What did you do to prepare for your deposition today?

ATTY McDONALD:  Object to the extent this invades the attorney-client privilege or attorney work product.

UNITED WHOLESALE MORTGAGE v MADISON ATRINA                         Job 51797
MCMAKEN, MIKELE 03/16/2026                                                 69

So you can answer without disclosing anything you talked with me or UWM's other lawyers.

THE WITNESS:  Okay.  I had a meeting.

BY ATTY HIRSCH:

Q.    Okay.  Who did you meet with?  I don't want to know what you said.

A.    Yeah.  With UWM counsel.

Q.    Okay.  Can you tell me who?

A.    Yeah.  Bill.

Q.    Mr. McDonald?

A.    Yup.

Q.    Okay.  When did you have that meeting?

A.    On Friday.

Q.    How long was that meeting?

A.    About an hour.

Q.    Okay.  Did you review any documents in preparation for the deposition?

A.    No.

ATTY HIRSCH:  Okay.  Let's take a short break.  I just want to go through my list.

ATTY McDONALD:  Okay.

THE VIDEOGRAPHER:  Off the

record at 11:43 AM.

(Recess taken at 11:43 AM.)

(Back on the record at 11:52 AM.)

THE VIDEOGRAPHER:  Back on the record at 11:52 AM.

BY ATTY HIRSCH:

Q.    Ma'am, I think you told me earlier that you were not familiar with the liquidated damages provision in the Wholesale Broker Agreement; is that correct?

A.    Correct.

Q.    And just to round this out, you did not have any discussions with anybody about the liquidated damages provision in the Wholesale Broker Agreement; is that right?

A.    Not that I can recall.

Q.    Are you familiar with UWM's annual renewal process for its broker partners?

A.    I'm aware that we do a renewal process, yes.

Q.    Do you know what that involves from the perspective of the broker partner?

A.    So I don't know every document that's needed, but I do know that my brokers go through a renewal process.

Q.    Do you know if that's done electronically or in hard copy?

UNITED WHOLESALE MORTGAGE v MADISON ATRINA          Job 51797
MCMAKEN, MIKELE 03/16/2026                                          71

A.    I don't know for sure.  I believe it's done
      electronically.

Q.    In your capacity as account executive, do you
      receive any sort of notice confirming that a broker
      partner has renewed?

A.    Yes.

Q.    What happens if you don't receive notice that a
      broker partner has renewed?

A.    What I would notice, you mean?  Like, at what point
      would I notice if a partner didn't complete the
      renewal process?

Q.    Well, let me ask a different question.

A.    Okay.

Q.    Is there a deadline for a broker partner to
      complete a renewal process?

A.    Yes.

Q.    Okay.  Is the deadline on the calendar year or some
      anniversary of the broker partner's relationship?

A.    It's generally on their relationship, so whenever
      they signed up within a year.  So every year it has
      to be renewed from my understanding.

Q.    Okay.  All right.  And do you know what the broker
      partner has to do to get that renewal?

A.    I don't.

Q.    Okay.

A.     It's not my wheelhouse.

ATTY HIRSCH:  I have nothing further.  Thank you.

ATTY McDONALD:  Okay.  No questions at this time.

THE VIDEOGRAPHER:  Okay.  This concludes today's deposition.  The time is 11:54 AM.

MS. REPORTER:  Would anyone like to order the transcript?

ATTY HIRSCH:  Yes.

ATTY McDONALD:  Yes.

(Deposition concluded at 11:54 AM.)

- - -

STATE OF MICHIGAN

COUNTY OF WAYNE

Certificate of Notary Public

I certify that this transcript, consisting of 73 pages, is a complete, true, and correct record of the testimony of MIKELE McMACKEN held in this case on March 16, 2026.

I also certify that prior to taking this deposition, MIKELE McMACKEN was duly sworn to tell the truth pursuant to Michigan Law on Notarial Acts 55.265 Section 5(d)(i)(i).

I further certify that I am not related to any of the parties or their attorneys or agents, nor am I an employee of any of the parties or their attorneys; and that I am not interested directly, indirectly, or financially in the matter of controversy.

*Kristen Trachet*

_____

Kristen N. Trachet, CSR-16330

Fortz Legal Support, LLC-8577

Certified Shorthand Reporter

Notary Public, Wayne County, Michigan

My commission expires 8/31/2030

DATE: March 30, 2026