# EXHIBIT 6

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF MICHIGAN

SOUTHERN DIVISION

UNITED WHOLESALE MORTGAGE, LLC,

    Plaintiff/

    Counter-Defendant,      Case No. 2:24-cv-10216

                                  Hon. Terrence G. Berg

vs                                  Chief Mag. J. David R. Grand

ATLANTIC TRUST MORTGAGE CORPORATION,

    Defendant/

    Counter-Plaintiff.

_____/

VIDEO DEPOSITION

DEPONENT:      SARAH DeCIANTIS

DATE:           Thursday, May 21, 2026

TIME:           10:00 a.m.

LOCATION:      BSP LAW

                 100 W Big Beaver Rd Ste 400

                 Troy, Michigan

REPORTER:      Jeanette M. Fallon, CRR/RMR/CSR-3267

JOB NUMBER:    54604

APPEARANCES:


BSP LAW

By:   Moheeb H. Murray

100 W Big Beaver Rd Ste 400

Troy MI 48084

248.822.7809

murray@bsplaw.com

      Appearing on behalf of the

      Plaintiff/Counter-Defendant.


MORGANROTH & MORGANROTH PLLC

By:   Jason R. Hirsch

344 N Old Woodward Ave Ste 200

Birmingham MI 48009

248.864.4000

jhirsch@morganrothlaw.com

      Appearing on behalf of the

      Defendant/Counter-Plaintiff.




ALSO PRESENT:

Ryan Byrd, United Wholesale Mortgage In-House Counsel

Bailey Wellman, Videographer

UNITED WHOLESALE MORTGAGE v ATLANTIC TRUST MORTGAGE    Job 54604
DECIANTIS, SARAH 05/21/2026                              3

TABLE OF CONTENTS

WITNESS                                                PAGE

SARAH DeCIANTIS

Examination by Mr. Hirsch                               4

Examination by Mr. Murray                               125

Reexamination by Mr. Hirsch                             126


                    E X H I B I T S

NUMBER              DESCRIPTION                        PAGE

Exhibit 1           First Amended Complaint            20

Exhibit 2           Defendant, Atlantic Trust Mortgage
                    Corporation, Answer and Affirmative
                    Defenses to First Amended Complaint,
                    Counterclaim and Reliance on Demand
                    for Jury Trial                     24

Exhibit 4           United Wholesale Mortgage, LLC's
                    Answers and Objections to Atlantic
                    Trust Mortgage Corporation's First
                    Set of Interrogatories             73

Exhibit 6           3-4-21 Wholesale Broker Agreement  57

Exhibit 9           9-16-22 Wholesale Broker Agreement 105

Exhibit 12          UWM_ATLANTIC000158                 59

Exhibit 28          LinkedIn Profile                   9

Troy, Michigan

Thursday, May 21, 2026

10:00 a.m.

*       *       *

THE VIDEOGRAPHER:  Good morning.  We are now on the record at 10:00 a.m. on Thursday, May 21st, 2026.

This begins the videotaped deposition of Sarah DeCiantis taken in the matter of United Wholesale Mortgage, LLC verse Atlantic Trust Mortgage Corporation.  We are taking this deposition at the offices of BSP Law in Troy, Michigan.

My name is Bailey Wellman, I'm your legal videographer today representing Fortz Legal Support.

Counsel, will you please state your name and whom you represent after which our court reporter will swear in the witness.

MR. MURRAY:  Moheeb Murray for United Wholesale Mortgage.

MR. HIRSCH:  Jason Hirsch for defendant, Atlantic Trust.

SARAH DeCIANTIS

having first been duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. HIRSCH:

Q.    Good morning.

A.    Good morning.

Q.    My name is Jason Hirsch, I'm one of the attorneys for defendant in this matter.

MR. HIRSCH:  Let the record show that this is the deposition of Sarah DeCiantis taken pursuant to notice under the Federal Rules of Civil Procedure.

BY MR. HIRSCH:

Q.    Ms. DeCiantis, please make sure you answer verbally so that our court reporter can record your answers; okay?

A.    Okay.

Q.    If you need a break at any time, let me know and we can take a break; okay?

A.    Okay.

Q.    You were just sworn in.  I will be asking you a series of questions.  You understand that your answers are under oath; correct?

A.    I do.

Q.    Please make sure to let me complete my question before you give your answer, both to make sure that you fully understand the question and because our court reporter can't record the two of us talking over each other; okay?

A.    Okay.

Q. And if you don't understand a question I ask, please let me know and I will attempt to clarify; okay?

A. Okay.

Q. And if at any time I interrupt you or you have not completed your answer, please let me know and I will let you finish your answer to that question for the record; okay?

A. Okay.

Q. Can you please state your full name for the record?

A. Sarah DeCiantis.

Q. Can you tell me about your education beginning with undergraduate college forward?

A. Yes, I went to Wayne State -- or graduated from Wayne State University, I have a BA in marketing and advertising.

Q. And what year did you receive your BA in marketing and advertising?

A. 2004.

Q. Can you tell me about your employment history from the time you graduated from undergraduate college in 2004 to the present?

A. Absolutely.  Started as an intern at Doner Advertising and then moved onto Campbell Ewald, also an advertising agency.  Following that was McCann, another advertising agency, and then after that was

Palace sports entertainment.  And then ever since then, the last twelve and a half years, I've been at UWM.

Q.   Starting with your position as an intern at Doner, what period of time were you at Doner?

A.   2004 to roughly 2006.

Q.   And what were your duties as an intern?

A.   Routing job bags, for the most part.

Q.   In laymen's terms, what does that mean?

A.   Taking marketing asset materials and taking it to the creative director, the legal team, and physically walking it around the building to make sure everyone signed off.

Q.   Was that a paid internship?

A.   It was.

Q.   I think the next position you told me about was at Campbell Ewald; is that correct?

A.   That's correct.

Q.   And for what period of time did you work at Campbell Ewald?

A.   I believe that was roughly three years.

Q.   Do you have the years?

A.   2006 to 2009 roughly.

Q.   On your LinkedIn profile it looked like it had said May 2006 to October 2008.  Does that ring a bell?

A.    That is possible, yeah.

Q.    Okay.  And what were your job title or titles at Campbell Ewald?

A.    I was an account executive there.

Q.    And what were your duties as an account executive at Campbell Ewald?

A.    It was to represent the clients, kind of be the conduit between clients and the creative team, so that work was being intaked by what the clients desired to see and then I would work with the creative team to make sure that that was the output that they received.

Q.    And Campbell Ewald is an advertising marketing firm; is that right?

A.    It is, yes.

Q.    And just going back quickly, Doner is located in Michigan; correct?

A.    Correct.

Q.    And that's where you worked; right?

A.    Yes.

Q.    And Campbell Ewald is also in Michigan?

A.    Uh-huh.

Q.    And that's where you worked; right?

A.    Uh-huh.

Q.    The next firm you mentioned is McCann Erickson; is that right?

A.    That's correct.

Q.    And where are they located?

A.    Birmingham.

Q.    And for what period of time did you work with
McCann Erickson?

A.    I was at McCann from 2008, if that was when I left
Campbell Ewald, until 2011.

                    (Marked for identification

                    Deposition Exhibit 28.)

BY MR. HIRSCH:

Q.    Ms. DeCiantis, I'm going to hand what you we've marked
as Exhibit 28 to the deposition.  After you've had a
chance to look at that, could you tell me if you
recognize that?

A.    Yes, I do.

Q.    Okay, what is it?

A.    My LinkedIn profile.

Q.    And if you could look at the dates on your job
history, I think it starts at sort of the bottom of
page -- well, I guess it's on page 2, if we focus on
McCann Erickson.

A.    Sure, yep.

Q.    And it looks to me like the period at McCann Erickson
was from November 2008 to April 2012.  Is that
accurate?

A.    That is accurate.

Q.    Okay.  And still referencing Exhibit 28, it looks like the first position you held there was account supervisor; is that accurate?

A.    That is correct.

Q.    And what were your duties as account supervisor?

A.    Was very similar to an account executive.  It's just more responsibility as far as the level of clients that you're interacting with on a day-to-day basis versus an account executive.

Q.    And then the next position listed on Exhibit 28 is business development supervisor; is that correct?

A.    That is correct.

Q.    And what were your duties as a business development supervisor?

A.    The role was to bring in new clients and new business. So if there was a brand that was looking for a new agency, it was my role to interact with them and then interact with our internal team to put a proposal together to present to the clients.

Q.    The next role listed at McCann Erickson is director new business; is that correct?

A.    That is correct.

Q.    Okay.  And the description here, it says, "Manage all aspects of a new business pitch process and team from

client/category assessment and pitch presentation development to budget and timelines."

That's the first item; is that correct?

A.   That is correct.

Q.   Okay, and is that accurate?

A.   That is accurate.

Q.   Okay.  The next line item, I guess it's cut off on the printout, but at least it starts with, "Assist in development of scope of work."  Do you see that?

A.   Yes, I do.

Q.   Could you tell me what else was in that particular aspect of your duties, if you recall?

A.   That was -- I mean, I can see the staffing, so it would be putting together proposals as far as who -- how many team members would be needed to support that account and then what would be the cost of supporting that account from a staffing perspective.  I would have to click on that more to see exactly what is the rest of that line.

Q.   And again, not focusing on what is written in the LinkedIn profile, any other duties you had that we haven't covered in the position of director new business?

A.   No.

Q.   The next position, at least as listed on the profile,

is with Palace Sports Entertainment; is that correct?

A.   Yes.

Q.   And it looks like the time period is April 2012 to February 2014; is that correct?

A.   That is correct.

Q.   And I guess can you tell me what your duties and responsibilities were?  It's sort of cut off again a little bit on this printout, at least of the profile.

A.   Sure.  So my role was to engage with the corporate sponsors, so, you know, whether it be Belle Tire or Budweiser or, you know, Coca-Cola, any of the sponsors that were tied to Palace Sports Entertainment at any of the venues, to be the relationship builder and ensure all the things that we had agreed to from a Palace Sports Entertainment standpoint as part of the sponsorship contract was being fulfilled.

Q.   And at least at the time you worked there, what venues were under the auspices of Palace Sports Entertainment?

A.   Palace, Pine Knob -- or at the time it was DTE -- we operated Meadowbrook Theater, and then later on for a very short period of time while I was there was Michigan Lottery Theater, which I think was called Freedom Hill at that time.

Q.   And your next position was when you went over to

United Wholesale Mortgage; is that correct?

A.   That is correct.

Q.   Okay.  And it looks like the first title you had at United Wholesale Mortgage was vice-president marketing; is that correct?

A.   That is correct.

Q.   And you held that position from February 2014 through August 2017; is that correct?

A.   Yes.

Q.   And what were your duties in the position of vice-president of marketing?

A.   My main duties at that time were to rebrand both UWM and at the time we had another brand called United Shore and Shore Mortgage, and so my role -- I was brought into the company to do that, so the entire time that I was vice-president, it was rebranding all of those brands as well as building out an internal marketing team.

Q.   Your next title at United Wholesale Mortgage is chief marketing officer; is that correct?

A.   That is correct.

Q.   And it looks like that's from August 2017 to the present; is that accurate?

A.   That is accurate.

Q.   And what are your duties in the role of chief

marketing officer?

A.   So I oversee what we define as an in-house agency.  So we have several different disciplines within marketing including PR, paid media, creative, event planning, there's several different aspects, but everything that I previously managed as, you know, working in an agency, now falls under my purview as CMO.

Q.   We talked a moment ago in your position as VP of marketing, you said you had come in to do some rebranding; is that correct?

A.   Uh-huh.

Q.   And you said that at the time you came in, there were three brands under the United Wholesale umbrella; is that right?

A.   There were -- well, there was USFT, which is United Shore Financial Services, that was the parent company, and then under that at the time was Capital Mortgage Funding, Shore Mortgage, and UWM.  We never rebranded Capital Mortgage Funding.

Q.   United Shore Financial Services.

A.   Uh-huh.

Q.   What did that company do or was it just a holding company?

A.   It was just a holding company, correct.

Q.   Okay.  And United Wholesale Mortgage at this time, was

it just a wholesale lender?

A. Yes.

Q. Did that ever change?

A. No.

Q. Shore Mortgage, what was its business?

A. They were retail.

Q. Does Shore Mortgage still exist?

A. It does not.

Q. Do you know when Shore Mortgage ceased to exist?

A. I would have to verify the exact year, but I believe it was 2015.

Q. Was the shutdown of Shore Mortgage related to the rebranding, or those were separate things going on?

A. It wasn't related to the rebranding, it was related to our decision to focus solely on wholesale.

Q. Were you involved in the decision to focus solely on wholesale?

A. No.

Q. Do you know who made the decision to focus solely on wholesale?

A. I'm not familiar with who exactly made the decision.

Q. The other entity you mentioned is Capital Mortgage Funding; correct?

A. Correct.

Q. Is that company still in business?

UNITED WHOLESALE MORTGAGE v ATLANTIC TRUST MORTGAGE          Job 54604
DECIANTIS, SARAH 05/21/2026                                                      16

A.   I do not know.

Q.   Do you know if it is still owned by United Shore
     Financial Services?

A.   It is not.

Q.   Do you know if it was sold to anybody?

A.   I don't know what the structure of that separation
     looked like.

Q.   Do you know when the separation occurred?

A.   I believe it was the same year.

Q.   When you say the same year, meaning around 2015 --

A.   Correct.

Q.   -- that you told me before?

A.   Yes.

Q.   And what business was Capital Mortgage Funding insofar
     as, you know, prior to the separation?

A.   They were a broker.

Q.   They were an independent mortgage broker?

A.   Correct.

Q.   Do you know how much of Capital Mortgage Funding's
     business went through United Wholesale during the time
     you --

A.   I do not.

Q.   Do you know Harry Glanz?

A.   I met him, yes.

Q.   Who is Harry Glanz?

A.   He was the CEO of Capital Mortgage Funding.

Q.   And do you know Dan Burke?

A.   I do not.

Q.   Do you know if Capital Mortgage Funding still does loans with United Wholesale Mortgage?

A.   I do not.

Q.   Do you know why you're being deposed today?

A.   I do.

Q.   Why is that?

A.   Because I was a participant in a meeting regarding the All-In addendum.

Q.   Are you aware that you were identified by UWM as a person who might have information about certain topics?

A.   Yes.

Q.   When did you first learn about this case?

A.   I don't know exactly when I first learned about this case.

Q.   Do you know how you first learned about this case?

         MR. MURRAY:  Just going to caution the witness, don't talk about anything that you've talked about with outside legal counsel for UWM or in-house legal counsel, but in terms of you can say when or generally how, but don't reveal the contents of any communications with legal counsel.

BY MR. HIRSCH:

Q.   Right, I don't want to know the contents, just if you can -- if you know how you learned about it, the mechanism that that happened.

A.   Very likely through PR.

Q.   Any particular human being that you recollect telling you about that?

A.   It was very likely a reporter reaching out asking for comment.

Q.   Do you know the nature of the allegations in this case?

A.   Yes.

Q.   What are they?

A.   That they -- the Atlantic Trust team feels that they did not breach the All-In addendum.

Q.   Do you have any knowledge about you -- well, strike that.

     I'll call United Wholesale Mortgage UWM; is that okay?  You'll --

A.   No, that's okay, yes.

Q.   -- know what I'm talking about?  Okay.

     What knowledge do you have about UWM's Wholesale Broker Agreement with Atlantic Trust?

A.   I do not have any knowledge.

Q.   Do you have any knowledge about Atlantic Trust's

agreement to any amendments to the Wholesale Broker Agreement?

A.   No.

Q.   Do you have any knowledge about Atlantic Trust's submission of mortgage loans to Rocket Mortgage since March 4th, 2021?

A.   I don't know specific dates, but I'm aware that they engaged in sending loans to Rocket.

Q.   How did you get that knowledge?

A.   Through this case.

Q.   When you say through this case, you mean you've read the -- well, strike that.

          Have you read the complaint in this case?

A.   Yes.

Q.   Is that where you got the knowledge?

          MR. MURRAY:  Object to the form and foundation, but you can answer.

A.   Can you rephrase?

BY MR. HIRSCH:

Q.   Well, let me ask a slightly different question then.

          How did you get -- well, strike that.

          Have you reviewed the complaint filed in this case by United Wholesale Mortgage?

A.   Yes.

Q.   When did you read the complaint filed by United

Wholesale Mortgage?

A.    When I was brought into this case.

Q.    When were you brought into this case?

A.    I would have to go back and look at the exact date.

Q.    What would you look at to determine that?

A.    Communication with legal counsel.

Q.    Did the communication with legal counsel happen before or after a reporter had reached out asking you for comment?

A.    After.

Q.    Do you have any information about mortgage loans that Atlantic Trust sent to Fairway Independent Mortgage since March 4th, 2021?

A.    I'm not aware of the specifics around that.

Q.    Do you know the significance of the date of March 4th, 2021?

              MR. MURRAY:   Object to form and foundation.

A.    Not specifically.

BY MR. HIRSCH:

Q.    Do you know the date the All-In Initiative was announced by United Wholesale Mortgage?

A.    Not the exact date.

              (Marked for identification

              Deposition Exhibit 1.)

BY MR. HIRSCH:

Q.   I'm going to hand you what we've marked as Exhibit Number 1.

MR. MURRAY:  Jason, so I'm clear, because you know I haven't been in all of the depositions, because the last one you marked as 28, I just want to make sure I have an understanding of the numbering.

MR. HIRSCH:  Yeah, the understanding is yes, I'm skipping around in the numbers, but number 1 is number 1 in every deposition.

MR. MURRAY:  Okay, got it.

MR. HIRSCH:  To the extent I've used --

MR. MURRAY:  That's what I assumed, I just wanted to make sure.

MR. HIRSCH:  It's always the same number.

I'm sorry, I just slightly lost my train.

BY MR. HIRSCH:

Q.   So what I've just handed you we've marked as Exhibit Number 1, and certainly after you've had a chance to look at it, my question is whether you recognize that document?

A.   I do.

Q.   Okay, what is that?

A.   This is the initial complaint.

Q.   Well, it's actually labeled the First Amended Complaint.  Do you see that on the first page?

A.    Yes.

Q.    Okay.  Do you know if this is the particular complaint you reviewed?

A.    I would have to go back and verify.

Q.    If you look at the top, you see this First Amended Complaint says it was filed on April 5th, 2024.  Do you see that sort of across the first line?

A.    Yes.

Q.    Do you recall if you would looked at a complaint before April 5th, 2024?

A.    I do not recall exact date ranges, no.

Q.    Do you have any knowledge about Atlantic Trust making -- well, closing loans with Rocket Mortgage before March 4th, 2021?

A.    I am not directly involved in their business.

Q.    We spoke a moment ago about the All-In announcement.

A.    Uh-huh.

Q.    And you are familiar with the announcement; right?

A.    Yes.

Q.    If you look at paragraph 22 of Exhibit 1, it's located on page 6, and in that paragraph, at least the beginning part says, "On March 4th, 2021, UWM announced its 'All-In Initiative'."

             Did I read that portion correctly?

A.    Yes.

Q.   Does that refresh your recollection that the
     All-In Initiative was announced on March 4th, 2021?

A.   Yes.

Q.   Did UWM monitor mortgage loans or mortgage loan
     applications sent by its broker partners to
     Rocket Mortgage or Fairway before March 4th, 2021?

A.   I am not aware.

Q.   Just to be clear, meaning you don't know one way or
     the other?

A.   Correct, I don't -- I'm not involved in that side of
     the business.

Q.   Do you know if UWM did that after March 4th, 2021?

A.   Yes.

Q.   So did you become involved in that side of the
     business after March 4th, 2021?

A.   Not directly involved in that side of the business,
     no, just awareness of it.

Q.   Do you know why UWM tracked that information, at least
     after March 4th, 2021?

A.   Due to the All-In Initiative.

Q.   Did you ever prepare any list of loans that Atlantic
     Trust had sent to Rocket Mortgage?

A.   No.

Q.   Have you ever seen such a list?

A.   No.

Q.  Have you ever prepared a list of loans that Atlantic Trust sent to UWM?

A.  No.

Q.  Have you ever seen such a list?

A.  No.

Q.  Did you ever see the answer and counterclaim filed by Atlantic Trust in this case?

A.  I would have to go back and refresh my memory.

(Marked for identification Deposition Exhibit 2.)

BY MR. HIRSCH:

Q.  Ms. DeCiantis, I'm going to hand you what our court reporter has marked as Exhibit 2. It's a document titled Defendant Atlantic Trust Mortgage Corporation Answer and Affirmative Defenses to First Amended Complaint Counterclaim and Reliance on Demand for Jury Trial. Do you have that in front of you?

A.  Uh-huh, yes.

Q.  And certainly you can take your time to look at that. When you've had a chance to do that, could you tell me if that refreshes your recollection as to whether you've seen that document before?

A.  This particular document does not look like one I have seen.

Q.  Okay. Are you aware that Atlantic Trust originally

entered into a Wholesale Broker Agreement with United Wholesale Mortgage in 2018?

A.   Not aware of the date.

Q.   Were you involved at all in the very first Wholesale Broker Agreement that Atlantic Trust entered into with United Wholesale Mortgage?

A.   No.

                    MR. MURRAY:  Object to form, foundation.

A.   No.

BY MR. HIRSCH:

Q.   Do you know who was involved in signing up Atlantic Trust as a broker partner initially?

A.   No.

Q.   Do you know any of the account represent -- sorry, account executives for Atlantic Trust at any time?

                    MR. MURRAY:  Object to foundation and form.

A.   No.

BY MR. HIRSCH:

Q.   I think we mentioned a couple times perhaps the All-In Initiative; correct?

A.   (Nods head affirmatively).

Q.   And I think you said you are familiar with what that is; right?

A.   I am.

Q.   What -- what is it?

A. It is an agreement or an addendum that was made to our broker agreement to help protect the broker channel as well as UWM to prevent loans from going to Rocket and Fairway, if they chose to still do business with UWM.

Q. Prior to March 4th, 2021, there was no such provision in United Wholesale Mortgage's Wholesale Broker Agreements that restricted who a broker partner could send loans to; correct?

A. That is correct.

Q. So prior to March 4th, 2021, a UWM broker partner could do business with any other wholesale lender, no restrictions; right?

A. As far as I am aware, yes.

Q. Do you recall that you previously gave testimony in a case called United Wholesale Mortgage V. Kevron?

A. Yes.

Q. And was that testimony true and correct in all respects?

A. To the best of my knowledge at the time, yes.

Q. Well, since you gave that testimony, is there anything that has come to your attention that you would want to correct?

A. Nothing that I recall specifically.

Q. Anything that you recall generally?

A. No.

UNITED WHOLESALE MORTGAGE v ATLANTIC TRUST MORTGAGE          Job 54604
DECIANTIS, SARAH 05/21/2026                                              27

Q.   Do you know the outcome of the Kevron case?

A.   No, I don't.

Q.   Do you know if the Kevron case has been concluded?

A.   No, I don't.

Q.   Did you provide any assistance in preparing UWM's claims in this lawsuit?

A.   Can you rephrase?

Q.   Let's go to a different question for the moment.

          With respect to the All-In Initiative, when did you first learn about it?

A.   It was in a meeting.

Q.   When did that meeting take place?

A.   I don't recall the exact date.

Q.   Did the meeting take place before the announcement on March 4th, 2021?

A.   It did.

Q.   Who set up the meeting?

A.   I do not recall who set it up.

Q.   Did you set up the meeting?

A.   I did not.

Q.   Did you know what the topic of the meeting was going to be before you attended the meeting?

A.   No.

Q.   Mr. Ishbia was present at that meeting; is that right?

A.   That's correct.

Q.   Katie Foster was present at that meeting; is that right?

A.   She was.

Q.   Ms. Foster was the chief risk officer; is that correct?

A.   That's correct.

Q.   Does she still hold that position?

A.   She does not.  She is still with the company.

Q.   What is Ms. Foster's current position?

A.   I would have to verify her exact title, but I believe she is advisor to the CEO.

Q.   Melinda Willner was present at that meeting; is that correct?

A.   That's correct.

Q.   And she was the chief operating officer; is that correct?

A.   Yes.

Q.   Is that still Ms. Willner's position?

A.   It is.

Q.   Danny Marogy was present at the meeting; is that correct?

A.   Yes.

Q.   What was his position at the time?

A.   At the time, I would need to verify, but believe his title was VP of sales.

Q.   Does Mr. Marogy still hold that position?

A.   He still holds a position, I don't believe he holds the title.

Q.   Do you know what his -- what Mr. Marogy's current position is?

A.   I don't know his exact title, but he is in the same type of sales role as he was at that time.

Q.   Mr. Wolfe was present at that meeting; is that correct?

A.   That's correct.

Q.   Mr. Wolfe is chief legal counsel; is that right?

A.   Yep.

Q.   And he still holds that position; is that correct?

A.   I believe his title has been expanded upon since that time, but yes.

Q.   Was anyone else present who I haven't named?

A.   Not that I recall.

Q.   Was there any document that would reflect the attendance at that meeting?

A.   Not that I'm aware of.

Q.   Do you know how the people were selected to be at that meeting?

          MR. MURRAY:   Object to foundation.   You can still answer.

A.   I would speculate that those are the individuals that

needed to participate in a conversation around what was this ultimately going to look like, a way to draft a document, and then obviously communicate that out to clients.

BY MR. HIRSCH:

Q.   And so based on that analysis, your presence there was for the communication to clients piece; would that be accurate?

A.   That is accurate.

Q.   Do you know who decided who would attend the meeting?

A.   I do not.

Q.   Was there any agenda provided at the meeting?

A.   I do not recall.

Q.   I think you told me there was no agenda before the meeting; right?

A.   No, and at that time too, it was not called All-In. That meeting was to establish a discussion around how we were going to approach the addendum.

Q.   But just to be clear, when I asked you if you knew the topic of the meeting before the meeting, I think you said you did not?

A.   Correct.

Q.   Correct?

A.   Correct.

Q.   So you didn't know what it was about at all?

A.   Correct.

Q.   Who led the meeting?

A.   It was a collaboration.  I wouldn't say that there was one specific lead.

Q.   Well, you didn't know the topics of the meeting before the meeting; correct?

A.   Correct.

Q.   So you couldn't really lead on those topics; right?

A.   Correct.

Q.   Do you know if anyone else knew what the topics were going to be before the meeting?

A.   I can't speak on their behalf.

Q.   Well, my question is whether you know if anyone else knew?

A.   I do not know.

Q.   Who started the meeting?

A.   Probably would have been either Danny or Mat.

Q.   Where did the meeting take place?

A.   I believe, if I'm recalling correctly, it was in the Breslin conference room on campus.

Q.   And everyone we mentioned as being there was present physically in person, not via Zoom or electronic communications; is that right?

A.   That's correct.

Q.   Was anyone else present by phone or videoconference

who we haven't discussed?

A.   Not to the best of my recollection, no.

Q.   Was the meeting recorded?

A.   I don't believe so.

Q.   Did you take any notes at the meeting?

A.   I'm sure I did.

Q.   Do you have those notes?

A.   No.

Q.   Do you know where those notes would be?

A.   I would not imagine I still have them.

Q.   Did you observe anyone else taking notes?

A.   I don't recall specifically.

Q.   Do you recall generally?

A.   We have a no technology policy in meetings, so majority of the time everyone is taking notes by hand.

Q.   So if you took any notes, those would have been handwritten notes on paper; correct?

A.   Yes.

Q.   Do you have any policy for how long you tend to keep notes after a meeting?

A.   Not that I'm aware of.

Q.   Have you made any sort of search to check if you had any notes of that meeting that you did keep?

A.   I have not.

Q.   Do you have any habit or practice after you take

handwritten notes to scan those in or store them in some other format?

A.   No.

Q.   How long did the meeting last?

A.   I would say probably an hour.

Q.   Do you have an electronic calendar for your business meetings?

A.   Yes.

Q.   Would that meeting have been recorded in the electronic calendar?

A.   I would imagine it was in the calendar, yes.

Q.   And would that entry still be there today?

          MR. MURRAY:   Object to foundation.

A.   I would have to check with IT.

BY MR. HIRSCH:

Q.   Were there any -- was any written information shared at the meeting, any slides, any handouts, anything like that?

A.   Not that I recall.

Q.   Was any formal data or research presented at the meeting?

A.   Not that I recall.

Q.   Were there any follow-up emails after the meeting?

A.   I don't recall.

Q.   Did you make any search of your emails to check if

there were any follow-ups among the group that was in the meeting?

A.    Can you specify when?

Q.    Well, at or around, you know, between the date of the meeting and March 4th, 2021.

A.    Can you rephrase?

Q.    Let me ask a different question.

      Do you know how far in advance of March 4th, 2021 this meeting took place?

A.    Not exactly, but it was not that far in advance.

Q.    And the meeting, of course, was definitely before March 4th, 2021?

A.    It was.

Q.    So do you recall if there was any email communications between the people that were in the meeting from the time after the meeting to the time of the announcement on March 4th, 2021?

A.    I am aware of communication I specifically had regarding Facebook Live, I am not recalling any other direct email communication.

Q.    And who did you have communications with about Facebook Live?

A.    The group that was in that room.

Q.    And what was the nature of those communications?

A.    What were the exact topics and how were we going to

roll this out to the clients.

Q.   And were you telling people what the topics were going to be or were you asking what are the topics going to be so you would know?

                MR. MURRAY:  Object to form.

A.   At that time we had established -- when we were discussing what the Facebook Live was going to be and when we were going to roll it out, we had established the All-In Initiative and what that looked like, so it was to walk through what exactly was going to be said on the Facebook Live.

BY MR. HIRSCH:

Q.   And so did you get feedback then via email when you were asking about setting up the Facebook Live?

A.   I would imagine feedback came and email is probably one form, yes.

Q.   So have you checked for any of those communications since this litigation to see if you still have those?

A.   No.  We have a six-month retention policy for email.

Q.   How do you know that?

A.   That's our IT policy across the company.

Q.   Focusing again on the meeting, what did you say at the meeting?

A.   Meeting was five years ago, I don't remember exactly what I said.

Q.   Do you remember anything you said at the meeting?

A.   No, nothing specific.

Q.   Do you remember anything generally that you said at the meeting?

A.   No.

Q.   Do you remember if you asked for your opinion on anything at the meeting?

A.   Yes.

Q.   What were you asked for your opinions about?

A.   It was a collaborative discussion in general around how were we going to tackle the idea of being able to support the broker channel from what we were considering to be bad actors in the space, specifically Fairway and Rocket.

Q.   And so then who first posed the idea of implementing a prohibition on allowing broker partners who work with UWM to also do business with Fairway and Rocket?

A.   I don't recall exactly who brought that up.

Q.   Were any other ideas proposed as to how to protect from these bad actors?

A.   There were other ideas, I don't recall exactly what those were.

Q.   Do you recall who proposed the other ideas?

A.   I'm not recalling specifically.  I'm sure Danny had some thoughts around that.

Q.   Do you recall what Danny said at the meeting?

A.   Not specifically.

Q.   Do you recall generally what Danny said at the meeting?

A.   Danny was very focused on account development at that point in time and he was very focused on growing the wholesale channel, as is UWM and sales in general, so I'm very sure the ideas that he had were aligned with what the role -- the goal of his job and the goal of wholesale -- or sorry, the goal of UWM is.

Q.   What did Ms. Willner say at the meeting?

A.   I don't recall.

Q.   What did Ms. Foster say at the meeting?

A.   I don't recall.

Q.   What did Mr. Wolfe say at the meeting?

A.   I don't recall specifically, but generally --

         MR. MURRAY:  And I just want to caution the witness, anything that constitutes legal advice, I'm going to caution you not to answer that, but if it was about, like, the business issue, you can answer that, but anything that would constitute legal advice, don't answer that, so.

         MR. HIRSCH:  I agree, so let me maybe rephrase the question narrower.

BY MR. HIRSCH:

UNITED WHOLESALE MORTGAGE v ATLANTIC TRUST MORTGAGE          Job 54604
DECIANTIS, SARAH 05/21/2026                                                                     38

Q.  Did Mr. Wolfe provide any business advice at the meeting?

A.  I don't recall.

Q.  And without telling me what it is, did Mr. Wolfe provide any legal advice at the meeting?

A.  I don't know that I know the line between legal advice in this particular instance and business advice.

Q.  What did Mr. Ishbia say at the meeting?

A.  I don't recall specifically.

Q.  Do you recall generally what Mr. Ishbia said at the meeting?

A.  Again, it was a collaborative conversation, there was -- it was not -- the conversation in the meeting was not controlled by any one individual, so I don't -- we were all having the same conversation.

Q.  Was anyone opposed to the idea of implementing the All-In Initiative?

A.  Not that I recall.

Q.  Specifically do you recall that Mr. Ishbia was in favor of implementing the All-In Initiative?

A.  Yes.

Q.  Fair to say that Mr. Ishbia was the most senior officer at the meeting; correct?

A.  Correct.

Q.  He's the most senior officer at the company; correct?

A.    Correct.

Q.    Who made the ultimate decision to move forward with the All-In Initiative?

                MR. MURRAY:  Object to foundation, form.

A.    I would not say that there was one individual.  Again, it was a collaborative conversation amongst that group.  As I said, no one was opposed to it, so I would say we were all in favor.

BY MR. HIRSCH:

Q.    Was there a vote or anything taken at the meeting?

A.    I would not say a formal vote, no.

Q.    Do people have a tendency to go along with what the CEO wants?

                MR. MURRAY:  Object to form and foundation.

A.    Not always, no.

BY MR. HIRSCH:

Q.    Can you give me an example of when you have disagreed with what the CEO wanted to do?

A.    Without violating, you know, personal conversations, we all -- have all been in a position to not always agree with what the CEO wants and we don't have reservations about expressing that when we do feel strongly.  We have a very tenured --

Q.    But you can't give me an example of that?

A.    I would have to think about that.

UNITED WHOLESALE MORTGAGE v ATLANTIC TRUST MORTGAGE  Job 54604
DECIANTIS, SARAH 05/21/2026  40

Q. Okay, if you think of it, let me know.

A. Okay.

Q. By the way, do you recall when you testified in the Kevron case, when you were asked who ultimately made the decision, your answer was legal counsel?

A. Yes.

    MR. MURRAY:  Object to foundation.

BY MR. HIRSCH:

Q. Yes, you recall that?

A. Uh-huh.

Q. And that's still accurate?

A. Yes.

Q. Were any tasks assigned at the end of the meeting?

A. I am aware of a task that I had to determine how we were going to market this to clients.

Q. And that would relate to some follow-up emails you said you might have had about the Facebook Live?

A. Correct.

Q. And whether you know the tasks or not, do you recall the tasks were or weren't assigned to anyone else?

A. The only other one I can recall was that legal counsel was taking back the conversation from the meeting to draft an amendment or the All-In Initiative document and finalize any additional things that needed to be finalized.

UNITED WHOLESALE MORTGAGE v ATLANTIC TRUST MORTGAGE
DECIANTIS, SARAH 05/21/2026

Job 54604
41

Q.   Beyond the emails you've mentioned relating to setting up the Facebook Live, did you have any separate follow-up discussions with anybody who attended the meeting about the topics discussed at the meeting?

A.   Not that I recall.

Q.   Did you have any discussions about those topics with anyone who did not attend the meeting, between the time of the meeting and March 4th, 2021?

A.   Not that I recall.

Q.   Did you delegate any tasks to any of your staff related to the Facebook Live announcement?

A.   Not prior to, no.

Q.   Okay, not prior to the Facebook Live --

A.   The Facebook Live.

Q.   -- announcement?

A.   Correct.

Q.   You delegated some tasks after the Facebook Live announcement?

A.   Marketing communication tasks, yes.

Q.   And to whom did you delegate marketing and communication tasks about the All-In Initiative after the Facebook Live announcement?

A.   It would have been mainly our email team at the time.

Q.   Who was on your email team at the time?

A.   Monique Rully.

Q.  Anyone else?

A.  I'm trying to think of the other individual's name. They're no longer with the company, I don't recall their name.

Q.  But there were two people, Monique is one, the other name you can't recall right now --

A.  Correct.

Q.  -- at the time?

And what sort of email were they supposed to prepare?

A.  We were sending the email, the follow-up email, out after the Facebook Live to kind of recap exactly what was communicated in that video announcement.

Q.  And was that email actually sent?

A.  Yes.

Q.  And would that have been sent to all broker partners?

A.  Yes.

Q.  I understand what you said before about the six-month retention issue, but do you know if you have a copy of that email that went to the broker partners?

A.  We should.

Q.  And did you prepare the text of the email or was that something you delegated?

A.  It's very likely something I delegated.

Q.  So following the meeting, the decision had been made

to move forward with the All-In Initiative; is that correct?

A.  We were pretty sure at the end of that meeting, that was the decision moving forward.  Legal counsel was taking back the conversation and the discussion points from the meeting to compile the addendum.

Q.  Did you actually schedule this Facebook Live that occurred on March 4th, 2021?

A.  Did I personally?

Q.  Yes.

A.  Not personally, no.

Q.  Did you delegate that task to someone?

A.  Yes.

Q.  To whom did you delegate that task?

A.  It would have been the individual in charge of social media at the time.

Q.  And do you know when the announcement was made that there was going to be a Facebook Live on March 4th, 2021?

A.  I would have to go back and look.

Q.  What would you look at to determine that?

A.  Our Facebook page.

Q.  Do you recall how far in advance of the announcement on March 4th that there was a notice sent out to let people know there's going to be this Facebook Live

UNITED WHOLESALE MORTGAGE v ATLANTIC TRUST MORTGAGE          Job 54604
DECIANTIS, SARAH 05/21/2026                                          44

event on March 4th?

A.   I would have to go back and look.

Q.   And again, to look, you would have to look on your Face -- UWM's Facebook page?

A.   That's correct.

Q.   Did you have any involvement in preparing what Mr. Ishbia would say on the Facebook Live announcement?

A.   Yes.

Q.   What was your involvement?

A.   In drafting an initial script.

Q.   And do you have the initial script you drafted?

A.   I would have to look.

Q.   So you have not looked in the context of this litigation; correct?

A.   Correct.

Q.   Do you recall how many drafts of the script were prepared?

A.   I do not.

Q.   When you had completed your draft of the script, you provided it to Mr. Ishbia; is that correct?

A.   To the group that was in the room.

Q.   Do you recall who provided feedback on the draft you had prepared?

A.   I believe everyone had some thoughts.

Q.   So were there multiple iterations of the draft before it was finalized, the draft script?

A.   That is very typical practice, so I feel comfortable saying yes.

Q.   And you haven't checked if you had those subsequent drafts with feedback; correct?

A.   No, I have not.

Q.   Do you recall the nature of the changes that were made between your initial draft and the final draft?

A.   I don't recall specifically, no.

Q.   Do you recall generally?

A.   No.

Q.   Do you recall any particular points that people were providing input about?

A.   No.

Q.   Did Mr. Ishbia also provide feedback?

A.   Yes.

Q.   And would it be fair to say since Mr. Ishbia was presenting, he had the final word on what was going to be said at the Facebook Live announcement?

          MR. MURRAY:  Object to foundation.

A.   Can you clarify?

BY MR. HIRSCH:

Q.   Well, strike that.  I'll ask a different question.

          Mr. Ishbia ultimately was the person who

UNITED WHOLESALE MORTGAGE v ATLANTIC TRUST MORTGAGE          Job 54604
DECIANTIS, SARAH 05/21/2026                                                          46

made the Facebook Live announcement; correct?

A.   That is correct.

Q.   Do you know if he was reading verbatim the final version of the script you had agreed upon?

A.   I don't know.

Q.   You never made a comparison to the transcript of the Facebook Live announcement to the script you had worked on preparing?

A.   I did not.

Q.   Did you recall noticing any material differences?

A.   No.

Q.   Did you watch the Facebook Live announcement?

A.   Yes.

Q.   Do you know where you watched it?

A.   The room that it was happening in.

Q.   So you saw it live --

A.   Yes.

Q.   -- as it was being broadcast?

A.   Correct.

Q.   UWM is the largest wholesale mortgage lender; is that correct?

A.   That is correct.

Q.   And does it offer certain exclusive products that aren't offered by other wholesale mortgage lenders?

A.   I believe we do have some, yes.

Q.   So if an independent mortgage broker chose not to work with UWM, its clients would not have access to those exclusive products; correct?

A.   They wouldn't have access to any products.

Q.   Any UWM products?

A.   Correct.

Q.   But you recall you previously testified that a broker partner isn't damaged if it can't work with UWM; right?

             MR. MURRAY:   Object to form, foundation.

A.   That is correct.

BY MR. HIRSCH:

Q.   And that's true even though that broker partner then wouldn't have access to these exclusive products; is that right?

A.   Correct.

Q.   So do those exclusive products actually have any value then?

             MR. MURRAY:   Object to form and foundation.

A.   Can you rephrase?

BY MR. HIRSCH:

Q.   Well, if a broker partner isn't damaged by the lack of access to the products, the exclusive products, then what value do the exclusive products have?

A.   It's a benefit of working with UWM.

Q.   It's a benefit why?

A.   As a UWM partner.

Q.   But what makes them better?  Why is exclusivity important?

A.   I'm not saying that it's better.  There -- I mean, there's 70-plus wholesale lenders that any broker can partner with and work with.  Oftentimes we may have a product that's exclusive for a period of time, doesn't mean that another lender is never going to have it. We are still subject to Fannie and Freddie guidelines.

Q.   But you understand that UWM has issued press releases periodically that touts exclusive products; right?

A.   Absolutely.

Q.   Are you aware that Atlantic Trust stopped submitting loans to UWM in February 2021?

A.   No.

Q.   If you pull out Exhibit 1 and you take a look at paragraph 30, which is on page --

A.   Eight.

Q.   -- eight.  You can certainly take a moment to review that.  But you have no reason to dispute the allegation made by UWM; correct?

A.   Which specific allegation?

Q.   Well, the allegation in paragraph 30.

A.   No, I have no reason to dispute that.

Q.   So you would agree with me that this was -- that the last mortgage loan application Atlantic Trust submitted to UWM on February 28th, 2021 was before the All-In announcement on March 4th; 2021 correct?

A.   Yes.

          MR. MURRAY:  Object to foundation.

BY MR. HIRSCH:

Q.   Were there other broker partners who stopped submitting loans to UWM at or around the time the All-In Initiative was announced?

A.   I -- that's out of my scope of knowledge.

Q.   Do you know if account executives were ever told to try to retain or get back broker partners who had left UWM at or around the time of the All-In Initiative?

A.   From a general perspective, yes; not anything specific.

Q.   Do you know who told the account executives to try to get broker partners who may have left to come back?

A.   Not specifically.

Q.   Do you know generally?

A.   Sales leadership.

Q.   Do you know how the account executives were to try to do that?

A.   No.

Q.   Do you know if UWM had any written policies about

trying to get back broker partners who had stopped doing business with UWM?

A.   Not that I'm aware of.

Q.   So do you know whether Atlantic Trust agreed to any Wholesale Broker Agreement that included the All-In addendum in 2021?

MR. MURRAY:  Object to foundation.

A.   I don't know dates specifically.

BY MR. HIRSCH:

Q.   Well, no broker partner could have agreed to a Wholesale Broker Agreement that contained the All-In addendum prior to March 4th, 2021; correct?

A.   That is correct.

Q.   And if you look at paragraph 33 of Exhibit 1, UWM alleges "On or about October 4, 2022, Atlantic Trust closed its first loan using one of the Select Retail Lenders."

Do you see that?

A.   Yes.

Q.   And by the way, the Select Retail Lenders are Rocket Mortgage and Fairway Mortgage; is that correct?

A.   Uh-huh, yes.

Q.   So if Atlantic Trust hadn't submitted any mortgage loan applications since February 28th, 2021, it certainly would not have been a breach -- it had not

submitted any mortgage loan applications to UWM since February 28th, 2021, submitting loans to the Select Retail Lenders could not have been a breach; right?

MR. MURRAY:  Object to form and foundation.

A.   Can you clarify?

BY MR. HIRSCH:

Q.   Well, there was no restriction on who broker partners could send loans to on February 28th, 2021; right?  We agree on that?

A.   Correct, yes.

Q.   And if Atlantic Trust submitted its last mortgage loan application to UWM on February 28th and then submitted loans to the Select Retail Lenders, that would not have been a breach; right?

MR. MURRAY:  Object to foundation, calls for legal conclusion.  You can answer.

A.   Prior to March 4th, correct.

BY MR. HIRSCH:

Q.   Well, even after March 4th, because it hadn't agreed to any Wholesale Broker Agreement containing the All-In addendum; right?

MR. MURRAY:  Object to foundation.

A.   If they were submitting a loan to UWM after March 4th, they would have agreed.

BY MR. HIRSCH:

UNITED WHOLESALE MORTGAGE v ATLANTIC TRUST MORTGAGE      Job 54604
DECIANTIS, SARAH 05/21/2026                                   52

Q.   Well, right, but we know they weren't submitting a loan after February 28th; right?  Because that's what UWM alleges in its complaint.

           MR. MURRAY:  Object to foundation.

A.   Can you rephrase?

BY MR. HIRSCH:

Q.   Well, UWM alleges, "Atlantic Trust submitted its last mortgage loan application to UWM on February 28th, 2021."

           Right?

A.   Correct.

Q.   So we know Atlantic Trust didn't submit any loans to UWM at least until -- well, at least until December of 2022; right?  If we read the allegations in paragraph 36; right?

A.   It looks like October 4th from what I'm reading.

Q.   Well, where are you reading that?

A.   Thirty-three.

Q.   Okay, October 4th, 2022, right.  So for that period, Atlantic -- from January 1st, 2020 to October 4th, 2022, it says, "Atlantic Trust did not submit any loans to the Select Retail Lenders."

           Do you see that?

A.   I do.

Q.   Okay.  And then "On October 4th, 2022, Atlantic Trust

closed its first loan with one of the lenders."

That's paragraph 33; right?

A.   Correct.

Q.   But that would not have been a breach; correct?

MR. MURRAY:   Object to foundation.

A.   It would have, because the All-In addendum was in place at that time as of October 4th, 2022.

BY MR. HIRSCH:

Q.   Right, but Atlantic Trust hadn't agreed to that implicitly or explicitly because it had not submitted a loan to UWM since February 28th, 2021 before the All-In; right?

MR. MURRAY:   Object to foundation.

A.   No.

BY MR. HIRSCH:

Q.   Okay, why is that not right?

A.   Because in order to submit loans to UWM, you have to have an active broker agreement.  As part of that active broker agreement, you are agreeing to all of the terms, which would have included the All-In addendum.

Q.   Right, but Atlantic Trust didn't have an active broker agreement because it didn't submit loans to UWM during that period.

A.   They would not have been able to submit loans without

an active broker agreement, to the best of my knowledge.

Q. We talked about the Select Retail Lenders a moment ago; do you recall that?

A. Yes.

Q. Were those the only two lenders who were discussed at the meeting to be excluded?

A. There were other lenders discussed. If I recall correctly, those were the em -- those two were the emphasis of the conversation.

Q. What other lenders were discussed?

A. I -- I don't recall specifically.

Q. Do you know how it ended up being only those two?

A. Yes, because those two, we felt as though they were the most egregious at the practices that we felt were harming the broker channel as a whole.

Q. When you talk about the practices that were harming the broker channel as a whole, are you talking about moving a loan from the wholesale channel to the retail channel?

A. That is correct.

Q. Anything else you're talking about when you say that?

A. That specifically.

Q. Okay. Did you have any data that showed Rocket Mortgage moving loans from the wholesale channel to

the retail channel?

MR. MURRAY:  Object to form.

BY MR. HIRSCH:

Q.  At that meeting?

A.  In that meeting, no; there was no documents, no.

Q.  Did you ever see any data showing Rocket Mortgage moving loans from the wholesale channel to the retail channel?

A.  Data specifically as far as research report, no.

Q.  So what information did you have -- well, strike that.

Let me ask the same question first about Fairway.  Any data or information about Fairway moving loans from the wholesale channel to the retail channel?

A.  Same response as far as research.

Q.  Okay.  So then what information did the people at the meeting have to come to the conclusion that Rocket and Fairway were the most egregious at this practice?

MR. MURRAY:  Object to foundation, but you can answer.

A.  They are the ones that we would most frequently hear feedback from our broker clients that loans that they had closed were now being solicited -- those borrowers were now being solicited by those two individuals' retail chains.

BY MR. HIRSCH:

Q.   Who would get that feedback at UWM?

A.   Sales mainly.

Q.   And is that feedback recorded anywhere?

A.   Not that I'm aware of.

Q.   So no hard data, just they were the names that came up most frequently in complaints from broker partners; is that right?

A.   Correct.

Q.   So if broker partners were complaining that this happened a lot, wouldn't those broker partners then inherently stop sending loans to Rocket and Fairway?

          MR. MURRAY:  Object to form and foundation.

A.   Yes, that's their choice.

BY MR. HIRSCH:

Q.   Well, did any broker partner tell UWM they did that? Hey, we're concerned that Rocket took our loans from -- that was in the wholesale channel and it was solicited by their retail channel, we'll never do business with those guys again?

          MR. MURRAY:  Object to foundation and form.

A.   They did not say that to me specifically.

BY MR. HIRSCH:

Q.   Since the time of the meeting, has there been any discussion about adding any of the lenders to the list

of excluded lenders?

A.   No conversations that I've been included in.

Q.   And Fairway is no longer operating the wholesale channel; is that correct?

A.   As far as I'm aware of, yes.

(Marked for identification Deposition Exhibit 6.)

BY MR. HIRSCH:

Q.   Ms. DeCiantis, I'm going to hand you what our court reporter has marked as Exhibit 6.  Certainly you can take a look at that and when you've -- it's titled Wholesale Broker Agreement.

A.   Yep.

Q.   And just for the record, at the bottom left it says Rev 3-4-21.  Certainly you can take your time to look at that and when you've had a chance to do that, my question is whether you've seen this particular version of the Wholesale Broker Agreement before?

A.   I believe the last time I saw this was in the previous deposition with Kevron.

Q.   Okay.  Were you aware of any broker partners refusing to sign the Wholesale Broker Agreement that contained the All-In provision?

A.   Refusing, I would say no.  Choosing not to, yes.

Q.   Which ones?

A.   I don't know specifics.

Q.   Do you know how many?

A.   I do not.

Q.   Which broker partners has UWM sought to enforce an alleged breach of the All-In provision against?

A.   I know of Kevron and Atlantic Trust.  I do not know which others.

Q.   Have you heard of Midland Funding?

A.   No.

Q.   Have you heard of America's Moneyline?

A.   Yes.

Q.   Do you know if UWM is seeking to enforce a breach against America's Moneyline?

A.   I do not know where that currently stands.  I do recall that that was one of the first.

Q.   Have you heard of District Lending?

A.   No.

Q.   Did you ever hear of UWM resolving any disputes about alleged violations of the All-In Initiative without filing lawsuits?

A.   Can you rephrase that?

Q.   Have you ever heard of UWM accusing some broker partner -- alleging some broker partner violated the All-In Initiative but that got resolved short of a lawsuit?

A.  Not that I'm aware of.

Q.  Have you ever heard of UWM deciding not to enforce the All-In provision against a broker partner even though they sent loans to Rocket?

A.  I am not.

Q.  You ever heard of UWM promising any broker partner that it wouldn't enforce the All-In initiative against that particular broker partner?

A.  No, I am not.

Q.  So after the announcement of the All-In Initiative, all broker partners had to agree to the Wholesale Broker Agreement that included the All-In provision in order to continue to do business with UWM; is that right?

A.  Correct.

Q.  And you're not aware of any exceptions to that; is that right?

A.  That is correct.

Q.  I think you told me before that UWM would not accept loans from a broker partner who had not executed the Wholesale Broker Agreement which contained the All-In provision after March 4th, 2021; is that correct?

A.  That is my understanding, yes.

                (Marked for identification

                Deposition Exhibit 12.)

BY MR. HIRSCH:

Q.   Ms. DeCiantis, I'm going to hand you what we've marked as -- what our court reporter's marked for us as Exhibit 12.  If you can take a look at that.  Do you recognize that document?

A.   No.

Q.   Have you ever seen any similar printouts showing a broker partner agreeing to a renewal of their Wholesale Broker Agreement with UWM?

A.   Other than the Kevron case, no.  This is outside of my world.

Q.   And you wouldn't have seen that actually on a computer screen either, not just a printout; is that right?  That wouldn't be in your area?

A.   No, I don't handle renewals.

Q.   Do you happen to know -- if you see, there's an email address towards the bottom; it says, Jgramer@uwm.com.  Do you see that?

A.   I do.

Q.   Do you happen to know who owns that email address?

A.   I do not.

Q.   Do you know anybody with the last name Gramer at UWM?

A.   I do not.

Q.   Okay.

     At the meeting we discussed earlier, were

liquidated damages discussed as well?

A.   They were.

Q.   What was the nature of the discussion about liquidated damages at the meeting?

A.   If there could be or what would be the liquidated damages should someone violate the All-In addendum.

Q.   You agree with me that the Wholesale Broker Agreements, at least on and after March 4th, 2021, did in fact include a liquidated damages provision; correct?

A.   As far as I'm aware, yes.

Q.   So the determination of whether it could include a liquidated damages provision, fair to say that conclusion was it could?

A.   Yes.

Q.   In terms of the amount of the liquidated damages provision, what was discussed?

A.   Several different amounts were discussed in that conversation.  Prior to that conversation, wrapping up, as I recall, 5,000 per loan that was sent to either Rocket or Fairway, but that was something that was part of Adam Wolfe's takeaway to make sure that that made sense.

Q.   So the 5,000 per loan number was discussed at the meeting; correct?

A.    Correct.

Q.    You said some other numbers were discussed; correct?

A.    (Nods head affirmatively).

Q.    You have to answer.

A.    Correct, sorry.

Q.    What other numbers were discussed?

A.    I don't recall specifically what others.  There were several.  It was -- it's very hard to quantify or calculate what we offer to our clients, because of our build versus buy strategy, so there was lots of different numbers, but --

Q.    Were those other numbers more or less than the 5,000 per loan number, $5,000 per loan number?

A.    Both.

Q.    Did anyone at the meeting suggest there was not a need for liquidated damages?

A.    Not that I recall.

Q.    So nobody suggested that if there was a breach, damages could just be calculated like damages for any other breach; is that right?

A.    Can you rephrase?

Q.    Well, do you agree with me that the liquidated damages provision applies only to a breach of the All-In portion of the Wholesale Broker Agreement; is that right?

A.   For this specific amount, yes.  I'm not -- I'm not as familiar with the rest of our broker agreement.

Q.   But you're not aware of any other liquidated damages provision that would apply to any other sort of breach; right?

A.   I am not, correct.

Q.   So for other sorts of breaches, you understand that the party alleging a breach can then calculate damages and say I was damaged this much and file a lawsuit and try to recover those damages; correct?

          MR. MURRAY:  Object to foundation and form.

A.   Can you specify what document are you referring to?

BY MR. HIRSCH:

Q.   The Wholesale Broker Agreement.  Well, strike that. Let's ask a different question.

          The Wholesale Broker Agreement has a lot of terms; right?

A.   I'm sure it does.

Q.   Besides the All-In addendum; right?

A.   Yes.

Q.   So a broker partner could breach some other term of that agreement; right?

A.   Sure.

Q.   Or UWM maybe could breach some other term of that agreement; right?

A.   Without understanding specifics around the entire broker agreement, I'm not comfortable answering that.

Q.   Okay.  So did anyone suggest during the meeting that we don't need a liquidated damages provision related specifically to the All-In provision because damages could just be calculated in the normal way?

A.   Not that I recall.

Q.   Do you recall who first suggested the use of liquidated damages?

A.   Legal counsel.

Q.   What did you say about liquidated damages at the meeting?

A.   I did not say anything specifically.  I generally agreed that there should be a liquidated damages included.

Q.   Did you know what the term liquidated damages meant before that meeting?

A.   Yes.

Q.   What did Mr. Marogy say about liquidated damages at the meeting?

A.   I don't recall.

Q.   What did Ms. Willner say about liquidated damages at the meeting?

A.   I don't recall.

Q.   What did Mr. Ishbia say about liquidated damages at

the meeting?

A.   I don't recall.

Q.   Was there any discussion at the meeting about a minimum amount of liquidated damages?

A.   The liquidated damages amount was discussed in general, both numbers at 5,000 and above and below that.

Q.   Do you recall any discussion that the minimum amount of liquidated damages would be $50,000?

A.   Whichever was greater, yes.

Q.   Whichever is greater than what?  I'm sorry.

A.   So $5,000 per loan or $50,000.

Q.   Right, so 50,000 would necessarily be a minimum then, because you just told me it was 5,000 per loan; right?

A.   It is 5,000 per loan, correct.

Q.   And the 50,000 is more than the five; right?

A.   Correct.

Q.   Okay.  Was there any attempt to compute $5,000 per loan?

A.   No, liquidated damages are hard to calculate.  We were basing it off of our -- the amount of technology, marketing support, training, the things that we have a build versus buy approach for.  That is not something we purchase off-the-shelf to say this particular thing cost this much.

Q.   But you didn't look at any numbers at all in that meeting; right?

A.   Numbers specifically in the meeting, no.

Q.   So you didn't look at some particular technology product that UWM had built and say this cost us so much in research, development, implementation, let's try to divide that on a per loan basis; you didn't do that?

A.   No.

Q.   Did you make any list of the technology products that could be included as a benefit when you're calculating this $5,000?

A.   As part of discussion, yes; not a documented list, no.

Q.   What were the ones that were discussed?

A.   EASE, in general, which is our origination platform. I believe at the time we also had Memory Maker, we had BOLT, we had UTRACK, we had UCONNECT --

Q.   I'm sorry, if you could go a little slower, I'm sorry.

A.   I'm sorry.

Q.   EASE, BOLT, UTRACK?

A.   Yep, UCONNECT.

Q.   UCONNECT.

A.   Client Connect, Brand 360.

Q.   Any other -- sorry, go ahead.

A.   I don't recall exactly every one.  I can list off the

ones I do remember, but --

Q.  Okay, I just want the list of the ones you do remember.

A.  Blink+.  That's the list of the ones I recall.

Q.  Okay, what is Blink+?

A.  An online application.

Q.  What does it do?

A.  So it's something that a broker can take, put on their website or social media, and if a borrower fills that out, it is the initial loan application that a borrower would complete.

Q.  And is that application that a borrower completes through Blink+, can that be used at any lender?

A.  Any lender -- no, it's a UWM white-labeled product, so it's something that the broker uses.

Q.  Right, but when the broker uses that to ask a client or a potential client, I guess, to input information --

A.  Yep.

Q.  -- and the broker gets that information, is that in a format that could be used with any lender?

A.  Yes.

Q.  Or is that in a format that can only go to UWM?

A.  Could go to any lender.

Q.  Okay.  Brand 360, what is that?

A.    It is a marketing platform, so there are a couple of different pieces or elements to Brand 360.  One is more of a brand builder, so there are -- marketing team creates flyers, social media, presentations, videos, a variety of different marketing content, we put it on the platform for clients to utilize and then they brand it however they want.  So there's nothing that says UWM on that content and then they use that in whatever form it is that they want to use that context.  Take it to an open house, post on social media, do a realtor presentation, they have full control over editing if they wanted to edit anything that we had created.  There's also a section on there that allows for any loans that had been closed by UWM previously with that broker, we monitor for did that home get listed again, and so we will then notify, hey, you had a borrower that closed a loan with you three years ago, it looks like they've listed their home, so it's more of a repeat business lead generation tool.  Could be if the borrower is ready to drop PMI, there's a variety of different things that's included in that.

And then there is a social media platform that's a part of Brand 360 that allows the broker to automatically schedule and post not only the content

that we created for them, that is again white-labeled, doesn't say UWM, but they can also schedule that through a calendar to make it a little bit easier to post on multiple social media channels versus them having to remember to do something every day or post individually on every single channel.

Q. So the monitoring portion to check if a home that they had previously done a mortgage for was back on the market, that was only applied to loans as to UWM; correct?

A. Correct, it's the only loans that we have that data on.

Q. But the remaining -- the other things you told me about, those -- I think you termed it white-label -- those could be used just to advertise the broker, nothing to do with UWM; is that accurate?

A. That is accurate, and just one small point of clarification. The communication that goes out to the borrower and the broker, even if it's for the fact they listed a home, it's still white-labeled, nothing says UWM. It's just a notification to make sure that the broker knows that this borrower looks like they're in the market again and we send something to the borrower on behalf of the broker to say, hey, looks like you might be looking to move to a new home, you

know, don't forget Jason was a great loan officer that you worked with previously.

Q. Right, but that's only for the loans that had gone through UWM --

A. That is correct.

Q. -- because those are the only ones UWM is monitoring?

A. That is correct, yes.

Q. Client Connect, was that --

A. That is part of Brand 360 that we talked about.  That is exactly what we just discussed.

Q. What is UCONNECT?

A. UCONNECT is actually part of Client Connect.  That is part of a, again, UWM closed loans, when someone has had their credit pulled for a mortgage, we will notify the broker.  So same structure.  Previously closed UWM loan, that information is monitored; when it looks like that borrower is back in the market, we notify the broker.

Q. So UWM is monitoring borrowers who had loans with UWM through that particular broker partner and if they have a credit pull again?

A. For a mortgage, yes.

Q. For a mortgage, okay.  So that could happen whether the potential borrower or repeat borrower is going through the wholesale channel or the retail channel;

right?

A.   Correct.

Q.   So that would allow the broker to then try to reach out again to that borrower?

A.   Correct.

Q.   I'm sorry, that was UTRACK; right?

A.   No, that was UCONNECT.

Q.   That was UCONNECT, I'm sorry, okay.  So my next one is what is UTRACK?

A.   So UTRACK is a -- think about it's like when you order a pizza and you can track and see what's happening: your pizza's in the oven, your pizza's now out, it's with the delivery, it's coming.  It's exactly the same thing from a loan process standpoint, so your loan is in underwriting, it looks like this has this many conditions, and that is a tool that can be used for the broker to share with the borrower, they can also share it with a real estate agent to say, hey, you can use this link to keep track of where this loan is as well.

Q.   Now, is that only for loans that are being processed through UWM?

A.   It is.

Q.   Okay.  What is BOLT?

A.   It's our underwriting system.  The main advantage of

BOLT is it can allow a 15 minute-ish preapproval.  So if we have a, you know, LO that's going to an open house with a real estate agent on a Saturday and they have a borrower come through and somebody's interested, they can pull a preapproval rather quickly on a weekend versus having to wait for an underwriter to come into the office on Monday.

Q.   So that is a preapproval through UWM only; correct?

A.   Uh-huh.

Q.   Okay.  The EASE origination platform, what is that?

A.   That is our entire LOS, our loan origination system. So from the time a loan is imported through closing, that is every touchpoint that's happening with that loan.

Q.   And that, of course then, is as to loans going through UWM only?

A.   That is correct.

          MR. MURRAY:  Jason, just if you're going to change a different topic, it's been about an hour-and-a-half, so --

          MR. HIRSCH:  Yeah, I'm not quite sure I'm done, but it's possibly a good time for a break anyway.

          MR. MURRAY:  Okay.

          MR. HIRSCH:  Because everyone probably

needs one.

THE VIDEOGRAPHER:  Off the record at 11:40 a.m.

(A brief recess was taken.)

THE VIDEOGRAPHER:  Back on the record at 12:09 p.m.

(Marked for identification

Deposition Exhibit 4.)

BY MR. HIRSCH:

Q.  Ms. DeCiantis, I'm going to hand you what we've marked as Exhibit 4 to your deposition.  Do you have that in front of you?  That's titled United Wholesale Mortgage, LLC's Answers and Objections to Atlantic Trust Mortgage Corporation's First Set of Interrogatories.

And again, certainly take your time to take a look at it.  The very last page is a verification that appears to be signed by you, and when you've had a chance to look at that, if you could tell me if you've seen this document before.

A.  Yes, I have.

Q.  Okay, and that is your verification on the last page; correct?

A.  Yes, it is.

Q.  And before we took our break, I think we were talking

a little bit about some of the technology that UWM provides and we had gone through some of them.  If you could look at page 12 of Exhibit 4 and the answer to interrogatory number 11.  It's talking about proprietary technology that UWM offers to broker partners; do you see that?

A.  Yes, I do.

Q.  And I think some of them we've talked about, but I'm going to go down this list and we'll confirm we've talked about them or else I'm going to ask you about some of the others; okay?

A.  Sure, yes.

Q.  So Brand 360 I believe we discussed; correct?

A.  Yes.

Q.  Blink+ we discussed; correct?

A.  Correct.

Q.  UWM InTouch, I don't think we discussed that.

A.  Correct.

Q.  Okay, what is UWM InTouch?

A.  It is our mobile app.  So the same functionality or very similar functionality that can be done in our LOS, like lock a loan, you know, extend, that can be also done in the app.

Q.  So that relates to loans in process with UWM only?

A.  That's correct.

Q.   Okay.  The next one here is Boost and I don't think we talked about that; did we?

A.   No, we did not.

Q.   Okay, what is Boost?

A.   It is a lead buying platform.

Q.   Okay, what does that mean?

A.   So they -- this is at a fee, so this is not a free service, that clients can go on there and they can purchase I believe it's sets of leads, so they say they want to spend a certain amount of money and then they would get those leads through Boost.

Q.   Do you know if that is a profit area for UWM?

A.   No, it is a pass-through cost to the broker.

Q.   Okay.  UTRACK I believe we discussed; correct?

A.   We did, yes.

Q.   One-Click AUS, I don't think we discussed that.

A.   Correct, we did not.

Q.   What is One-Click AUS?

A.   So AUS stands for automated underwriting system, and so One-Click allows them to run both Fannie and Freddie to determine if it would be approved eligible or ineligible based on Fannie or Freddie's guidelines.

Q.   So that is as to a loan that has been submitted to UWM only; correct?  Or would that apply to a loan with -- that could be done with any lender?

A.    They -- they could.  At that point in time they could still pull it out of our system and take it somewhere else.

Q.    EZ Findings, I don't think we discuss that had one; right?

A.    Correct.

Q.    What is that one?

A.    That is connected to One-Click AUS, so it is a -- if someone wanted to understand, you know, Fannie is saying this particular LTV doesn't qualify, you could click on it and it would give you the findings in a summarized way versus you having to read the entire guideline.

Q.    And I'm sorry, those are only UWM guidelines or those are --

A.    No.

Q.    -- the F -- the federal guidelines?

A.    Federal guidelines.

Q.    Okay.  So that could apply to a loan going to any lender?

A.    Correct.

Q.    Okay.  EASE DOCS?

A.    Yes.

Q.    Now, I do think we discussed EASE?

A.    Yes.

Q.   Is EASE DOCS different or a part of it?

A.   It's a part of it.

Q.   So what is the EASE DOCS part?

A.   It is the documents that actually come out of the EASE platform for, you know, CDs, closing disclosures, I'm not exactly sure what else is included in that packet.

Q.   And again, we talked about EASE, that's for a loan that's in process with UWM; right?

A.   Yeah, that's our loan origination.

Q.   So that likewise would apply to this EASE DOCS and the documents that get produced; right?

A.   Yes.

Q.   Okay.  UCLOSE I believe we talked about; right?

A.   No, we did not talk about UCLOSE.

Q.   Okay, I'm sorry, we didn't talk about UCLOSE.  What is UCLOSE?

A.   UCLOSE is a system that allows you to actually go through several pieces of the closing process independently of having to have a closer involved, so it's a system, it's another technology system.

Q.   And is that only for a closing with UWM?

A.   It is.

Q.   Okay.  EASE we did talk about; right?

A.   Yes.

Q.   I don't think we talked about ChatUWM.

A.    We did not.

Q.    Okay, what is ChatUWM?

A.    It is our AI chat tool, so anything that you would have a question about related to something -- related to something that's UWM or if it is something related to federal guidelines that they could just ask a question like you would with ChatGPT and it would give you the response.

Q.    So that's not necessarily connected to a particular loan going through UWM, that's for general questions about mortgage process; correct?

A.    Exactly.

Q.    Okay.  Keep, what is that?

A.    Keep is a refinance tool.  So loans that had previously closed with UWM, when rates get to a place where it would make sense or there would be value in the consumer refinancing, there would be an automated communication that would go out to that borrower saying you may be eligible to save on your monthly payment and it's an application -- the start of an application process.

Q.    And that's related to loans that were previously done with UWM?

A.    Correct.

Q.    Okay.  MortgageMatchup.com, formerly known as

FindAMortgageBroker.com.

A.   Yes.

Q.   We didn't talk about that one; right?

A.   Correct.

Q.   What is that one?

A.   That is a website that essentially acts as a database of licensed mortgage brokers for consumers or real estate agents to go on and find somebody in their local area.

Q.   Now, that database includes only mortgage brokers who have a Wholesale Broker Agreement with UWM; correct?

A.   Incorrect.

Q.   It includes all mortgage brokers?

A.   It does not include all mortgage brokers, but there are brokers that do not work with UWM in that database as well.

Q.   Okay, and when someone accesses MortgageMatchup.com to locate a broker in their area, how are those brokers sorted?

A.   Based on pro rankings.

Q.   And pro rankings are a ranking you get with UWM; correct?

A.   Correct.

Q.   So any broker who did not work with UWM would be at the bottom of those listings because they would not

have a pro ranking?

MR. MURRAY: Objection to form and foundation.

A.    They actually do not. We put them in the middle.

BY MR. HIRSCH:

Q.    So there's an algorithm that literally puts them in the middle of the number of brokers that have been returned?

A.    Correct.

Q.    I don't think we discussed Virtual Close. What is that?

A.    That is a system that allows somebody to close their loan virtually either from any kind of device, iPad, laptop, cell phone, they do not need to be in person for that closing.

Q.    And that applies only to loans closed with UWM; correct?

A.    Yes.

Q.    Okay. Doc-less, what is that?

A.    That one I am not as familiar with. I believe that that is part of our underwriting system, but I am not -- I'm not as familiar to speak to.

Q.    Okay. Loan Eligibility Tool.

A.    Uh-huh.

Q.    Do you know what that one is?

A.   I do not.

Q.   Okay.  Safe Check, do you know what that one is?

A.   Yes, Safe Check is something that we had in place when trigger leads were becoming a bigger issue in the marketplace.  A broker could go on here, they could pull credit -- a soft pull credit for a borrower without initiating that trigger lead and then we would subsequently actually have to pull a hard pull but it would come later in the process.

Q.   What's a trigger lead?

A.   It is a lead that is -- if someone goes on and fills out an online application or they have their credit pulled for a mortgage, oftentimes that borrower's information is sold to a lot of different aggregators and they -- borrowers will kind of be bombarded with phones calls getting them to win their business.

Q.   And so what -- the purpose of Safe Check is to then do a soft pull to make sure it's a meaningful lead?

A.   No, so a soft pull -- sorry, soft credit pull.

Q.   Soft credit pull, right.

A.   Yes, so that's to make sure that they are actually creditworthy of the loan they're trying to apply for.

Q.   Okay.

A.   The trigger leads only happen on hard pulls and on the hard -- the three bureau credit pulls.

Q.   So Safe Check could be used regardless of where that loan ends up -- regardless of which lender that loan would end up closing with, the hypothetical loan?

A.   Correct.

Q.   Okay.  So you talked about the build versus buy strategy when we were talking about these --

A.   Yes.

Q.   -- technology items; right?

A.   Uh-huh.

Q.   And that means that UWM generally builds its technology tools in-house; is that right?

A.   Correct.

Q.   And that consumes resources at UWM; is that correct?

A.   Yes.

Q.   And UWM then shares these tools with its broker partners; correct?

A.   Correct.

Q.   At least one tool, though, is shared with nonbroker partners, which is the MortgageMatchup; right?

A.   Correct.

Q.   Okay.  Now, in terms of the tools that aren't directly related to a loan in process with UWM, does UWM know which particular broker partner has actually used the tool?

A.   Not necessarily.  We don't have tracking on every

UNITED WHOLESALE MORTGAGE v ATLANTIC TRUST MORTGAGE          Job 54604
DECIANTIS, SARAH 05/21/2026                                                      83

single tool.  We know if they're logged in, but not necessarily that a particular broker took this action A, B, C, D while they were logged in.

Q.   And as to the tools that are related only to the UWM loans, the broker would have to first determine where the loan was going before it could use that particular tool; right?

A.   Several of them, yes.  There is obviously a process to withdraw a loan midstream, so they could have used some of the tools and not all of them.

Q.   And you recall that you testified in the Kevron -- your deposition in the Kevron case that UWM wouldn't provide these technological resources if it knew a broker partner would act in a way that would harm the wholesale channel.  I'm paraphrasing, by the way.

A.   That seems like a fair paraphrase.

Q.   I think you've testified before that UWM views conducting business with Rocket and Fairway as something that hurts the wholesale channel; right?

A.   Correct.

Q.   But prior to the implementation of the All-In Initiative, the broker partners could work with Rocket and Fairway as well as UWM; right?

A.   That's correct.

Q.   But even before the implementation of the

All-In Initiative, UWM still shared its technological tools with its broker partners; right?

A.   Uh-huh, yes.

Q.   So why did that change with the implementation of the All-In Initiative?

A.   Can you rephrase?

Q.   Well, why was it okay before March 4th, 2021 to share these tools with broker partners even if they were working with Rocket and then after March 4th, 2021 it was not okay?

A.   That was stipulations of the All-In agreement.

Q.   But what changed from UWM's perspective at or around that time that made it necessary to then implement that as opposed to what had been going on before that?

           MR. MURRAY:  Object to foundation.  Go ahead.

A.   Because we were deciding between what was going to be the next move as this became a practice by both of those lenders that was becoming more harmful to the channel as a whole.

BY MR. HIRSCH:

Q.   So you're suggesting that the practice had become more pervasive over time?

A.   Correct.

Q.   And is there any data to back up that it had become

more pervasive over time?

A.   There is publically available data of where loans are sent, yes.

Q.   So did UWM analyze the publicly available data to look at loans that were formerly in the wholesale channel that had moved to the retail channel by these two lenders?

A.   There are individuals within sales that do that analysis, yes.

Q.   Have you ever seen that analysis?

A.   No.

Q.   Do you know what that analysis looks like?

A.   What does the document look like?

Q.   Yeah, is there a spreadsheet, is there a presentation that lists what the data is or the conclusions that these people reached?

A.   Not that I have seen.  I have just been privy to the output of that information.

Q.   Who are the people?

A.   I don't know.

Q.   Is the information you've been privy to in writing?

A.   No, it's all been verbal.

Q.   Who has verbally communicated the information to you?

A.   Sales leadership.

Q.   Can you identify any person in sales leadership who

has communicated the information?

A.   Allen Beydoun talks about it, Danny Marogy will talk about it.  I don't know if there -- I'm sure there are others as well.

Q.   And when they talk about it, do they give you any hard numbers?

A.   Not that I recall the exact numbers, no.

Q.   I'm not asking you if you recall the numbers, I'm just asking if they have conveyed any hard numbers or have they just said generally this has become more pervasive?

A.   Generally.

Q.   So UWM can decide to work or not work with any broker partner that it wants to; right?

A.   Can you rephrase that?

Q.   Even before the All-In Initiative --

A.   Uh-huh.

Q.   -- UWM could decide whether they want to enter into -- it wants to enter into a Wholesale Broker Agreement with any particular broker partner?

A.   The process really works in the reverse.  Brokers reach out to us and fill out an online broker application and as long as they meet the -- everyone meets the same criteria that is determined through our client approval team, then they become a broker.  It

doesn't necessarily -- we don't necessarily reject clients from joining our network.

Q.   So before the All-In Initiative, a broker partner could have signed up with UWM, but they could have been sending a whole bunch of loans to Rocket or Fairway; right?

A.   Prior to, yes.

Q.   And wouldn't that have been harming the wholesale channel?

A.   That was starting to become the reason for the discussion.

Q.   But UWM would sign up with them anyway?

          MR. MURRAY:   Object to foundation.

A.   They would sign up with us.

BY MR. HIRSCH:

Q.   Well, UWM wouldn't say no?

A.   No.

Q.   Do you know when Rocket entered the wholesale mortgage business?

A.   I do not know the year.

Q.   Do you know when Fairway entered the wholesale mortgage business?

A.   Don't know the year.

Q.   I think we agree they have since exited the wholesale mortgage business; right?

A.    That's --

            MR. MURRAY:  Object to foundation.

A.    That is my understanding.

BY MR. HIRSCH:

Q.    And United Shore Financial Services actually used to
      also be in the retail mortgage business; right?

            MR. MURRAY:  Object to foundation.

A.    Shore Mortgage was.

BY MR. HIRSCH:

Q.    Which was owned by United Shore Financial Services;
      correct?

A.    Uh-huh, yes.

Q.    Okay.

            And all of the loans Shore Mortgage did
      were closed with United Wholesale Mortgage; right?

            MR. MURRAY:  Object to foundation.

A.    No.

BY MR. HIRSCH:

Q.    Who did -- what lender did United Shore Mortgage use?

            MR. MURRAY:  Object to foundation.

A.    Shore Mortgage.

BY MR. HIRSCH:

Q.    So it was its own --

A.    Correct.

Q.    -- retail lender?

A.   Yep.

Q.   Do you know what percentage of its loans it subsequently sold to United Wholesale Mortgage?

A.   They didn't sell loans to United Wholesale Mortgage.

Q.   Okay, so zero?

A.   Zero.

Q.   Okay.  When Shore Mortgage was shut down, what happened to its loans?  It just sold its portfolio of loans?

          MR. MURRAY:  Object to foundation.

A.   That I don't know.

BY MR. HIRSCH:

Q.   We were talking earlier about the liquidated damages; you recall that?

A.   Yes.

Q.   I think we had talked about who determined the $5,000 per loan number; right?

A.   Yes.

Q.   I don't think we talked about who determined the $50,000 minimum number.  Do you know who determined the $50,000 minimum number?

A.   The numbers that were going to be added to the agreement were takeaways that legal counsel had in drafting the agreement.

Q.   Did anyone discuss at the meeting that 50,000 would be

punitive for a single loan?

A.    I don't recall that.

Q.    Do you think $50,000 is punitive for a single loan?

A.    Do I personally?

Q.    Yes.

A.    I -- depends on the loan.

Q.    Depends on the loan in the sense that it depends on the amount of the loan or some other criteria of the loan?

A.    The amount of the loan.

        MR. MURRAY:  Object to form, foundation.

BY MR. HIRSCH:

Q.    Well, you previously said that liquidated damages were not a penalty; do you recall that?

A.    Correct.

Q.    If a broker did a single loan to Rocket after it entered into a Wholesale Broker Agreement with the All-In Initiative, the damages would be $50,000; right?

A.    (Nods head affirmatively).

Q.    You have to answer verbally.

A.    That is correct.

Q.    So wouldn't 45,000 of that amount to a penalty?

        MR. MURRAY:  Object to form and foundation, calls for legal conclusion.

A.   It is not.

BY MR. HIRSCH:

Q.   So you don't think that's punitive?

A.   I don't -- I'm not sure I understand your question.

Q.   Well, I asked you if 45,000 of the 50 would amount to a penalty if there was a single loan, because the minimum is 50,000?

MR. MURRAY:   Same objection.

A.   (Nods head affirmatively).

BY MR. HIRSCH:

Q.   So does that amount to a penalty?

A.   No.

Q.   And for that you didn't need to know the amount of that single loan?

A.   No.

Q.   That didn't matter in your answer?

A.   No.

Q.   Okay.   So why are loans over the ten loans just an additional $5,000 then?

MR. MURRAY:   Object to form and foundation.

A.   I'm not sure I know the ten loans.

BY MR. HIRSCH:

Q.   Well --

A.   Oh, I'm sorry, I understand the ten, the five, got it, understood.

Q.   Correct.  If we have ten loans, right, we're still at the 50,000, that's ten times 5,000?

A.   Yes.

Q.   That happens to work out to the same amount as the minimum; right?

A.   (Nods head affirmatively).

Q.   Loan number 11 would be another 5,000; am I interpreting that correctly?

A.   Correct.

Q.   So why are the loans above ten loans just $5,000?

          MR. MURRAY:  Object to foundation.

A.   That was legal counsel's determination.

BY MR. HIRSCH:

Q.   Okay.  But you would agree with me that UWM is not damaged in the amount of $50,000 for a single loan; right?

          MR. MURRAY:  Object to foundation.

A.   I -- it's hard to say.

BY MR. HIRSCH:

Q.   Well, certainly UWM is not claiming $50,000 for loan number 11; right?

A.   Correct.

Q.   Is a $50,000 penalty enough to put some broker partners out of business?

          MR. MURRAY:  Object to form and foundation.

A.    I'm not aware.

BY MR. HIRSCH:

Q.    Not aware one way or the other?

A.    No.

Q.    Was the impact the liquidated damages could have on the broker partners considered at the meeting?

A.    Can you rephrase that?

Q.    Was the financial impact of the $50,000 liquidated damages minimum considered at the meeting?  The impact it would have on the broker partners, not the UWM side for damages, but the impact it would have on someone who was subject to $50,000 in liquidated damages?

A.    I don't recall that being a specific topic.

Q.    Was there ever any discussion that it would be okay to financially harm an independent broker who works with Rocket?

A.    If they breached the contract that they signed, there were -- there was an enforcement mechanism.

Q.    And did anybody mention that that might run counter to UWM's position that it's a champion of independent brokers?

A.    No, we did not discuss that.

Q.    You agree that UWM is not damaged if a loan is sent to one of the non-excluded lenders; right?  Not UWM, but not Rocket or Fairway?

UNITED WHOLESALE MORTGAGE v ATLANTIC TRUST MORTGAGE                Job 54604
DECIANTIS, SARAH 05/21/2026                                            94

A.   Can you restate that?

Q.   Well, you said there's a whole bunch of other lenders
     that broker partners can work with and work with UWM;
     right?

A.   Correct.

Q.   Except for the two select lenders; right?

A.   Correct.

Q.   So if a broker partner sends a loan to one of these
     other lenders --

A.   Yes.

Q.   -- not one of the excluded ones, one of the other ones
     that's not UWM, though, UWM isn't damaged; is that
     correct?

A.   Not at the same scale, no.

Q.   What scale is it damaged at?  Just a loss of business?

A.   It's not --

            MR. MURRAY:  Object to form.  Go ahead.

A.   It's not just the -- that has really little to do with
     it.  It's more so about the protection of the
     wholesale channel.  There is obviously a harm to UWM
     if loans leave wholesale, because we are only
     wholesale, and so the reason for the two that were
     selected was they were the most egregious in those
     practices.

BY MR. HIRSCH:

UNITED WHOLESALE MORTGAGE v ATLANTIC TRUST MORTGAGE          Job 54604
DECIANTIS, SARAH 05/21/2026                                             95

Q.  But they were egregious in the loan later being transferred to the retail channel, not in the origination of the loan; right?

A.  Correct.

Q.  Because the origination of the loan would necessarily be in the wholesale channel because it was coming through an independent broker; right?

A.  Exactly.

Q.  Okay, so if the independent broker sends a loan to someone else --

A.  Uh-huh.

Q.  -- who it's permitted to send a loan to --

A.  (Nods head affirmatively).

Q.  -- you said UWM is damaged but not to the same degree?

A.  Sure.

Q.  Okay, so what degree is UWM damaged in that circumstance?

A.  If the loan is sent where?

Q.  To any other lender that is not prohibited for an independent broker to send to.

A.  Most of the other lenders that are on that list of 65 or 70 do not have a strong retail arm or have policies in place that wholesale and retail are kind of church and state, so loans that may not come to UWM that go to another wholesale lender, a refinance, an

investment property, you know, any other future business, because it's -- they're remaining in the wholesale channel, we have a shot, UWM has a shot. When loans leave wholesale after the original origination, then they move to retail, there is a far less likelihood that that broker can win that business back.  They are not call centers, they do not have massive marketing budgets, the retail side does, and so the ability for a retail side of let's just say Rocket or Fairway's business to get that broker in there on their retail side where they make a lot more money is much more prevalent than a lender -- a wholesale lender who either doesn't have retail at all or they have different policies in place.

Q.   Ultimately it's the borrower who decides whether it's going to work with a retail lender or an independent broker; correct?

A.   Yep.

Q.   Exhibit 6 I think you have in front of you, which is the Wholesale Broker Agreement.

A.   Yes.

Q.   If you could turn to section 7.30 liquidated damages, I think it's -- it's actually the very last page. Okay, you're there.

A.   Uh-huh.

Q.   That is the liquidated damages provision; correct?

A.   Yes.

Q.   Have you seen it before?  In other words, the actual provision as memorialized in the Wholesale Broker Agreement?

A.   Yes.

Q.   Okay.  And this agreement, I think we talked about before, at the bottom left of each page says Revision 3-4-2021; you see that?

A.   I do.

Q.   So that would be the same date as the All-In Initiative was announced on Facebook Live; right?

A.   That's correct.

Q.   And this particular provision, if you look at section 7.30, little Roman numeral 1 -- although, again, you can certainly take your time to read the whole thing -- it says, liquidated damages are "$5,000 per loan closed with UWM."

         Do you see that?

A.   I do.

Q.   So first of all, if no loans are sent to UWM after a loan is sent to one of the Select Retail Lenders by a broker partner, then there are no liquidated damages; is that right?

A.   I would just like to clarify one thing.  I believe that this should say Rocket.

Q.   Okay, but it doesn't; right?

A.   You are correct.

Q.   Okay.

A.   But the intent behind that was that it was per closed loan with Rocket or Fairway.

Q.   So this is wrong?

A.   I -- that is not representative of the discussion that we had in the meeting.  If this is where legal counsel ended with the first amendment, then that is something that changed.

Q.   Well, so then you would agree with me that UWM isn't damaged by loans that get sent to it; right?

                MR. MURRAY:  Object to foundation.

A.   Correct.

BY MR. HIRSCH:

Q.   Okay.  So you never saw this particular version of the liquidated damages provision?

A.   I believe the only other time I've seen this particular section is through Kevron, the Kevron case.

Q.   And the one you believe you saw in the Kevron case said that it was $5,000 per loan closed with Rocket; correct?

A.   That is what I recall, yes.

Q.  Okay.  And you didn't have any involvement in revisions to the Wholesale Broker Agreement; correct?

A.  I did not.

Q.  So you don't know when or if this provision was revised to say per loan closed with Rocket; correct?

A.  I do not know when it was revised, no.

Q.  Do you recall anybody ever informing you that there had been an error in some of the Wholesale Broker Agreements such that the liquidated damages provision was linked to loans closed with UWM?

A.  No.

Q.  And fair to say that at the meeting prior to the Facebook Live announcement, there was no discussion of linking liquidated damages to loans closed with UWM; correct?

A.  I was not part of any of those conversations, no.

Q.  And to the best of your knowledge, UWM never sought to recover liquidated damages computed based on loans that were sent to UWM; is that correct?

A.  I'm not aware of that, no.

Q.  Do you know if any broker partner was alleged to have breached the terms of the All-In Initiative between March 4th, 2021 and September 24th, 2021?

A.  I do not.

Q.  Have any liquidated damages actually been paid to UWM?

MR. MURRAY:  Object to foundation.

A.   I do not know.

BY MR. HIRSCH:

Q.   When you talked about the damage to the wholesale channel, you said that was damage that occurs because a loan gets moved out of the wholesale channel into the retail channel by some lenders who have both wholesale and retail arms; is that right?

A.   That's right.

Q.   And that would occur when that loan is sought to be refinanced; is that right?

A.   Most likely for a refinance, yes.

Q.   But again, we agreed that it is up to the buyer how they want to go about any refinance; correct?

A.   Yes.

Q.   And so the damage is just that the retail arm begins to solicit these borrowers who started in the wholesale channel; is that right?

A.   That's right.

MR. MURRAY:  Object to form.

BY MR. HIRSCH:

Q.   But UWM, through some of its tools, solicits borrowers who started in the retail channel; right?

A.   Not knowingly, no.

Q.   So if the damage impacts the wholesale channel

generally, why is it UWM that gets to recover the liquidated damages directly to it?

> MR. MURRAY: Object to form and foundation.

A. I don't know that we've recovered any liquidated damages at this point, but I do know, I believe I would have to go back and look, that it was communicated in the Facebook Live that if there were any recovered, we would invest that back into technology, marketing, ways to help grow the broker channel, it wasn't something that UWM was adding to its bottom line.

BY MR. HIRSCH:

Q. And you think that was in the Facebook Live video?

A. I believe that it was.

Q. Okay. But as you've told me, there are lots of other wholesale lenders who operate as well; right?

A. Yes.

Q. And they would not get any of these liquidated damages from alleged damage to the wholesale channel; right?

A. Not directly, but they benefit from the opportunity to have a future loan if it stays in the wholesale channel, because brokers are partnered with more than just UWM.

Q. So they benefit because the largest wholesale mortgage broker gets some more money?

MR. MURRAY:  Object to form and foundation, argumentative.

A.   No, it's not about the money.

BY MR. HIRSCH:

Q.   Well, they're competitors; right?

A.   They are, but they have the opportunity to get another bite at the apple if that loan stays in wholesale.

Q.   Sure, well, UWM has the opportunity to get a loan that goes to retail too; right?  It just has to compete?

A.   Far less opportunity; and it's not about UWM, it's about the broker channel.

Q.   Well, if a borrower was extraordinarily happy with their independent broker and they went to refinance, they would likely come back; right?

A.   Yes.

Q.   Okay.  And if they weren't, they might seek out a retail loan; right?

MR. MURRAY:  Object to foundation.

A.   They might.

BY MR. HIRSCH:

Q.   So that's up to the borrower?

A.   That part is up to the borrower.  Oftentimes it's not the borrower seeking it out, though; it's the retail channel call centers incessantly calling.

Q.   Right, but UWM also provides information to its broker

partners when a loan might be available to be refinanced; right?

A.  Yes.

Q.  You told me that?

A.  Yes.

Q.  So the independent brokers, through the help of the very technology that we talked about in the wholesale channel, does the same thing; right?  It calls existing borrowers?

MR. MURRAY:  Object to form and foundation.

A.  It notifies the broker.  So we're not trying to bring the borrower into a retail arm, because we don't have one; we're trying to maintain that opportunity for the broker.

BY MR. HIRSCH:

Q.  You're trying to get the borrower to refinance a loan that will hopefully close with UWM; right?

A.  No.  Close with the broker.

Q.  And the broker will likely use UWM; right?

A.  That is hard to say.

Q.  You agree with me there are some independent brokers who do virtually all their closings with UWM?

A.  I'm not aware of who that would be.

Q.  Do you know what percentage of the wholesale channel -- what market percentage of the wholesale

channel is controlled by UWM?

A.    I believe the most recent numbers are around 45 percent.

Q.    So if this damage to the wholesale channel was so severe or getting so pervasive, why would any independent broker send a loan to Rocket or Fairway?

          MR. MURRAY:  Object to form and foundation.

A.    I can't speak for them.

BY MR. HIRSCH:

Q.    So we can't offer an explanation, but you heard it happens because it was becoming more pervasive?

A.    Correct.

          MR. MURRAY:  Object to form.

BY MR. HIRSCH:

Q.    Is it possible you were wrong and it wasn't becoming more pervasive?

A.    I personally don't have the data.

Q.    At the meeting when you were discussing how to stop or ameliorate this, did you discuss maybe we should just educate the independent brokers that it's not good to send loans to Rocket or Fairway because they hurt your wholesale channel?

A.    That was absolutely part of it.

Q.    And what was the decision on going possibly that route?

A.    Continue to do that, we still do that.

Q.    Did you do that before March 4th, 2021?

A.    Absolutely.

Q.    But it wasn't working well enough before March 4th, 2021?

A.    I would say that there were different tactics that we were going forward with and this was another one of those tactics.

Q.    So when the tactics of education weren't sufficient to quell brokers sending loans to Rocket or Fairway, UWM added another tactic, which was the All-In Initiative provision; right?

A.    Correct.

Q.    And the liquidated damages provision; right?

A.    All one in the same.

            MR. HIRSCH:  Okay, this might actually be a decent time for a break, if you guys are good.

            MR. MURRAY:  Okay, yeah.

            THE VIDEOGRAPHER:  Off the record at 12:51 p.m.

            (Luncheon recess between 12:51 p.m. and 1:15 p.m.)

            (Marked for identification Deposition Exhibit 9.)

            THE VIDEOGRAPHER:  Back on the record at

1:23 p.m.

BY MR. HIRSCH:

Q.   This will be number 4 -- or I'm sorry, number 9,
apologize.

Ms. DeCiantis, I've just handed you what we've marked as Exhibit 9 to your deposition.  And again, you can certainly take a moment to look at it.  The title is again Wholesale Broker Agreement.  The distinction you'll see in the lower left-hand corner of each page this one says Rev 09-6-22.

MR. MURRAY:  09-16-22.  I think you misspoke.

MR. HIRSCH:  I'm sorry, 09-16-22.  Thank you.

MR. MURRAY:  Yep.

BY MR. HIRSCH:

Q.   Okay.  Do you know if you've ever seen this one before?

A.   No, but liquidated damages look correct in this one.

Q.   Right, so that's where I wanted to go next.

If we could turn to section 7.30, which again I think is on the last page and the provision entitled liquidated damages.  You see that; right?

A.   I do.

Q.   And you recall before our break we were talking about

$5,000 per loan closed with UWM on the earlier revision we had looked at and you mentioned that the version you saw had said per loan closed with Rocket; correct?

A.   Correct.

Q.   And this one says, "Per loan closed with Rocket, Fairway Independent or subject to Section 3.03(x), an Acquired Lender."

That's sub 1; right?

A.   Yes.

Q.   Okay.  So this aligns with the provision you recall; correct?

A.   Correct.

Q.   Okay.  If you look at the first part of section 7.30, it says, "Broker and UWM agree that the measure of damages in the event of breach" and I'm going to skip a little bit here, "may be difficult, if not impossible, to ascertain."

Do you see that sort of portion of the first sentence?

A.   I do, yes.

Q.   And I think you had told me earlier that in fact in the meeting you had discussed that it would be difficult to determine the amount of damages; right?

A.   Yes.

Q.   Okay.  Now, when this says the "Broker and UWM agree," do you know in what fashion it was that broker and UWM reached that agreement?

A.   I do not.

Q.   Do you know if there was any discussion apart from the execution of the wholesale agreement that says there's been an agreement?

A.   I'm not aware of that, no.

Q.   Are you aware of that conversation happening with any broker partner?

A.   No.

Q.   And I take it you're not aware of that conversation -- any separate conversation happening with any representative of Atlantic Trust; correct?

A.   Correct.

Q.   I think we're done with that one and it may be handy for you to have Exhibit 1, which is the First Amended Complaint, again.

        And you can certainly reference that as needed, but are you aware that the First Amended Complaint alleges that Atlantic Trust was offered a 60-day trial period in December 2022 to see if, again, working with UWM would work for its business?

A.   Where is that noted?

Q.   If you could, in the amended complaint, look at

paragraph -- sort of starting at paragraph 36 on the bottom of page 8 and through paragraph 38 on page 9.

A.   I see that, yes.

Q.   Okay.  Had you ever heard of a trial period to work with UWM?

A.   No.

Q.   Had you ever heard of that offer being made to any other broker?

A.   No.

Q.   Do you know who made that offer to Atlantic Trust?

A.   I do not.

Q.   Do you know why that offer was made?

A.   No.

Q.   Do you know who would have authorized a 60-day trial period?

A.   No.

Q.   Have you ever seen any written documentation at UWM about a trial period?

A.   No.

Q.   Have you ever heard that phrase used before at UWM, in the context of a relationship with an independent mortgage broker?

          MR. MURRAY:  Object to foundation.

A.   No.

BY MR. HIRSCH:

Q.   So I take it you have no understanding of what the 60-day trial period for Atlantic Trust meant; correct?

A.   No, I mean, the reality is every day is a trial period for us because they have no obligation to send us loans tomorrow just because they send it today, so I don't know where -- what a trial period means in this context.

Q.   So it would have to mean something different than the normal agreement; correct?

MR. MURRAY:  Object to foundation and form.

A.   I don't -- I don't know where a trial period would come from.

BY MR. HIRSCH:

Q.   Were you ever made aware that Atlantic Trust had actually written to UWM that it would not sign the addendum stating it won't work with Quicken?

MR. MURRAY:  Object to foundation.

A.   Rephrase that one more time.

MR. HIRSCH:  Well, actually can you read it back?  And if you still don't understand, I'll try to rephrase it.

(Record read back as requested.)

THE WITNESS:  No.

BY MR. HIRSCH:

Q.   And when I say Quicken, do you understand that Quicken

was the predecessor to Rocket Mortgage?

A.   Yes.

Q.   Okay.  And so fair to say you had no involvement in entering into an agreement with -- strike that.

You had no involvement on behalf of UWM in connection with entering into an agreement with Atlantic Trust in or around December of 2022; correct?

A.   That is correct.

Q.   Now, you did I think testify earlier that at least after March 4th, 2021, UWM did monitor submissions by its broker partners of mortgage loans and loan applications to other lenders; is that correct?

A.   Restate that one more time.

Q.   After March 4th, 2021, the announcement of the All-In Initiative, I think you testified that UWM did monitor loans that its broker partners, the ones that had signed up with UWM, were sending to other lenders; is that right?

A.   It is not something that -- it's not a system that is in place, but where a broker closes a loan, not application, but closes a loan is publicly available information.

Q.   And would UWM look at that information for its broker partners after March 4th, 2021?

A.   Yes.

Q.   Did UWM have any tools that it would use to monitor that information?

          MR. MURRAY:  Object to foundation.

A.   To the best of my knowledge, it is a report that would have to be pulled from a public database and then analyzed.  It is not a tool that monitors realtime.

BY MR. HIRSCH:

Q.   Are you familiar with a tool called UWM vs. Everybody?

A.   Yes.

Q.   What is that?

A.   That is a tool that imports closed loan data that is populated from a publicly available database of where loans go.  So whether that loan is UWM or closed with Pennymac or Loan Store or wherever, it is that data -- we're pulling in publicly available data into a centralized place, but that again is not in realtime.

Q.   When you say it's not in realtime, it's not in realtime in the sense that the data about a closed loan may not be made publicly available until sometime after the loan has been closed?

          MR. MURRAY:  Object to form.

A.   It is always only made available after closing, but it could be months after closing.

BY MR. HIRSCH:

Q.   Who has access to that tool?

A.   Sales.

Q.   And do you know who would monitor the loans for a given independent mortgage broker whose responsibility that was for each broker partner?

A.   To the best of my knowledge, it is a team within sales and nobody was assigned to specific brokers or loan officers.  It was more pulled in aggregate with, you know, some form of regularity.  Don't know if it was pulled quarterly or a couple times a year or how often it was actually pulled, but it was pulled in aggregate and analyzed in aggregate, not on a -- it was not the responsibility of the AE or one individual per account.

Q.   Do you know what CoreLogic is?

A.   I am familiar with CoreLogic, yes.

Q.   What is CoreLogic?

A.   Also a publicly available -- or, sorry, let me rephrase that.  It is a database of publicly available information as it relates to loan data.

Q.   And how is it different than UWM vs. Everybody?

A.   I believe -- and I would need to verify this is still the case -- I believe CoreLogic was one of the tools that actually populates UWM Logic -- I'm sorry, UWM vs. Everybody.

Q.   Are you aware of any written policies that UWM has

about monitoring the loans that are made by its broker partners?

A. No.

Q. Would UWM terminate its relationship with a broker partner if it learned that the broker partner had been doing business with one of the Select Retail Lenders after March 4th, 2021?

MR. MURRAY: Object to form and foundation.

A. Yes, to the best of my knowledge.

BY MR. HIRSCH:

Q. Do you know how long it would take after UWM got the information until it would actually terminate that broker partner?

A. I do not know the timeframe.

Q. I think you testified in the Kevron case that if UWM learned that loans were being sent to Rocket or Fairway by a broker partner after March 4th, 2021, UWM would address this with the particular broker partner; is that accurate?

A. Yes.

MR. MURRAY: Just for clarification, are you paraphrasing or are you quoting?

MR. HIRSCH: I'm paraphrasing.

BY MR. HIRSCH:

Q. Is that the substance of the testimony you gave?

A.   Yes.

Q.   Do you know if UWM actually did this with any broker partners?

A.   Can you elaborate?

Q.   Could you name any broker partner that UWM actually addressed the issue of sending loans to Select Retail Lenders?

A.   The only ones I can say for sure is Kevron and Atlantic Trust.

Q.   So when you say address, were the issues ever addressed in some manner other than by a lawsuit?

A.   I don't know.

Q.   Do you know if any of the broker partners were given any other options to resolve the issue?

A.   I don't know.

Q.   And specifically do you know if UWM was tracking loans that Atlantic Trust closed with Rocket?

A.   Not specifically to them, no.

Q.   Looking at Exhibit 1 in paragraph 48, UWM alleges that "Since December 2022, Atlantic Trust has submitted at least 71 mortgage loans to at least one of the Select Retail Lenders."

     Do you see that?

A.   Yes.

Q.   Do you know how UWM came up with its number of "at

least 71 mortgage loans"?

A.   Through publicly available data.

Q.   Have you ever seen the list that supported that number?

A.   No.

Q.   Do you know why UWM didn't flag this issue before the number got to 71 loans?

          MR. MURRAY:   Object to form and foundation.

A.   As I stated earlier, this is not something that is monitored in realtime.  Again, I don't know how frequently the data is pulled, but it is something that requires manual intervention, manual -- something to pull that data, then analyze that data, and it's not a small set of data.  So I am not familiar with exactly what the cadence is for checking, but it's not daily and I'm fairly sure it's not even monthly.

BY MR. HIRSCH:

Q.   Do you know what UWM's average profit is per loan closed?

A.   I don't.

Q.   Do you know if it's more or less than $5,000?

A.   I don't know.

Q.   Do you know if it's more or less than $50,000?

A.   I don't know.

Q.   Do you know when UWM first learned that Atlantic Trust

had sent any loans to Rocket Mortgage after Atlantic Trust had executed the Wholesale Broker Agreement containing the All-In provision?

        MR. MURRAY:  Object to foundation.

A.   No.

BY MR. HIRSCH:

Q.   Who is Justin Glass?

A.   I believe his current title is SVP of sales, national sales maybe.

Q.   Are you aware that Mr. Glass was negotiating with Atlantic Trust to move their correspondent business away from Rocket to UWM in February 2024?

        MR. MURRAY:  Object to foundation.

A.   No.

BY MR. HIRSCH:

Q.   Would working with Rocket preclude a future relationship with UWM?

        MR. MURRAY:  Object to foundation.

A.   No, as long as they were not working with both of us at the same time.

BY MR. HIRSCH:

Q.   Would UWM ever agree to waive a breach of the Wholesale Broker Agreement if a broker partner agreed to come back and work with UWM and not Rocket going forward?

MR. MURRAY:  Object to foundation.

A.    That would be a legal decision.

BY MR. HIRSCH:

Q.    Did you ever hear of that happening?

A.    No.

Q.    Are you familiar at all with the broker portal that a broker partner uses to approve the Wholesale Broker Agreement?

A.    Are you asking -- can you rephrase?

Q.    Have you personally used -- seen or used the portal that a broker partner would go through to renew or initiate a Wholesale Broker Agreement with UWM?

MR. MURRAY:  Object to form.

A.    No.

BY MR. HIRSCH:

Q.    Are you familiar with a company called E Mortgage Capital?

A.    Yes.

Q.    What is it?

A.    One of our broker clients.

Q.    Have you ever heard that E Mortgage Capital also sends loans to Rocket?

A.    Never.

Q.    So E Mortgage Capital does have a Wholesale Broker Agreement with UWM; correct?

UNITED WHOLESALE MORTGAGE v ATLANTIC TRUST MORTGAGE     Job 54604
DECIANTIS, SARAH 05/21/2026     119

MR. MURRAY:  Object to foundation.

A.    As far as I'm aware.

BY MR. HIRSCH:

Q.    Are you familiar with a company called UMortgage?

A.    Yes.

Q.    What is it?

A.    Broker client of ours.

Q.    Have you ever heard that UMortgage sends basically all of its loans to UWM?

A.    No.

Q.    You don't know what percentage of loans UMortgage sends to UWM; correct?

A.    The last numbers that I saw were south of 50 percent.

Q.    Do you remember what year those numbers were?

A.    Last year.

Q.    Do you know if that was an increase or a decrease from prior years?

A.    Don't know.

Q.    Are you familiar with LoanUnited Wholesale?

A.    No.

Q.    Do you know who someone named Sy Gulati is?

A.    No.

Q.    Do you know Jessie Drury?

A.    No.

Q.    Do you know Heather Demy?

A.   Yes.

Q.   Who is she?

A.   She works at UWM.  I'm not exactly sure of her title, she is in sales.

Q.   Do you know what role she had with respect to Atlantic Trust?

A.   I'm not aware of any role.

Q.   I think you mentioned before that you know Allen Beydoun; correct?

A.   Yes.

Q.   And what is his current role at UWM?

A.   He is EVP chief client officer.

Q.   Do you know what that role entails?

A.   He does mainly the on-the-road interaction with our clients since the rest of our sales force is in-house.

Q.   Do you know if he had any role with respect to Atlantic Trust?

A.   Not specifically, no.

Q.   Do you know generally if he had any role?

A.   I mean, he's our chief client officer, so I would imagine he had interactions, but I'm not aware of specifics.

Q.   Who is Desmond Smith?

A.   He is our chief growth officer.

Q.   And what is his role involved at UWM, if you know?

A.    He oversees sales.

Q.    And do you know if Mr. Smith had any role in
      connection with Atlantic Trust?

            MR. MURRAY:  Object to foundation.

A.    Not that I'm aware of.

BY MR. HIRSCH:

Q.    Who is Anthony Frederick?

A.    He is SVP of sales.

Q.    And what does that role involve?

A.    Oversight of the sales floor, mainly our account
      executives.

Q.    And do you know if Mr. Frederick had any role with
      respect to Atlantic Trust?

A.    No.

Q.    What did you do to prepare for this deposition today?

A.    Spoke to counsel.

Q.    I don't want to know what you said, but who did you
      speak to?

A.    Which individuals?

Q.    The human beings, yes.

A.    Mahde, Bill, Moheeb and Ryan.

            THE COURT REPORTER:  Who was the third one?

            THE WITNESS:  Mahde, Bill, Moheeb and Ryan.

            THE COURT REPORTER:  Thank you.

BY MR. HIRSCH:

Q.   And did you speak to everybody in one setting or
     multiple settings?

A.   A couple different settings.

Q.   How many?

A.   Two.

Q.   In the first setting, who was there?  Everybody?

A.   No, Bill was not there.

Q.   Okay, so in the first setting it was -- it was Mahde,
     Moheeb and Ryan; correct?

A.   Correct.

Q.   And when did that meeting take place?

A.   Couple months ago.

Q.   And about how long was that meeting?

A.   An hour.

Q.   And where did the meeting take place?

A.   Via Zoom.

Q.   The second meeting, who was present?

A.   Mahde, Bill, and Ryan.

Q.   And when did that meeting take place?

A.   Yesterday.

Q.   And how long was that meeting?

A.   About an hour-and-a-half.

Q.   And where did that meeting take place?

A.   Zoom.

Q.   Did you review any documents to prepare for the

deposition today?

A.   Interrogatories.

Q.   And when you say interrogatories, would those be the ones I showed you --

A.   Yes.

Q.   -- as Exhibit 4?

A.   Correct.

Q.   Okay.  Did you reviewer your deposition testimony from the Kevron case?

A.   Yes.

Q.   Anything else you reviewed?

A.   No.

         MR. HIRSCH:  Okay, if we'll take a moment, I'll just look through my notes, but we may be done or very nearly.

         MR. MURRAY:  Okay.

         THE VIDEOGRAPHER:  Off the record at 1:49 p.m.

         (A brief recess was taken.)

         THE VIDEOGRAPHER:  Back on the record at 1:53 p.m.

BY MR. HIRSCH:

Q.   Ms. DeCiantis, I think we were talking a few minutes ago about monitoring loan information from public databases; do you recall that?

A.  Yes.

Q.  And you said that sometimes there can be a lag between when the loan actually closes and when that information shows up in a public database; right?

A.  Correct.

Q.  Do you have any idea how long that lag time could be?

A.  It could be several months.  It depends on how the counties operate and how quick or slow they are.

Q.  So if some independent broker partner didn't understand that there had been this change in UWM's terms and it had sent a bunch of loans to Rocket, it might be a long time before UWM would know this; is that correct?

        MR. MURRAY:  Object to foundation.

A.  Correct.

BY MR. HIRSCH:

Q.  So some independent broker partner could rack up a very large amount of liquidated damages; correct?

A.  Yes.

Q.  Okay.  Was that possibility discussed at all during the meeting before the Facebook Live announcements?

A.  Not specifically, no.

        MR. HIRSCH:  Okay, I have nothing further. Thank you.

        MR. MURRAY:  I have one just clarification

question.

                    EXAMINATION

BY MR. MURRAY:

Q.   Ms. DeCiantis, earlier Mr. Hirsch asked you a question about an email that was sent to the broker partners ahead of the Facebook Live announcement; do you recall that?

A.   Yes.

Q.   And I'm paraphrasing, but I think generally your testimony was that that email might still be available; correct?

A.   Uh-huh.

Q.   Okay, is that a yes?

A.   Yes.

Q.   Okay, and did you mean by that that you personally have a copy of that email somewhere?

A.   No.

Q.   What did you mean?

A.   The database -- or I shouldn't say the database, the system that we use to send emails as an organization could still have it in there.

Q.   Okay, but as you sit here today, you don't know whether it does or does not have that?

A.   Correct.

                    MR. MURRAY:  Okay, I don't have any other

questions.

MR. HIRSCH: I just have one follow-up based on that and maybe I misunderstood.

REEXAMINATION

BY MR. HIRSCH:

Q. I thought you had said that the email was sent to the broker partners after the Facebook Live announcement describing the sum and substance of the Facebook Live announcement; is that right?

A. Correct.

MR. HIRSCH: Okay, I thought you had said before?

MR. MURRAY: I'm sorry, I might have misspoken. I apologize.

MR. HIRSCH: Okay, I just want to make sure.

BY MR. HIRSCH:

Q. Okay, and then I guess that may or may not have been preserved in a company type database that would keep it?

A. Correct.

Q. It's like a mass email --

A. Correct, exactly.

Q. -- that would go out? Not from some individual sender, right, some automated system?

A.    Correct.

Q.    That would go to the list of all the current broker partners?

A.    Yes.

MR. HIRSCH:  Okay.  Okay nothing further, thank you.

MR. MURRAY:  I have nothing else.

THE VIDEOGRAPHER:  This concludes today's deposition.  The time is 1:56 p.m.  We are off the record.

THE COURT REPORTER:  Are counsel ordering this?

MR. HIRSCH:  Yes.

MR. MURRAY:  Yeah.

THE COURT REPORTER:  Okay, thank you.

(Deposition concluded at 1:56 p.m.)

*    *    *

State of Michigan)

County of Oakland)

Certificate of Notary Public

I do hereby certify that the witness, whose testimony was taken in the above-entitled matter, was first duly sworn to tell the truth; the testimony contained herein was reduced to writing in the presence of the witness by means of stenography; afterwards transcribed; and is a true and complete transcript of the testimony given by the witness.

I further certify that I am not connected by blood or marriage with any of the parties; their attorneys or agents; and that I am not interested, directly, indirectly or financially, in the matter of controversy.

In witness whereof, I have hereunto set my hand this 4th day of June, 2026.

*Jeanette M. Fallon*

Jeanette M. Fallon, CRR/RMR/CLR/CSR-3267

Certified Realtime Reporter

Registered Merit Reporter

Certified Shorthand Reporter

Notary Public, Oakland, Michigan

My Commission Expires: 9-19-30